## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF NEW YORK

KERRY WACHTER;

DANIELLE CIAMPINO;

SARAH ROUSE;

ISSAC KUO,

     *Plaintiffs*,

v.

LETITIA JAMES, in her official capacity as
Attorney General for the State of New York;

BETTY ROSA, in her official capacity as
Commissioner of Education for the State of New
York;

LESTER W. YOUNG, JR., in his official capacity
as Chancellor of the New York State Board of
Regents; JUDITH CHIN, in her official capacity as
Vice Chancellor of the New York State Board of
Regents; ROGER TILLES; CHRISTINE CEA;
WADE NORWOOD; SUSAN MITTLER;
FRANCES WILLS; ARAMINA VEGA FERRER;
SHINO TANIKAWA; ROGER CATANIA;
ADRIAN HALE; HASONI PRATTS; PATRICK
MANNION; SEEMA RIVERA; BRIAN KRIST;
KEITH WILEY; and FELICIA THOMAS-
WILLIAMS, in their official capacities as members
of the New York State Board of Regents,

     *Defendants*.

Case No.  1:25-cv-1718 (GTS/TWD)

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

---

**INTRODUCTION**

1. New York Attorney General Letitia James and Commissioner of Education Betty Rosa have threatened to remove from office school board members from any district across New York for publicly supporting sex-separated interscholastic sports and school facilities, or for using pronouns that correspond to biological sex at public school board meetings. Letter from Letitia James and Betty Rosa to Boards of Education (May 8, 2025) (Guidance Letter) (Exhibit A).

2. Even if these board members say nothing, Attorney General James and Commissioner Rosa still threaten them with removal for merely allowing parents or other community members to speak the same viewpoints, purportedly "misgender" students, or question the "legitimacy of students' gender identity." Guidance Letter at 2, 4; *see id.* at 6–7.

3. In other words, the Attorney General and Commissioner of Education, through the Guidance Letter, require school board members across New York to self-censor and shut down parent speech that advocates for their core values and for children's privacy, safety, and opportunity. If school board members and parents disagree with Defendants' viewpoint, they cannot speak. If they do speak, school board members risk being removed from their elected offices, and school board members and parents alike risk being publicly and falsely branded a bully and harasser of children.

4. But "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Indeed, "[t]o permit one side of a debatable public question to have a monopoly in expressing its views to the government is the antithesis of constitutional guarantees." *Madison Joint Sch. Dist. v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 175–76 (1976). That is what is happening here.

5. Through the Guidance Letter, Defendants label mainstream speech supportive of sex-separated facilities and sex-separated sports as "attacks." Guidance Letter at 1.

6.    Defendants also repeatedly categorize such speech as "bullying" and "harassment." Guidance Letter at 1, 2, 4 n.12, 6, 8. But "[a]nti-harassment measures cannot target 'pure speech.'" *Perlot v. Green*, 609 F. Supp. 3d 1106, 1120 (D. Idaho 2022) (quoting *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2010)). By labeling Plaintiffs' pure speech as harassment, Defendants "necessarily discriminate[] between two opposed sets of ideas." *Moms for Liberty – Wilson Cnty. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 517 (6th Cir. 2025) (Thapar, J., concurring) (internal quotation marks omitted).

7.    The Guidance Letter's prohibition on so-called "misgendering" at school board meetings likewise forbids Plaintiffs from using biological pronouns. Guidance Letter at 4. But whether to use biological pronouns or those which correspond to a person's subjective gender identity are two "different sides of this debate." *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, No. 23-3630, 2025 U.S. App. LEXIS 29181, at *41 (6th Cir. Nov. 6, 2025) (en banc). By silencing one, "the [government] has not just entered this policy debate. It has taken a side." *Id.* at *44.

8.    In addition, by mischaracterizing Plaintiffs' speech as "harassment" and "bullying," Guidance Letter at 2, 4, 6, Attorney General James and Commissioner Rosa sweep in a broad swath of protected speech and expression. This, too, is impermissible. *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). And the Guidance Letter's overbreadth is made worse by its vagueness. *Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489, 494 n.6 (1982).

9.    Plaintiffs here, school board members Kerry Wachter and Danielle Ciampino (School Board Plaintiffs), and parents Sarah Rouse and Issac Kuo (Parent Plaintiffs), seek to end this speech code. They ask the Court to declare that Attorney General James, Commissioner Rosa, and the members of the New York State Board of Regents (collectively "Regents" or "Regents

Defendants") cannot outlaw or threaten their viewpoints at school board meetings on important issues related to student safety and opportunity. Plaintiffs ask this Court for an injunction against Defendants' censorship.

## JURISDICTION AND VENUE

10.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought under 42 U.S.C. §§ 1983 and 1988.

11.     This Court has federal question jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343 because this case concerns whether Defendants' Guidance Letter and its enforcement violate the First Amendment to the United States Constitution.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1)–(2). Defendants are state actors sued in their official capacities and thus reside in Albany County, within this judicial district. *See Bazelais v. New York State Dep't of Corr. Cmty. Supervision*, No. 22-CV-2773 (LTS), 2022 U.S. Dist. LEXIS 72197, at *2–3 (S.D.N.Y. Apr. 19, 2022). In addition, a substantial part of the events giving rise to the claims occurred in this district because Defendants published and sent the Guidance Letter to Plaintiff Ciampino, who resides in this district, and the Guidance Letter applies to every public school district within this judicial district.

13.     This Court has personal jurisdiction over all defendants. Upon information and belief, the Attorney General and Commissioner maintain a continuous and systematic presence in this district because James is the chief law enforcement officer for the State of New York and Rosa is the Commissioner of Education and thus takes action and passes policies that directly affect the Plaintiffs. The Regents Defendants are the head of the New York State Education Department and likewise have a continuous and systematic presence in this district. Further, Defendants have substantial contacts with this district because the Guidance Letter, jointly written by the Attorney

4

General and Commissioner, injures all Plaintiffs, including Plaintiff Ciampino, who resides in this district.

## THE PARTIES

**A. Plaintiffs**

14. Kerry Wachter is an individual who resides in Nassau County, New York, within the Massapequa Union Free School District. She is an elected member of its Board of Education. Ms. Wachter has served as a member of the Massapequa Board for seven years and is currently the Massapequa Board President. She is also a parent of a student in the 11th grade in her school district. Ms. Wachter sues in her individual capacity.

15. Danielle Ciampino is an individual who resides in Schenectady County, New York, within this judicial district. She serves as an elected member of the Rotterdam-Mohonasen Central School District Board of Education. She is also a parent of two students in her school district, in the 8th and 5th grades. Ms. Ciampino sues in her individual capacity.

16. Sarah Rouse is a resident of Nassau County, New York, within the Rockville Centre Union Free School District. She is a mother of two school-age children. One of her children, in the 11th grade, attends school in the Rockville Centre Union Free School District. Ms. Rouse sues in her individual capacity.

17. Issac Kuo is a resident of Nassau County, New York, within the Rockville Centre Union Free School District. He is a father of five children, including four daughters who attend Rockville Centre schools. His daughters are in the 9th, 6th, 3rd, and Kindergarten grades. Mr. Kuo sues in his individual capacity.

**B. Defendants**

18.    Letitia James is the Attorney General for the State of New York. She is sued in her official capacity. As such, she is a resident of Albany County within the State of New York. She is a co-author of the Guidance Letter.

19.    Betty Rosa is the Commissioner of Education for the New York State Education Department. She is sued in her official capacity. As such, she is a resident of Albany County within the State of New York. She is a co-author of the Guidance Letter.

20.    Lester W. Young, Jr., is the Chancellor of the New York State Board of Regents. As Chancellor, Young presides over the Regents' meetings. Judith Chin is the Vice Chancellor of the Regents. Roger Tilles, Christine Cea, Wade Norwood, Susan Mittler, Frances Wills, Aramina Vega Ferrer, Shino Tanikawa, Roger Catania, Adrian Hale, Hasoni Pratts, Patrick Mannion, Seema Rivera, Brian Krist, Keith Wiley, and Felicia Thomas-Williams are each members of the Board of Regents. Each member of the New York State Board of Regents is sued in his or her official capacity as such. Thus, each resides in Albany County within the State of New York.

**FACTUAL ALLEGATIONS**

**A. New York exemplifies the trend of state and local governments across the country stifling expression through the use of speech codes applied to school board meetings and board members.**

21.    Under the First Amendment to the United States Constitution, the government may not discriminate against parent and community-member viewpoints on important school-related issues expressed at public comment portions of local school board meetings. *E.g.*, *Moms for Liberty v. Brevard Pub. Sch.*, 118 F.4th 1324 (11th Cir. 2024) ("*Moms for Liberty Brevard*"); *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887 (6th Cir. 2021); *Alexander v. Sutton*, 747 F. Supp. 3d 520 (E.D.N.Y. 2024); *McBreairty v. Sch. Bd. of RSU22*, 616 F. Supp. 3d 79 (D. Me.

6

2022); *Marshall v. Amuso*, 571 F. Supp. 3d 412 (E.D. Pa. 2021); *Anderson v. Hansen*, 489 F. Supp. 3d 836 (E.D. Wis. 2020).

22.    Likewise, state officials may not "oust an elected representative of the people on the bald ground that she voices unsympathetic political views." *Velez v. Levy*, 401 F.3d 75, 97 (2d Cir. 2005); *see also Alexander*, 747 F. Supp. 3d at 549–53 (ruling for New York City community education council members' First Amendment claims against viewpoint-discriminatory and vague speech restrictions).

23.    School board meetings are an important venue for the exercise of a fundamental constitutional right. Indeed, "[f]or many parents, school board meetings are the front lines of the most meaningful part of local government—the education of their children. And sometimes speaking at these meetings is the primary way parents interact with their local leaders or communicate with other community members." *Moms for Liberty Brevard*, 118 F.4th at 1328.

24.    But education officials across the country, including in New York, are restricting speech at school board meetings based on viewpoint and compulsion. One form of this censorship labels non-threatening and non-obscene speech on transgender-related issues "harassing," "bullying," "discriminatory," and "offensive." Another form is pronoun policies that require students, teachers, parents, and school board members to use pronouns inconsistent with another person's biological sex but that accord with that individual's belief in his or her gender identity.

25.    In one such example, New York City Public Schools restricted speech through its Regulation D-210, which prohibited, *inter alia*, "derogatory or offensive comments about any [New York City Department of Education] student." *Alexander*, 747 F. Supp. 3d at 534 (quoting policy). The regulation applied to school board members at public meetings and even beyond. *Id.* at 549. Maud Maron, a former elected member of a New York City Community Education Council,

7

was removed from office under these provisions for statements to the New York Post criticizing a school newspaper article which she called "revolting Hamas propaganda" and "Jew hatred." *Id.* at 539. But it was "Plaintiff Maron's statements describing the 'rapid rise in trans-identifying children as a "social contagion,"' decrying the 'use of drugs and medical procedures to change children's sex,' and criticizing 'anti-racism'" that originally drew NYCPS's ire. *Id.* The court preliminarily enjoined Regulation D-210 and ordered Maron's reinstatement. *Id.* at 556. The court held, *inter alia*, that prohibiting "derogatory" and "offensive" comments, even at board meetings and about students, "disfavors ideas that offend and therefore discriminates based on viewpoint, in violation of the First Amendment." *Id.* at 550.

26.    The Linn Mar Community School District in Iowa adopted a similar policy, "Administrative Regulations Regarding Transgender and Students Nonconforming to Gender Role Stereotypes." *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 663 (8th Cir. 2023). Linn Mar made an "'intentional and/or persistent refusal by staff or students to respect a student's gender identity . . . a violation of school board policies,' including 'anti-bullying' and 'anti-harassment' policies." *Id.* at 664 (quoting school district policy). The Eighth Circuit enjoined the policy because it "broadly prohibits a refusal to 'respect a student's gender identity,'" restricting those who wish to "state [the] belief that biological sex is immutable." *Id.* at 667 (quoting school district policy); *see also id.* at 669.

27.    The Olentangy Local School District in Ohio likewise "bar[red] students from referring to transgender and nonbinary classmates using the pronouns that match their biological sex if the classmates prefer to go by different pronouns." *Defending Educ.*, 2025 U.S. App. LEXIS at *3. The Sixth Circuit, sitting en banc, held such a policy "raises the most serious red flags under the First Amendment." *Id.* at *45.

28.    New York has followed this censorship trend at the state level. *See generally* Guidance Letter; N.Y. Educ. Law § 10, *et seq.* (Dignity for All Students Act or DASA).

**B.  Before the Guidance Letter, the Plaintiffs' districts allowed speech at board meetings from all viewpoints on gender identity issues.**

29.    School boards in New York are responsible for adopting and overseeing the enforcement of policies on issues such as bathroom and locker-room usage, pronoun usage, and athletics. *See, e.g.*, N.Y. Educ. Law. §§ 1709(1), (2), 2503(2).

30.    Regular school board meetings are, by definition, public, and must occur at least once per quarter. N.Y. Educ. Law § 1708. New York's Open Meetings Law does not allow school boards to meet privately with citizens about school-related issues. *See Orange Cnty. Publ'ns, Div. of Ottaway Newspapers, Inc. v. Council of Newburgh*, 60 A.D.2d 409, 418, 401 N.Y.S.2d 84, 91 (N.Y. App. Div. 1978) (private meetings with a quorum of city councilors forbidden by Open Meetings Law).

31.    School board meetings with public comment are thus designed to allow parents and community members to approach board members about how the board is managing such issues in that district. *See, e.g.*, *Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536, 548 (D. Vt. 2014) ("speech related to school governance [is] the very type of speech for which school board meetings are opened to the public").

32.    Before Attorney General James and Commissioner Rosa published the Guidance Letter, the School Board Plaintiffs and Parent Plaintiffs did not face explicit threats from the State of removal or censorship for speaking about gender identity and transgender issues at public school board meetings.

33.     Before the Guidance Letter, the School Board Plaintiffs never observed a person being shut down during the public comment portion of their respective board meetings for speaking about gender identity and transgender issues.

34.     Before the Guidance Letter, neither of the Parent Plaintiffs was refused an opportunity to speak about gender identity issues at public comment portions of public school board meetings.

35.     All Plaintiffs' school districts allow public comment at board meetings, which they had done before the Guidance Letter as well.

**C.  The Guidance Letter prohibits speech about gender identity and transgender issues with which the State disagrees.**

36.     Despite the Supreme Court's recent admonishment of the State of New York for using "guidance letters" to suppress speech, *NRA of Am. v. Vullo*, 602 U.S. 175, 183 (2024); *see also id.* at 180 ("Six decades ago, this Court held that a government entity's 'threat of invoking legal sanctions and other means of coercions' against a third part 'to achieve the suppression' of disfavored speech violates the First Amendment." (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963))), Attorney General James and Commissioner Rosa have issued a Guidance Letter that threatens legal sanctions against school board members and parents, like the Plaintiffs here, for their speech and advocacy at public school board meetings.

37.     On May 8, 2025, Attorney General James and Commissioner Rosa published the Guidance Letter. It is addressed as a "Dear Colleagues" letter and provides "guidance" to members of local boards of education, including the School Board Plaintiffs here. Guidance Letter at 1.

38.     On May 15, 2025, the New York Board of Education Presidents sent out an email with the Guidance Letter attached. The email advised local boards of education that "[t]he [Letter] provides information around obligations to adhere to state laws and regulations that safeguard

students from harassment, bullying, and the disclosure of protected student information, *and the consequences for not meeting those obligations*. Board members *must* conduct meetings in a manner that respects the dignity of all students." E-mail from Bd. of Educ. Presidents BOE-PRES@LISTSERV.NYSED.GOV on behalf of NYSEDP20 NYSEDP20@NYSED.GOV, to BOE-Pres@LISTSERV.NYSED.GOV (May 15, 2025 14:45:35 ET) (email entitled "NYSED Weekly for 5/15/2025") (emphasis added) (Exhibit B).

39.    The Guidance Letter applies to public school board meetings and public comment portions during those meetings.

40.    The Guidance Letter states:

some board members have made, and encouraged, comments during board meetings that demean and stigmatize LGBTQ+ students. These comments have included attacks on school support for LGBTQ+ student groups and on transgender and gender-expansive students' rights to use facilities, including restrooms and locker rooms, or participate on school athletic teams consistent with their gender identity—rights that remain firmly embedded in state law.

Guidance Letter at 1.

41.    The Guidance Letter restricts what it terms "inflammatory remarks about the legitimacy of students' gender identity and students' equal access to educational facilities and opportunities." *Id.* at 2.

42.    The Guidance Letter does not define "inflammatory."

43.    The Guidance Letter states that "school board meetings are considered limited public fora." It then asserts that in such fora, school boards can limit public comment by "prohibiting all comments on a particular topic that would have discriminatory, harassing, or bullying effects." *Id.* at 3; *see also id.* at 4 n.12.

11

44. The Guidance Letter states that "purely ideological statements opposing students' rights under New York law are an unproductive diversion from boards' important work." *Id.* at 3–4.

45. The Guidance Letter does not define what makes a statement "purely ideological."

46. The Guidance Letter fails to state how a parent or community member can raise to a local school board their responsibilities to ensure the safety of district children related to sex-separated bathroom or locker room usage, opportunities for their children in sex-separated sports, or pronoun usage requirements without being labeled as "purely ideological."

47. The Guidance Letter does not state that statements *supporting* LGBTQ+ "students' rights under New York law" are an unproductive diversion from boards' important work.

48. The Guidance Letter states that school boards "should not entertain baseless allegations that transgender students' identities and experiences are illegitimate, or that their mere presence in school spaces and participation in school activities is harmful to other students." *Id.* at 4.

49. The Guidance Letter does not define what makes an allegation "baseless."

50. The Guidance Letter fails to instruct school boards to restrict speech that "transgender students' identities and experiences" are *legitimate*.

51. The Guidance Letter fails to instruct school boards to restrict speech that transgender-identifying students' "mere presence in school spaces and participation in school activities" is *harmless* to other students.

52. The Guidance Letter does not identify what a speaker would have to say for his or her statement at a board meeting to mean that "transgender students' identities and experiences are illegitimate."

53.    The Guidance Letter does not identify what a speaker would have to say for his or her statement at a board meeting to mean that transgender-identifying students' "mere presence in school spaces and participation in school activities is harmful to other students."

54.    The Guidance Letter then states that boards should not "allow individuals to intentionally misgender district students . . . ." *Id.*

55.    It defines "misgendering" as "[a]ttributing a gender to someone that is incorrect or does not align with the person's gender identity." *Id.* at 4 n.14.

56.    The Guidance Letter defines "gender identity" by reference to Section 292(35) of the New York Executive Law, which states: "The term 'gender identity or expression' means a person's actual or perceived gender-related identity, appearance, behavior, expression, or other gender-related characteristic regardless of the sex assigned to that person at birth, including, but not limited to, the status of being transgender." *See* Guidance Letter at 1 n.2.

57.    Under the Guidance Letter, therefore, the definition of "gender identity" relies on "a person's" subjective determination of their "gender identity."

58.    The Guidance Letter refers to another New York State Education Department document entitled "Creating a Safe, Supportive, and Affirming School Environment" for its definition of "misgendering." *Id.* at 4. n.14 (citing New York State Education Dep't, *Creating a Safe, Supporting, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices*, at 10, https://perma.cc/W5T3-R5SN).

59.    That document in turn cites a New York Division of Human Rights guidance document for the definition of misgendering as "when a person is not referred to with pronouns that are consistent with their gender identity. Refusing to use requested names or titles is also

13

misgendering." New York State Division of Human Rights, *Guidance on Protections from Gender Identity Discrimination* (Jan. 29, 2020), at 6 (on file with author).

60.     The Guidance Letter therefore bans the use of biological pronouns when referring to a transgender-identifying person at school board meetings.

61.     The Guidance Letter also, therefore, requires speakers at school board meetings to "use requested names or titles" when referring to a transgender-identifying person.

62.     The Guidance Letter allows the use of non-biological pronouns when referring to transgender-identifying persons, such as opposite-sex pronouns, they/them pronouns to refer to a single person, or "neopronouns,"[1] at school board meetings.

63.     The Guidance Letter references the Dignity for All Students Act (DASA) and states that in enacting DASA, "the legislature found that 'students' ability to learn and to meet high academic standards, and a school's ability to educate its students, are compromised by incidents of discrimination and harassment including bullying, taunting or intimidation.'" *Id.* at 4 (quoting N.Y. Educ. Law § 10).

64.     DASA provides as follows, in relevant part:

a.    DASA purports to shield students from "harassment or bullying by employees or students on school property or at a school function" based on the student actually or being perceived as belonging to a protected category, including sexual orientation or gender. N.Y. Educ. Law § 12(1).

b.    The definitional provision of DASA, § 11, defines harassment and bullying as:

> the creation of a hostile environment by conduct or by threats, intimidation or abuse . . . that (a) has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being; or . . . (c) reasonably causes or would reasonably be

---

[1] Neopronouns are "gender-neutral or nonbinary pronouns that are distinct from the common she, he and they." Scottie Andrew, *A guide to neopronouns, from ae to ze*, CNN (Aug. 12, 2023, 5:00 A.M. ET), https://perma.cc/8JZM-7MXG.

> expected to cause physical injury or emotional harm to a student. Acts of harassment and bullying shall include, but not be limited to, those acts based on a person's actual or perceived . . . sexual orientation, gender or sex.

> N.Y. Educ. Law § 11(7).

> c.  DASA also defines "sexual orientation" to mean "actual or perceived heterosexuality, homosexuality or bisexuality." N.Y. Educ. Law § 11(5). And it defines "gender" to mean "actual or perceived sex," including "a person's gender identity or expression." N.Y. Educ. Law § 11(6).

65.  The Guidance Letter then says that "[b]oard members who knowingly undermine the purpose of [DASA] by making or promoting discriminatory and harassing comments willfully neglect their duties to 'engage in constructive discussion' and ensure effective functioning of board operations." *Id.* at 4–5 (quoting *Appeals of Gill & Burnett*, 42 Ed. Dep't Rep. Decision No. 14,785 (Aug. 22, 2002)).

66.  The Guidance Letter does not define what it means to "promot[e]" a comment. For example, it does not explain the difference between promoting and permitting a comment. *Compare id. with id.* at 6, 6 n.24.

**D. The Guidance Letter threatens penalties for uttering or allowing speech with which Defendants disagree about gender identity and transgender issues.**

67.  The Guidance Letter states, "Boards of education that permit harassing and stigmatizing comments about LGBTQ+ students in public meetings may expose districts to liability under this law." *Id.* at 6.

68.  The Guidance Letter explains in a footnote that "merely permitting the harassment of a student on the basis of a protected characteristic, such as gender identity, may well be sufficient for liability under the state Human Rights Law, even if the harassment does not directly result in the creation of a disparately hostile environment." *Id.* at 6 n.24.

15

69.     The Guidance Letter also states that "[b]oards of education whose acts or omissions *lead to* the bullying or harassment of LGBTQ+ students may also breach their common-law duty to provide adequate supervision." *Id.* at 6 (emphasis added).

70.     The Guidance Letter does not define when an act or omission would "lead to" bullying or harassment.

71.      The Guidance Letter states that removal of a board member may occur where board members violate "the Education Law" or the "Human Rights Law"; "willfully neglect their duties as public officers"; or "willfully disobey a 'decision, order, rule or regulation' of the Regents or the Commissioner of Education." *Id.* at 6–7 (quoting N.Y. Educ. Law § 306(1)).

72.     The Guidance Letter explains that citizens can apply for removal of a board member by filing an application for removal. *Id.* at 8 (citing N.Y. Educ. Law § 310; 8 N.Y.C.R.R. § 275 (explaining how to file a Commissioner's Appeal)).

73.     The Guidance Letter also states that "[s]tudents and other community members who have experienced or witnessed harassment or discrimination on the basis of these or other protected characteristics may lodge a complaint with OAG . . . ." *Id.* at 8 (linking to the New York State Attorney General's office at https://pcf.ag.ny.gov/form/CIVIL).

74.     The Guidance Letter also says, "[b]oard members may be removed by the Commissioner of Education." *Id.* at 6.

75.     Commissioner Rosa has the authority under New York law to initiate removal proceedings herself. *E.g.*, N.Y. Educ. Law §§ 306, 308, 1706; *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 248 (2d Cir. 2006).

76.     The Guidance Letter further warns board members that making comments that approach the speech it limits or permitting parents to do the same will be detrimental to the board,

for "even an unsuccessful application for removal may pose a financial burden to schools and an unwelcome distraction from school boards' important work." Guidance Letter at 7–8.

77. The Guidance Letter claims to be upholding "rights that remain firmly embedded in state law." *Id.* at 1.

78. Attorney General James is New York's top law enforcement official and is required by statute to "[p]rosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel, in order to protect the interest of the state." N.Y. Exec. Law § 63(1).

79. Attorney General James is also empowered to enforce state antidiscrimination and human rights laws. N.Y. Exec. Law § 63(9)–(10); N.Y. Civ. Rts. Law §§ 40-c, 40-d (penalty and misdemeanor offense); *see also New York v. Feldman*, 210 F. Supp. 2d 294, 300 (S.D.N.Y. 2002) (describing the Attorney General's power under § 63(12) to take action related to discrimination (citing *People by Abrams v. Hamilton*, 125 A.D.2d 1000, 511 N.Y.S.2d 190 (N.Y. App. Div. 1986))).

80. Attorney General James used power provided by section 63 of the Executive Law and section 40-c of the Human Rights Law just last year to sue Nassau County based on purported gender-identity discrimination. Compl. ¶ 11, *People v. Cnty. of Nassau*, No. 612368/2024 (N.Y. Sup. Ct. July 15, 2024). In that suit, the Attorney General purported to enforce New York Human Rights Law section 40-c. *Id.* at ¶¶ 58–63. Simply put, Attorney General James can "exercise discretion" to bring "an enforcement action" under the New York Human Rights Law. *See Blakeman v. James*, No. 2:24-cv-1655 (NJC) (LGD), 2024 U.S. Dist. LEXIS 115441, at *18-19 (E.D.N.Y. Apr. 4, 2024) (describing the Attorney General's power to enforce New York Human

17

Rights Law against county plaintiffs under section 63(1)). Under the Human Rights Law, a plaintiff—including the Attorney General—can seek civil penalties and press a misdemeanor prosecution. N.Y. Civ. Rts. Law § 40-d. Regardless of who brings such an action, the Attorney General must be notified. *Id.*

81.    The Regents Defendants are responsible for the general supervision of all educational activities within the State. They preside over the New York State Education Department and are "[t]he head of the department." N.Y. Educ. Law § 101. The Regents Defendants appoint and may remove "at pleasure" the Commissioner of Education. *Id.* The Regents determine "all educational policies" that the Commissioner must enforce. N.Y. Educ. Law § 305(1). Further, the Regents "establish rules for carrying into effect the laws and policies of the state, relating to education, and the functions, powers, duties and trusts conferred or charged upon . . . the education department." N.Y. Educ. Law § 207. "Rules or regulations . . . adopted or prescribed by the commissioner . . . shall not be effective unless and until approved by the regents, except where authority is conferred by the regents upon the commissioner of education to adopt, prescribe, amend or repeal such rules or regulations." *Id.* The Regents are, therefore, jointly responsible with the co-drafters of the Guidance Letter for the threats to Plaintiffs.

82.    Attorney General James and Commissioner Rosa promulgated the Guidance Letter under color of state law and thereby threaten Plaintiffs' speech.

83.    The Regents have ratified Commissioner Rosa's authorship, as the Commissioner serves subject to the Regents' "direction and control." N.Y. Educ. Law § 301.

84.    In the face of Defendants' threats, the duly elected School Board Plaintiffs merely want to present their sincerely held viewpoints to the public and advance positions about a

18

"sensitive topic of public concern" consistent with their campaign platforms, and now because of Defendants' threats they fear being removed from office for doing that.

85.    In the face of Defendants' threats, the Parent Plaintiffs merely want to present their sincerely held viewpoints to the public and their elected school board officials about a "sensitive topic of public concern" without being labeled a bully and harasser of children, being deemed out-of-order, losing their speaking time, or being removed from a school board meeting.

**E. The School Board Plaintiffs want to advocate for student rights to privacy and fairness and allow parents and other community members to speak regardless of viewpoint.**

*Kerry Wachter*

86.    Kerry Wachter is an elected member of the Massapequa Union Free School District Board of Education. She has served on the Massapequa Board for seven years. She is currently the Massapequa Board President.

87.    Ms. Wachter is also the mother of one child who is enrolled in a school within the Massapequa District.

88.    Ms. Wachter disagrees with the viewpoints expressed in the Guidance Letter.

89.    Ms. Wachter believes that human beings are assigned a sex by God at birth and that a person's gender corresponds with that sex. She further believes that sex, and therefore gender, depend on whether the person has only X chromosomes (female) or has a Y chromosome (male). She believes that humans cannot change their gender, or hold multiple genders, or have no gender at all. She also believes that students should not be permitted to use sex-separated[2] restrooms and locker rooms or play sex-separated sports based on purported gender identity, as opposed to their biological sex. Further, Ms. Wachter believes the use of "preferred" pronouns that conflict with a

---

[2] "Sex-separated" refers to places, activities, or social groups reserved to only males or only females, where the opposite sex is generally not permitted to go or participate.

person's biological sex is a form of false acknowledgment that an individual can change his or her sex. Likewise, Ms. Wachter believes that "preferred" pronouns and theories that sex and gender can be changed should not be taught in schools as part of the K-12 curriculum. Finally, Ms. Wachter believes that school employees should not hide a student's purported transgender status from the student's parents.

90.    Ms. Wachter is aware of students in Massapequa who self-identify as transgender or are asking to be referred to by a different gender than their biological sex, and who wish to use school facilities reserved for the opposite biological sex.

91.    Ms. Wachter agrees with and voted for Massapequa Union Free School District Board of Education resolutions requiring students to use either facilities that correspond to their sex or single-stall facilities that both sexes can use privately.

92.    At prior Board meetings, the Massapequa Union Free School District Board of Education has permitted parents and community members to speak, from all viewpoints, on gender identity and transgender issues.

93.    Ms. Wachter is aware of parents and community members in Massapequa who would speak in the future against transgender-identifying students using sex-separated bathrooms and locker rooms that do not correspond with their biological sex. These parents and community members are likely to also use biological pronouns when discussing these issues.

94.    Ms. Wachter is also aware of LGBTQ+ individuals and individuals who have advocated at past Massapequa Board meetings against sex-separated spaces and athletics within the Massapequa Union Free School District.

95.    Ms. Wachter was accused of "misgendering" an individual speaker at a Massapequa Board meeting's public comment portion in the Fall of 2025. Ms. Wachter referred

to the person as "he." The person told Ms. Wachter that he prefers "they/them" pronouns. Ms. Wachter then referred to the person as "the speaker," because Ms. Wachter will not use "they/them" pronouns to refer to a male speaker.

96. Ms. Wachter intends to allow parents and community members to speak viewpoints the Guidance Letter prohibits at Massapequa Board meetings. Ms. Wachter also intends to allow parents and community members to speak viewpoints supported by and articulated in the Guidance Letter at those meetings.

97. Ms. Wachter also intends to continue allowing parents and community members to use pronouns that correspond to third persons' biological sex, or to use preferred pronouns, at those meetings.

98. Ms. Wachter intends to continue to express her views about gender identity and transgender issues, including about what facilities students may use and what sports teams they may compete on, at Massapequa Board meetings and in resolutions.

99. When necessary, Ms. Wachter intends to continue using pronouns that correspond to third persons' biological sex, including individuals who speak at Massapequa Board meetings.

100. The Guidance Letter threatens Ms. Wachter's intended course of action with removal from office.

101. Ms. Wachter learned of the Guidance Letter on May 15, 2025. Ms. Wachter learned about the Letter when members of the Massapequa Board received an email from the New York Board of Education Presidents. As described more fully herein, the letter threatens Ms. Wachter with legal penalties for allowing members of her community to say to the public what she believes to be true and right about sex and gender.

21

102.   The Guidance Letter's threats against Ms. Wachter are heightened because she has supported Massapequa resolutions which require students to use sex-separated school bathroom facilities which correspond to students' sex or single-person facilities that can be used privately by both sexes.

103.   Because of the Guidance Letter's threats against board members like Ms. Wachter, she fears legal action by local activists, Commissioner Rosa, or Attorney General James if she allows speech by parents and community members at Massapequa Board meetings or makes statements regarding gender identity and transgender issues consistent with her views.

104.   Because of the Guidance Letter's threats against board members like Ms. Wachter, she fears legal action by local activists, Commissioner Rosa, or Attorney General James if she permits parents and community members at Massapequa Board meetings to use biological pronouns when referencing a transgender individual or uses such pronouns herself when referencing transgender individuals.

105.   This fear is enhanced because Ms. Wachter has been accused of "misgendering" an individual at a prior Massapequa Board meeting.

### *Danielle Ciampino*

106.   Danielle Ciampino is an elected member of the Rotterdam-Mohonasen Central School District Board of Education. She has served in this capacity for two years.

107.   Ms. Ciampino is also the mother of two children who are enrolled in schools within the Rotterdam-Mohonasen District.

108.   Ms. Ciampino disagrees with the viewpoints expressed in the Guidance Letter.

109.   Ms. Ciampino believes that human beings are assigned a sex by God at birth and that a person's gender corresponds with that sex. She further believes that sex, and therefore

gender, depend on whether the person has only X chromosomes (female) or has a Y chromosome (male). She believes that humans cannot change their gender, or hold multiple genders, or have no gender at all. She also believes that students should not be permitted to use sex-separated restrooms and locker rooms or play sex-separated sports based on their purported gender identity, as opposed to their biological sex. Finally, Ms. Ciampino believes the use of "preferred" pronouns that conflict with a person's biological sex is a form of false acknowledgment that an individual can change his or her sex.

110.    Ms. Ciampino included some of these views on gender identity and transgender issues as part of her election campaign platform when running for her position on the Rotterdam-Mohonasen Board.

111.    Ms. Ciampino is aware of students in the Rotterdam-Mohonasen Central School District who self-identify as transgender. Ms. Ciampino is also aware of transgender-identifying students in the Rotterdam-Mohonasen District having used restrooms that correspond with their purported gender identity rather than their biological sex.

112.    The Rotterdam-Mohonasen Central School District Board of Education has discussed and aspires to revise its policies concerning issues surrounding gender identity and transgender-identifying students.

113.    At prior board meetings, the Rotterdam-Mohonasen Central School District has permitted parents and community members to speak, from all viewpoints, on gender identity and transgender issues.

114.    Ms. Ciampino is aware of parents and community members in the Rotterdam-Mohonasen district who would speak in the future against transgender-identifying students using sex-separated bathrooms and locker rooms that do not correspond with their biological sex. Ms.

Ciampino perceives that these parents and community members are likely to also use biological pronouns when discussing these issues.

115. Ms. Ciampino is also aware of an active LGBTQ+ activist community within the Rotterdam-Mohonasen Central School District area.

116. Ms. Ciampino intends to allow parents and community members to speak viewpoints the Guidance Letter prohibits at Rotterdam-Mohonasen Board meetings. Ms. Ciampino also intends to allow parents and community members to speak viewpoints supported by and articulated in the Guidance Letter at those meetings.

117. Ms. Ciampino intends to continue allowing parents and community members to use pronouns that correspond to third persons' biological sex, or to use preferred pronouns, at those meetings.

118. Ms. Ciampino intends to continue to express her views about gender identity and transgender issues during Rotterdam-Mohonasen Board meetings. Ms. Ciampino intends to advance positions consistent with the campaign platform she presented to her constituents. When necessary, Ms. Ciampino also intends to use pronouns that correspond to third persons' biological sex at those meetings.

119. The Guidance Letter threatens Ms. Ciampino's intended course of action with removal from office.

120. Ms. Ciampino learned of the Guidance Letter in May 2025. As described more fully herein, the Guidance Letter threatens Ms. Ciampino with legal penalties for allowing members of her community to say to the public what she believes to be true about sex and gender.

121. The Guidance Letter's threats against Ms. Ciampino are heightened because, before issuance of the Letter, a local activist attempted to remove her colleague based on an alleged

statement related to LGBTQ+ student organizations. The person who attempted removal incorrectly believed Ms. Ciampino's colleague's statement labeled students who identify as transgender in a derogatory fashion. A complaint was filed with the State Education Department, and Commissioner Rosa issued a decision that admonished Ms. Ciampino's fellow board member. *See Application of T.L. for the removal of Chad McFarland as member of the Board of Education of the Rotterdam-Mohonasen Central School District*, 2024 N.Y. Educ. Dept. LEXIS 103, at \*5, Decision No. 18,474 (Aug. 19, 2024).

122. Because of the Guidance Letter's threats against board members like Ms. Ciampino, she fears legal action by local activists, Commissioner Rosa, or Attorney General James if she allows speech by parents and community members at Rotterdam-Mohonasen Board meetings or makes statements regarding gender identity and transgender issues consistent with her views and the campaign platform she advanced when running for her elected board position.

123. Because of the Guidance Letter's threats against board members like Ms. Ciampino, she fears legal action by local activists, Commissioner Rosa, or Attorney General James if she permits parents and community members at Rotterdam-Mohonasen Board meetings to use biological pronouns when referencing a transgender individual or uses such pronouns herself when referencing a transgender individual.

124. These fears, and their impact on Ms. Ciampino's future actions during Rotterdam-Mohonasen Board meetings, are enhanced by the prior complaint against and Commissioner decision regarding her fellow board member.

**F.  The Parent Plaintiffs want to advocate for their children's privacy, safety, opportunities, and core values.**

### *Sarah Rouse*

125.    Sarah Rouse is the mother of children who attend or have attended school in the Rockville Centre Union Free School District.

126.    Ms. Rouse believes that human beings are assigned a sex by God at conception and that a person's gender corresponds with that sex. She further believes that sex, and therefore gender, depend on whether the person has only X chromosomes (female) or has a Y chromosome (male). She believes that humans cannot change their gender, or hold multiple genders, or have no gender at all. Ms. Rouse further believes that an individual should be required to use sex-separated restrooms that corresponds with an individual's biological sex and to play in school-sponsored, sex-separated sports in accord with an individual's biological sex. Ms. Rouse also believes the use of "preferred" pronouns that conflict with a person's biological sex is a form of false acknowledgment that an individual can change his or her sex. Finally, Ms. Rouse believes that class curriculum should not include lessons discussing, referencing, or promoting gender identity or transgenderism.

127.    Ms. Rouse is aware of students in Rockville Centre schools who self-identify as transgender and who have used or are using bathrooms meant for students of the opposite sex.

128.    Ms. Rouse has spoken at the public comment portion of Rockville Centre Board meetings about sex-and-gender-related policies, actions, and occurrences within the Rockville Centre District. Her comments have focused on how those policies, actions, and occurrences have affected her children. In her comments, she has maintained her view that students must have sex-separated facilities, regardless of their claimed gender.

129.    Ms. Rouse has observed that when she speaks during the public comment portion of Rockville Centre Board meetings, her statements are more widely heard and generate better public conversations than if she merely writes to district leadership.

130.    When speaking at Rockville Centre Board meetings, Ms. Rouse has always used biological pronouns and descriptors when referring to transgender individuals and talking about gender identity and transgender issues.

131.    Ms. Rouse has also spoken at Rockville Centre Board meetings in opposition to curriculum lessons focused on gender identity and transgender issues and has helped organize a petition drive urging the Rockville Centre Board and District to remove said lessons from the curriculum.

132.    When Ms. Rouse last spoke about these issues at a January 9, 2025, Rockville Centre Board meeting, that board permitted her to speak without interference or interruption.

133.    Ms. Rouse became aware of the Guidance Letter in May 2025.

134.    Ms. Rouse intends to continue to speak at Rockville Centre Board meetings in support of her viewpoints on gender identity and transgender issues. Because of the Guidance Letter, she fears the Rockville Centre Board will verbally reprimand her, deem her out-of-order, and/or stop her from speaking and, in doing so, will publicly brand her as harassing and bullying children for expressing her views.

135.    Ms. Rouse intends to continue using pronouns that correspond to third persons' biological sex at Rockville Centre board meetings. Because of the Guidance Letter, she fears the Rockville Centre Board will verbally reprimand her, deem her out-of-order, stop her from speaking, and/or publicly brand her as harassing and bullying children for using biological pronouns to reference a transgender-identifying individual.

27

136. Ms. Rouse's fears are exacerbated by the activism of others who have spoken at Rockville Centre Board meetings such as a representative of RVC Pride and community members who are parents of individuals who purportedly identify as transgender. The LGBTQ+ activist community in Rockville Centre is sizeable and active.

137. Ms. Rouse's fears are also exacerbated because the Rockville Centre Board has made clear, through both a presentation by its legal counsel and statements by its president, that it considers guidance letters from the New York State Education Department "binding" and to be enforced by the Rockville Centre Board for fear of Commissioner Rosa pursuing action against the Rockville Centre Board, including stripping funding from the Rockville Centre district.

### *Issac Kuo*

138. Issac Kuo is the father of five children who attend Rockville Centre Union Free School District schools.

139. Mr. Kuo believes that human beings are assigned a sex by God at birth, and that a person's gender corresponds with that sex. He further believes that sex, and therefore gender, depend on whether the person has only X chromosomes (female) or has a Y chromosome (male). He believes that humans cannot change their gender, or hold multiple genders, or have no gender at all. Mr. Kuo is concerned that permitting biological males who purportedly identify as transgender into a girls' locker room or bathroom presents a safety concern. He further believes that individuals should be required to play in school-sponsored, sex-separated sports in accord with the individual's biological sex. Finally, Mr. Kuo believes the use of "preferred" pronouns that conflict with a person's biological sex is a form of false acknowledgment that an individual can change his or her sex, which he believes is not true.

140. Mr. Kuo is aware of students in Rockville Centre schools who self-identify as transgender and who have used or are using bathrooms meant for students of the opposite sex.

141. Mr. Kuo has spoken at the public comment portion of Rockville Centre Board meetings about sex-and-gender-related policies, actions, and occurrences within the Rockville Centre District. His comments have focused on how those policies, actions, and occurrences have affected his children, especially his daughters' safety. In his comments, he has maintained his view that students must have sex-separated facilities, such as restrooms and locker rooms, regardless of their claimed gender.

142. Mr. Kuo has also observed that when he speaks during the public comment portions, his statements are more widely heard and generate better public conversations than if he merely meets with district leadership.

143. When Mr. Kuo last spoke about these issues at a January 9, 2025, Rockville Centre Board meeting, that board permitted Mr. Kuo to speak without interference or interruption.

144. Mr. Kuo became aware of the Guidance Letter in May 2025.

145. Mr. Kuo intends to continue to speak at Rockville Centre Board meetings in support of his viewpoints on gender identity and transgender issues. Because of the Guidance Letter, he fears the Rockville Centre Board will verbally reprimand him, deem him out-of-order, and/or stop him from speaking and, in doing so, will publicly brand him as harassing and bullying children for expressing his views.

146. Mr. Kuo intends to continue to avoid using "preferred" pronouns and wishes to use biological pronouns when discussing gender identity and transgender issues at Rockville Centre Board meetings. Because of the Guidance Letter, he fears the Rockville Centre Board will verbally reprimand him, deem him out-of-order, stop him from speaking, and/or publicly brand him as

29

harassing and bullying children if he uses biological pronouns to reference a transgender-identifying individual.

147. Mr. Kuo's fears are exacerbated by the activism of others who have spoken at Rockville Centre Board meetings such as a representative of RVC Pride and community members who are parents of individuals who purportedly identify as transgender. The LGBTQ+ activist community in Rockville Centre is sizeable and active.

148. Mr. Kuo's fears are also exacerbated because the Rockville Centre Board has made clear, through both a presentation by its legal counsel and statements by its president, that guidance letters from the New York State Education Department are "binding" and must be enforced by the Rockville Centre Board for fear of Commissioner Rosa pursuing action against the Rockville Centre Board, including stripping funding from the Rockville Centre District.

## CLAIMS FOR RELIEF

## COUNT I

### First Amendment Viewpoint Discrimination – School Board Plaintiffs
### U.S. Const. amend. I & XIV

149. All of the above paragraphs are realleged as if fully set forth herein.

150. The Guidance Letter is a viewpoint-based restriction on speech which violates the School Board Plaintiffs' First Amendment rights.

151. "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 819. This is true even in a forum of the State's own creation. *Id.* at 829.

152. And this is true even if the messages the government targets are offensive to some; government action "disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) (quoting *Matal v. Tam*, 582

U.S. 218, 223 (2017)). Indeed, "[g]iving offense is a viewpoint." *Matal*, 582 U.S. at 243. Speech cannot be restricted where "the speech is merely offensive to some listener." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J., authoring).

153.    Despite this, the Guidance Letter announces Defendants' policy of punishing Plaintiffs' pure speech based on their viewpoint on gender identity.

154.    First, the Guidance Letter expressly targets for punishment the School Board Plaintiffs' *pure speech* at school board meetings, which the School Board Plaintiffs intend to make but fear Defendants' enforcement of the Guidance Letter against them. It likewise targets the speech of community members the School Board Plaintiffs wish to allow.

155.    Second, the Guidance Letter prohibits the School Board Plaintiffs' *viewpoint*. It calls their viewpoint "attacks" on students using opposite-sex facilities or competing in opposite-sex athletics. It also prohibits their use of biological pronouns to refer to any person who identifies as transgender. It labels such speech "demeaning," "inflammatory," "bullying," and "harassment." *See supra* ¶¶ 36–66.

156.    But it does not prohibit speech at board meetings which would *encourage* or *promote* school support for the use of opposite-sex facilities by transgender-identifying persons. It does not prohibit speech *supporting* transgender-identifying students participating in sports with the opposite sex. It does not prohibit "preferred" pronouns. It does not state or infer that such speech would be discriminatory, bullying, or harassing. It does not even warn against *actually* "demeaning," "inflammatory," or even "harassing" speech by ideological opponents about the School Board Plaintiffs or their viewpoints.

157.    Third, the Guidance Letter credibly threatens to *punish* such speech. Defendants label such speech "bullying" and "harassment" and threaten it with legal penalties. *See* Guidance

31

Letter at 3, 4 n.12 (prohibiting "all comments on a particular topic that would have discriminatory, harassing, or bullying effects"); *id.* at 6–8 (describing how school board members can be removed). New York law empowers the public, the Commissioner, and the Attorney General to take such actions. *See supra* ¶¶ 67–85.

158.    While Defendants' viewpoint discrimination is at least presumptively unconstitutional, this Court or an appellate court should hold that it is *per se* unconstitutional. *See Defending Educ.*, 2025 U.S. App. LEXIS 29181, at *49 (explaining that "a viewpoint-discrimination finding suffices—without more—to hold a government action unconstitutional" in contexts outside the in-school setting (citing *Iancu*, 588 U.S. at 393; *Rosenberger*, 515 U.S. at 829–30)); *see also Gen. Media Commc'ns v. Cohen*, Dkt. No. 97-6029, 1997 U.S. App. LEXIS 40571, at *61 n.7 (2d Cir. Nov. 21, 1997) (Parker, J., dissenting) ("However, the view that viewpoint discrimination is per se unconstitutional has also been expressed." (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 392 (1992))). It provides a "heckler's veto" to fellow members of the public to stop speech they disagree with based on that disagreement alone.

159.    Neither can Defendants justify their viewpoint discrimination under strict scrutiny. First, there is no state interest in government actors like the Defendants prescribing what side of an important political matter a speaker must take at a public comment session. Further, Defendants have no adequate interest in suppressing the School Board Plaintiffs' speech or forcing the School Board Plaintiffs to violate others' First Amendment rights. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (once a plaintiff demonstrates an infringement of his rights under the Free Speech Clause, "the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of our case law").

160.    Second, even if they did, the Guidance Letter is not sufficiently tailored to further that interest. *See id.* Removal from office for making or allowing speech which Defendants deem harassing, bullying, or discriminatory only by reference to its viewpoint or content is neither a reasonable restriction on speech, nor is it adequately tailored to achieve any state interest. *E.g., Velez v. Levy*, 401 F.3d 75, 97–98 (2d Cir. 2005) ("We cannot permit a state official to oust an elected representative of the people on the bald ground that she voices unsympathetic political views.").

161.    The Guidance Letter discriminates against the School Board Plaintiffs' viewpoints.

## COUNT II

### First Amendment Viewpoint Discrimination – Parent Plaintiffs
### U.S. Const. amend. I & XIV

162.    All of the above paragraphs are realleged as if fully set forth herein.

163.    The Guidance Letter is a viewpoint-based restriction on speech which violates the Parent Plaintiffs' First Amendment rights by targeting for punishment the Parent Plaintiffs' viewpoints, which are the same as or similar to the viewpoints of the School Board Plaintiffs. *See supra* ¶¶ 125–48.

164.    First, the Guidance Letter expressly targets for punishment the Parent Plaintiffs' *pure speech* at school board meetings.

165.    Second, the Guidance Letter prohibits the Parent Plaintiffs' *viewpoint*. It calls their viewpoint "attacks" on students using opposite-sex facilities or competing in opposite-sex athletics. It also prohibits their use of biological pronouns to refer to any person who identifies as transgender. It labels such speech "demeaning," "inflammatory," "bullying," and "harassment."

166.    But it does not prohibit speech at board meetings which would *encourage* or *promote* school support for the use of opposite-sex facilities by transgender-identifying persons. It

does not prohibit speech *supporting* transgender-identifying students participating in sports with the opposite sex. It does not prohibit "preferred" pronouns. It does not state or infer that such speech would be discriminatory, bullying, or harassing. It does not even warn against *actually* "demeaning," "inflammatory," or "harassing" speech by ideological opponents about the Parent Plaintiffs or their viewpoints.

167.    Third, the Guidance Letter credibly threatens to *punish* such speech at public school board meetings. Defendants label such speech "bullying" and "harassment" and threaten it with legal penalties. *See* Guidance Letter at 3 & 4 n.12 (prohibiting "all comments on a particular topic that would have discriminatory, harassing, or bullying effects"). New York law empowers the public, the Commissioner, and the Attorney General to take action against Parent Plaintiffs who allegedly violate the laws Defendants have highlighted in the Guidance Letter. *See supra* ¶¶ 67–85. It provides a "heckler's veto" to fellow members of the public to stop speech they disagree with based on that disagreement alone.

168.    The Parent Plaintiffs are likewise threatened because Defendants threaten school board members unless they shut down their speech. *NRA of Am. v. Cuomo*, 350 F. Supp. 3d 94, 115 (N.D.N.Y. 2018). The Parent Plaintiffs are threatened with being deemed out-of-order, having their speech silenced, losing the balance of their speaking time, and being publicly branded bullies and harassers of children by Defendants for speaking their viewpoint on gender identity and transgender issues.

169.    For the same reasons as for the School Board Plaintiffs, *see supra* ¶¶ 149–161, the Guidance Letter is *per se* unconstitutional and cannot survive strict scrutiny, either.

170.    In addition to the harm of being silenced for speech, the threat of being made a spectacle and falsely labeled in such a manner in front of friends, family, colleagues, and rivals, causes dignitary harm to the Parent Plaintiffs.

171.    The Guidance Letter discriminates against the Parent Plaintiffs' viewpoints.

## COUNT III

**Vagueness and Overbreadth Prohibiting Protected Speech – All Plaintiffs**
**U.S. Const. amend. I & XIV**

172.    All of the above paragraphs are realleged as if fully set forth herein.

173.    The Guidance Letter is vague and overbroad and prohibits Plaintiffs' protected speech in a manner that violates their First Amendment rights.

174.    A government policy is overbroad on its face where, by its reach, it "prohibits constitutionally protected conduct"—here, protected speech. *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972); *accord Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129–30 (1992).

175.    The reach of a government policy depends on its clarity. With unclear policies, "a court should evaluate the ambiguous as well as the unambiguous scope of the enactment. To this extent, the vagueness of a law affects overbreadth analysis." *Hoffman Ests.*, 455 U.S. at 494 n.6.

176.    A government policy is vague where it "either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925). Where vague laws interfere with free speech rights, "a more stringent vagueness test" applies. *Hoffman Ests.*, 455 U.S. at 499.

177.   Vague and overbroad policies are also unconstitutional because they give officials unfettered discretion to approve or censor speech based on its viewpoint or content. *Forsyth Cnty.*, 505 U.S. at 130–33.

178.   The Guidance Letter calls Plaintiffs' speech harassment, bullying, or discrimination, but it does not define those terms. It fails to provide enough information for an ordinary person to know what speech to avoid to not be shut down or removed from office.

179.   The Guidance Letter calls Plaintiffs' speech "demean[ing]" and "stigmatiz[ing]," Guidance Letter at 1, and characterizes that speech as "harassment" and "bullying," Guidance Letter at 2, but fails to define those terms or how a speaker would know whether his or her speech would be so considered by a putative complainant.

180.   The Guidance Letter says these "comments have included attacks" on gender-related school policies, but does not define an "attack," and does not say what "comments" beyond "attacks" would be harassment, bullying, or discrimination.

181.   The Guidance Letter likewise claims, "inflammatory remarks about the legitimacy of students' gender identity and students' equal access to educational facilities and opportunities serves [sic] no school-related purpose and may only make children feel unwelcome and excluded," *id.* at 2 (emphasis added), but it fails to say what makes such remarks "inflammatory."

182.   It is unclear to a person of ordinary intelligence whether any remark stating that sex and gender are immutable, or that biological males should not use girls' facilities or play on their sports teams, would be "inflammatory," "attacks," "demeaning," or "stigmatizing," or whether more is required.

183.   The Guidance Letter also appears to create liability for speech beyond what it labels as "harassment." Beyond speech itself, the Guidance Letter threatens school board members

36

"whose acts or omissions *lead to* the bullying or harassment of LGBTQ+ students." *Id.* at 6 (emphasis added). It likewise outlaws "entertaining" and "promot[ing]" certain speech without defining those terms. Moreover, it advises school board members that making or permitting comments that fall just short of those prohibited by the Letter and warrant removal "may pose a financial burden to schools and an unwelcome distraction from school boards' important work." *Id.* at 7–8.

184.    The Guidance Letter sweeps in pure speech on matters of public concern. Perhaps worse, even if it did not, a person of ordinary intelligence in the public would be forced to guess at its meaning, rendering the Guidance Letter unconstitutionally vague and overbroad.

185.    For these reasons, Plaintiffs fear penalties for engaging in speech that they have made and intend to continue to make at public school board meetings, which is subject to civil and possibly criminal penalties because of the Guidance Letter.

186.    Allowing the Guidance Letter to remain in effect would violate Plaintiffs' First and Fourteenth Amendment rights against the government applying vague and overbroad policies to their speech.

## COUNT IV

### First Amendment Compelled Speech – School Board Plaintiffs
### U.S. Const. amend. I & XIV

187.    All of the above paragraphs are realleged as if fully set forth herein.

188.    The Guidance Letter compels the School Board Plaintiffs' speech in a manner that violates the First Amendment.

189.    Requiring individuals to use preferred pronouns violates the protection against compelled speech afforded by the First Amendment. It "offers an illusory choice that is no choice at all—self-censor or acquiesce in the compelled speech." *Defending Educ.*, 2025 U.S. App.

37

LEXIS 29181, at *130 (Bush, J. concurring); *see also Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021); *Darren Patterson Christian Acad. v. Roy*, No. 1:23-cv-01557-DDD-STV, 2023 U.S. Dist. LEXIS 198528, at 48−54 (D. Colo. Oct. 23, 2023) (granting preliminary injunction against state anti-discrimination provision requiring preferred pronoun usage).

190.    The School Board Plaintiffs believe that it is right to use biological pronouns when referring to any third person, including those persons who identify as transgender.

191.    The Guidance Letter and its threatened enforcement force the School Board Plaintiffs to use the pronouns preferred by a person even if they are not biological when referring to a third person at a school board meeting.

192.    The Guidance Letter compels the School Board Plaintiffs' speech in another way: by forcing them to "curate" speech at board meetings such that only Defendants' viewpoints are expressed. This creates the false impression that all speakers agree with their message.

193.    This Court or an appellate court should hold that the Guidance Letter and its enforcement is *per se* unconstitutional. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 586, 589 (2023) (striking down compulsory law without conducting strict scrutiny); *Wooley v. Maynard* 430 U.S. 705, 717 (1976) ("[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest *cannot outweigh* an individual's First Amendment right[.]" (emphasis added)).

194.    At the very least, this compulsion is subject to strict scrutiny. *Eugene Volokh, Locs. Tech. Inc. v. James*, No. 23-356, 2025 U.S. App. LEXIS 19405, at *17–18 (2d Cir. Aug. 1, 2025).

195.    The School Board Plaintiffs were elected to their offices and serve as school board members to advance their beliefs and the beliefs of their communities in large part through their speech.

196.   Yet the Guidance Letter requires them to silence those who agree with them on gender identity and transgender issues at school board meetings or be removed from office. It likewise forces them to use and to require others to use preferred pronouns when speaking about a third person who identifies as transgender, and to stop speakers from using biological pronouns.

197.   Defendants have no compelling interest in forcing the School Board Plaintiffs to "curate" for the public a presentation of speech supportive of transgender-identifying students using facilities consistent with their claimed gender identities or playing in interscholastic sports consistent with their claimed gender identities. Likewise, Defendants have no compelling interest in forcing the School Board Plaintiffs to use preferred pronouns and force others to do the same or be silent.

198.   Defendants have not tailored their restrictions to meet any interest in any way.

199.   This forced curation is compelled speech which violates the First Amendment.

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request the following relief:

A.   A declaration that the Guidance Letter and its implementation and enforcement are unconstitutional;

B.   A preliminary and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with those individuals from enforcing the Guidance Letter;

C.   Nominal damages of One Dollar ($1.00);

D.   Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorney's fees, associated with this litigation; and

E.   Grant Plaintiffs such additional and further relief as the Court may deem just and proper.

39

Respectfully submitted this 9th day of December, 2025.

                                   **s/ James V. F. Dickey**

James V. F. Dickey
  N.D.N.Y Bar No. 706872
Jordan R. Miller*
  Michigan Bar No. P81467
Attorneys for Plaintiffs
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Road, Suite 104
Roswell, GA 30075
Tel.: (770) 977-2131
jdickey@southeasternlegal.org
jmiller@southeasternlegal.org

*Pro hac vice forthcoming

40