## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

KERRY WACHTER;                          )
                                        )
DANIELLE CIAMPINO;                      )
                                        )
SARAH ROUSE;                            )
                                        )
ISSAC KUO,                              )
                                        )   Case No. 1:25-cv-01718-GTS-TWD
      *Plaintiffs*,                )
                                        )
v.                                      )
                                        )
LETITIA JAMES, in her official capacity as   )
Attorney General for the State of New York;  )
                                        )
BETTY ROSA, in her official capacity as )
Commissioner of Education for the State of New  )
York;                                   )
                                        )
LESTER W. YOUNG, JR., in his official capacity   )
as Chancellor of the New York State Board of  )
Regents; JUDITH CHIN, in her official capacity as  )
Vice Chancellor of the New York State Board of  )
Regents; ROGER TILLES; CHRISTINE CEA;   )
WADE NORWOOD; SUSAN MITTLER;            )
FRANCES WILLS; ARAMINA VEGA FERRER;     )
SHINO TANIKAWA; ROGER CATANIA;          )
ADRIAN HALE; HASONI PRATTS; PATRICK     )
MANNION; SEEMA RIVERA; BRIAN KRIST;     )
KEITH WILEY; FELICIA THOMAS-            )
WILLIAMS, in their official capacities as members  )
of the New York State Board of Regents,  )
                                        )
      *Defendants*.                )

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION FOR A PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 3

   I.   Defendants restrict certain speech concerning gender identity in the Letter. .................... 3

       A.   The Letter prohibits only some speech related to sex-separated facilities and sports, and biological pronouns, at New York school board meetings....................... 3

       B.   The Letter includes punishments for making the speech it forbids............................ 6

   II.   Plaintiffs want to express their beliefs on gender identity and transgender issues but fear enforcement of the Letter........................................................................................ 7

       A.   Plaintiffs believe that students should use facilities and play sports consistent with their biological sex. ........................................................................................ 8

       B.   Plaintiffs have expressed their beliefs at past school board meetings, and School Board Plaintiffs have permitted speech on these issues at past meetings. .................. 8

       C.   Plaintiffs expect that gender identity and transgender issues will arise at future school board meetings, and they intend to continue expressing their beliefs and permitting the expression of such beliefs. ................................................................ 9

       D.   Plaintiffs fear that Defendants will enforce the Letter against them. ........................ 10

ANALYSIS .........................................................................................................................11

   I.   The standard governing a motion for a preliminary injunction. ....................................... 12

   II.   Plaintiffs are likely to succeed on the merits of their claims. ........................................... 12

       A.   Plaintiffs are likely to succeed on their viewpoint discrimination claims................ 13

           1.   The Letter is *per se* unconstitutional because it discriminates based on viewpoint. .......................................................................................................13

           2.   The Letter fails strict scrutiny.........................................................................17

       B.   Plaintiffs are likely to succeed on their vagueness and overbreadth claim. ............. 19

       C.   School Board Plaintiffs are likely to succeed on their compelled speech claim. ....... 21

   III.   Plaintiffs are irreparably harmed by and have standing to challenge the Letter............... 23

   IV.   The balance of equities and public interest factors favor Plaintiffs................................ 24

   V.   The Court should not require an injunction bond. ........................................................... 25

CONCLUSION.................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) .......................................................... 22

*A.H. v. French*, 985 F.3d 165 (2d Cir. 2021) ................................................. 12, 24, 25

*Agudath Isr. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020) ..................................................... 12

*Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481 (6th Cir. 2020) ........ 13, 16

*Application of T.L. for the removal of Chad McFarland as member of the Bd. of*
    *Educ. of the Rotterdam-Mohonasen Ctr. Sch. Dist.*, 2024 N.Y. Educ. Dept. LEXIS 103,
    Decision No. 18,474 (Aug. 19, 2024) ...............................................................11

*Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996) ..................................................... 23

*Boehringer Ingelheim Pharms., Inc. v. HHS*, 150 F.4th 76 (2d Cir. 2025) ................................... 21

*Burns v. Martuscello*, 890 F.3d 77 (2d Cir. 2018) ............................................................... 21

*Collins v. Putt*, 979 F.3d 128 (2d Cir. 2020) ................................................................... 13

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1925) ........................................................... 19

*Counterman v. Colorado*, 600 U.S. 66 (2023) ................................................................... 18

*Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999) .................................................. 18

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732
    (6th Cir. 2025) (en banc) ................................................................... 15, 16

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................................. 23

*Eugene Volokh, Locs. Tech. Inc. v. James*, 148 F.4th 71 (2d Cir. 2025) ..................................... 23

*Farrell v. Burke*, 449 F.3d 470 (2d Cir. 2006) ................................................................... 21

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) .............................................. 19

*Gen. Media Commc'ns v. Cohen*, Dkt. No. 97-6029, 1997 U.S. App. LEXIS 40571
    (2d Cir. Nov. 21, 1997) ................................................................................... 16

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .................................................. 19, 21

*Hartford Courant Co., LLC v. Carroll*, 474 F. Supp. 3d 483 (D. Conn. 2020) ........................... 25

*Hill v. Colorado*, 530 U.S. 703 (2000) ........................................................................... 18

*Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489 (1982) ............................................ 19

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995) ................. 21

*Iancu v. Brunetti*, 588 U.S. 388 (2019) .................................................................. 13, 16

*JTH Tax, LLC v. Agnant*, 62 F.4th 658 (2d Cir. 2023) ..................................................... 12

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) ........................................................... 20

*Matal v. Tam*, 582 U.S. 218 (2017) ....................................................................... 13, 14

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ....................................................... 15

*Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir. 1984) ............................................................ 23

*Moms for Liberty v. Brevard Pub. Sch.*, 118 F.4th 1324 (11th Cir. 2024) ................................... 1

*Monroe v. Hous. Indep. Sch. Dist.*, 794 F. App'x 381 (5th Cir. 2019) (unpublished) ................. 17

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ...................................................... 19, 20, 21

*Mullins v. City of New York*, 626 F.3d 47 (2d Cir. 2010) ..................................................... 23

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) .............................. 12

*New York v. DHS*, 969 F.3d 42 (2d Cir. 2020) ......................................................... 24

*Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023) ................ 17

*People v. Dietze*, 75 N.Y.2d 47 (N.Y. Ct. App. 1989) ....................................... 13, 17

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ....................................... 13, 16, 18

*Robar v. Vill. of Potsdam Bd. of Trs.*, 490 F. Supp. 3d 546 (N.D.N.Y. 2020) ................................ 23

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) ........................... 13, 16

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001) ........................................ 17, 18

*Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022) .......................................... 13

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ............................................ 24

*Texas v. Johnson*, 491 U.S. 397 (1989) .............................................................. 13

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) .................................................. 21

*United States v. Yung*, 37 F.4th 70 (3d Cir. 2022) ..................................................... 17

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) ..................................................... 12

*Upsolve, Inc. v. James*, 155 F.4th 133 (2d Cir. 2025) ................................................... 24

*Virginia v. Black*, 538 U.S. 343 (2003) .............................................................. 18

*Wandering Dago, Inc. v. Destito*, 879 F.3d 20 (2d Cir. 2018) ........................................... 17

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .............................................. 12

*Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232 (2d Cir. 2006) ................... 6

*Wooley v. Maynard* 430 U.S. 705 (1976) ............................................................. 22

## Statutes

8 N.Y.C.R.R. § 275 ............................................................................... 7

N.Y. Educ. Law § 10 ........................................................................... 5, 20

N.Y. Educ. Law § 11(7) ........................................................................ 5, 20

N.Y. Educ. Law § 12 ........................................................................... 5, 20

N.Y. Educ. Law § 1706 ........................................................................... 6

N.Y. Educ. Law § 306(1) ......................................................................... 6

N.Y. Educ. Law § 308 ............................................................................ 6

N.Y. Educ. Law § 310 ............................................................................ 7

N.Y. Educ. Law. § 1709(1) ....................................................................... 1

N.Y. Educ. Law. § 1709(2) ....................................................................... 1

N.Y. Educ. Law. § 2503(2) ....................................................................... 1

N.Y. Exec. Law § 300 ............................................................................ 7

## Other Authorities

11 C. Wright & A. Miller, *Fed. Prac. & Proc.*, § 2948 (1973) .................................... 23

## Court Rules

Federal Rule of Civil Procedure 65 ........................................................... 12, 25

## INTRODUCTION

School boards across the country, including those in New York and Plaintiffs' school districts, frequently discuss school policies related to sex, gender identity, and Title IX of the Education Amendments of 1972.[1] Anyone who attends a school board meeting is likely to hear parents, community members, students, and school board members sharing their views on topics such as pronoun usage, biological boys using girls' locker rooms and bathrooms, and biological boys playing in girls' sports.

This makes sense because, "[f]or many parents, school board meetings are the front lines of the most meaningful part of local government—the education of their children. And sometimes speaking at these meetings is the primary way parents interact with their local leaders or communicate with other community members." *Moms for Liberty v. Brevard Pub. Sch.*, 118 F.4th 1324, 1328 (11th Cir. 2024). It is inevitable that parents and community members will discuss facility usage policies and athletic policies that involve transgender students at school board meetings. This is especially so in New York where school boards are responsible for adopting and overseeing the enforcement of such policies. *See, e.g.*, N.Y. Educ. Law. §§ 1709(1), (2), 2503(2).

Plaintiffs Kerry Wachter and Danielle Ciampino (School Board Plaintiffs) are school board members and parents, and plaintiffs Sarah Rouse and Issac Kuo (Parent Plaintiffs) are parents, who wish to speak their viewpoints on these issues at New York school board meetings. They have spoken and wish to speak about students using school facilities and competing in sports in accordance with their biological sex, not their gender identity. They wish to use biological pronouns consistent with their viewpoint that sex and gender are immutable.

---

[1] *See, e.g.*, Daniel Offner, *Schools address concerns over transgender access to restrooms*, Rockville Centre Herald (Jan. 17, 2025).

But despite Plaintiffs' and other community members' fundamental First Amendment right to discuss issues of sex and gender freely, consistent with their beliefs, Defendants Attorney General Letitia James, Commissioner of Education Betty Rosa, and the Members of the New York State Board of Regents now threaten their speech. On May 8, 2025, Defendants issued a Guidance Letter (Letter) labeling Plaintiffs' speech bullying and harassment. Defendants threaten to remove from office school board members, like Ms. Wachter and Ms. Ciampino, who speak or allow others to speak Plaintiffs' viewpoints at school board meetings. Those parents and community members who speak Plaintiffs' viewpoints at meetings, like Ms. Rouse and Mr. Kuo, are in constant jeopardy of losing their full speaking time and being branded harassers and bullies.

A preliminary injunction is needed to stop this unconstitutional suppression of protected speech. The Court should issue a preliminary injunction because Plaintiffs are likely to succeed on the merits, and they are irreparably harmed by Defendants' speech suppression. First, through the Letter, Defendants discriminate against Plaintiffs' viewpoints by prohibiting them at New York school board meetings. Second, Defendants fail to define key terms in the Letter, which makes it vague and overbroad. Third, Defendants compel Ms. Wachter and Ms. Ciampino, against their will, to curate a message that all speakers at their school board meetings agree with Defendants' viewpoint. Plaintiffs suffer irreparable harm because of these violations of their constitutional freedom of speech. An injunction will prevent further harm by restoring Plaintiffs' freedom to speak without vague viewpoint restraints at school board meetings. And remedying such a deprivation is always in the public interest. Because Plaintiffs satisfy the criteria for a preliminary injunction, the Court should grant Plaintiffs' motion and preliminarily enjoin Defendants from enforcing the Letter and from violating these fundamental rights any further.

**STATEMENT OF FACTS**

Defendants, through their Letter, prohibit speech at New York school board meetings advocating for sex-separated bathrooms and locker rooms, sex-separated sports, and biological pronoun usage. Decl. of Kerry Wachter, Jan. 7, 2026, Ex. A.[2] Plaintiffs are school board members and parents who have spoken these viewpoints at their local school board meetings. They intend to continue their advocacy. But according to the Letter, if Plaintiffs engage in this speech, they face punishment, including removal from office for School Board Plaintiffs.

**I.    Defendants restrict certain speech concerning gender identity in the Letter.**

**A.    The Letter prohibits only some speech related to sex-separated facilities and sports, and biological pronouns, at New York school board meetings.**

Despite the fundamental right to discuss issues of sex and gender freely, consistent with a person's beliefs, the State of New York has adopted some of the most aggressive prohibitions on speech at school board meetings. On May 8, 2025, Attorney General James and Commissioner Rosa published the Letter. Through the Letter, Defendants prohibit speech at school board meetings that expresses certain viewpoints on gender identity and transgender issues, while allowing contrary viewpoints on the same topics. Letter at 1. Defendants begin the Letter by suggesting that they published it in response to comments at New York school board meetings on "LGBTQ+ student groups and on transgender and gender-expansive students' rights to use facilities, including restrooms and locker rooms, or participate on school athletic teams consistent with their gender identity." *Id*. The New York State Department of Education emailed the Letter to the State's school board presidents and advised them that "[t]he [Letter] provides information around obligations to adhere to state laws and regulations that safeguard students from harassment,

---

[2] The Letter is attached as Exhibit A to the Wachter Declaration. For brevity and clarity, citations will be directly to the Letter at the appropriate page.

bullying, and the disclosure of protected student information, *and the consequences for not meeting those obligations*." Wachter Decl. Ex. B at 3 (emphasis added).

Defendants, through the Letter, prohibit speech on gender identity and transgender issues that the State disfavors, including the following viewpoints:

- Speech opposing transgender students using sex-separated facilities, including restrooms and locker rooms, and playing sex-separated sports, based on their purported gender identity rather than their biological sex, Letter at 1, 2, 3–4;

- Speech that questions a student's purported gender identity, *id.* at 2, 4; and

- The use of biological pronouns, regardless of gender identity. *Id.* at 4; *see also id.* at 1 n.2 (defining "gender identity or expression").

As examples, the Letter prohibits comments at school board meetings that oppose "transgender and gender-expansive students' rights to use facilities, including restrooms and locker rooms, or participate on school athletic teams consistent with their gender identity." *Id.* at 1. Likewise, it prohibits "remarks about the legitimacy of students' gender identity," which it describes as "inflammatory." *Id.* at 2. And it warns school board members not to "allow individuals to intentionally misgender district students." *Id.* at 4. The Letter considers "misgendering" to be "[a]ttributing a gender to someone that is incorrect or does not align with the person's gender identity." *Id.* at 4 n.14 (quotation marks omitted).

Defendants label comments expressing these viewpoints as "demean[ing] and stigmatiz[ing]." *Id.* at 1; *see also id.* at 6 (prohibiting board members from "permitt[ing] harassing and stigmatizing comments"). Defendants claim these comments constitute unlawful "harassment" or "bullying." *E.g.*, *id.* at 2 (instructing board members to "safeguard students from harassment [and] bullying" related to "inflammatory remarks"); *id.* at 4 (instructing board members not to

"allow individuals to intentionally misgender district students," which they claim causes "emotional harm"); *id.* (banning the "making or promoting" of "discriminatory and harassing comments"); *id.* at 6 (it is "unlawful for school districts to '*permit* the harassment of any student' . . . because of the student's . . . gender identity." (quoting N.Y. Exec. Law § 296(4)) (emphasis in original); *see also id.* at 6 n.24 (similar). They consider such statements "purely ideological," *id.* at 3, and "an unproductive diversion from boards' important work," *id.* at 4.

Defendants also repeatedly instruct New York's school board members to prohibit comments expressing these viewpoints at board meetings. They instruct school board members to silence any statements opposing transgender students using sex-separated facilities and playing sex-separated sports based on purported gender identity rather than biological sex. *Id.* at 1, 3–4. They instruct them to not "entertain," *id.* at 4, "permit," *id.* at 3, 5, 6, 7, or "allow," *id.* at 4, 6, this prohibited speech. And they instruct them to "prohibit[] all comments on a particular topic that would have discriminatory, harassing, or bullying effects." *Id.* at 3.

Yet Defendants fail to actually define what qualifies as "bullying" or "harassment" in the context of speech at a school board meeting. "Bullying" appears five times and "harassment" appears eight times in the body of the Letter, but Defendants offer no clear definition of these terms. Defendants come closest through citations to the purpose and prohibition sections of the Dignity for All Students Act (DASA). *Id.* at 4 n.15 (citing N.Y. Educ. Law § 10); *id.* at 5 n.17 (citing N.Y. Educ. Law §§ 10, 12). In turn, DASA states that it prohibits discrimination, harassment, and bullying in schools. *See id.* But Defendants fail to directly cite DASA's *definitions* of harassment and bullying in the Letter. *Compare id.* at 1–7, *with* N.Y. Educ. Law § 11(7). As a result, school board members and parents across New York cannot be sure how prohibitions on

bullying and harassment might apply to their speech at school board meetings. *See* Wachter Decl. ¶¶ 18, 20; Ciampino Decl. ¶¶ 18, 20; Rouse Decl. ¶¶ 19–20; Kuo Decl. ¶¶ 18–19.

Defendants do not, however, prohibit *all* speech at school board meetings about gender identity and transgender issues. Instead, they allow speech that expresses viewpoints opposite of the prohibited speech described above. For example, they do not warn against speech supporting transgender-identifying students using sex-separated facilities or playing in sex-separated sports based on gender identity rather than biological sex. Nor do they forbid speech asserting that a person can change sex or gender or contending that purported gender or sex changes are legitimate, supported by science, or not to be questioned. And finally, they do not prohibit using "preferred" pronouns (based on gender identity) or arguing that a school should require speakers to use "preferred" pronouns when referring to a transgender-identifying person.

### B.    The Letter includes punishments for making the speech it forbids.

Defendants detail in the Letter the potential consequences for anyone who violates its prohibitions. If school board members express at a school board meeting the viewpoints barred by the Letter or permit a parent or community member to do the same, they can be removed from office. Letter at 3, 6–7. Defendants, therefore, require school board members to stop a parent from speaking if the parent expresses certain forbidden viewpoints. *See id.* This, in turn, has the effect of depriving a parent of their full speaking time at a board meeting and branding the parent a harasser and bully. *See infra* Statement of Facts II.D.

Defendants assert the power to act on violations of the Letter. They state that "[b]oard members may be removed by the Commissioner of Education."[3] Letter at 6. They also note in the

---

[3] Commissioner Rosa has the authority under New York law to initiate removal proceedings herself. *See* N.Y. Educ. Law §§ 306(1), 308, 1706; *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 248 (2d Cir. 2006).

Letter that citizens can apply to Commissioner Rosa for removal of a board member by filing an application. *Id.* at 7 (citing N.Y. Educ. Law § 310; 8 N.Y.C.R.R. § 275 (explaining how to file a Commissioner's Appeal)).

The penalties do not stop at removal—Defendants identify civil and financial penalties against board members and districts for acting contrary to the Letter. Defendants state that making—or failing to stop others from making—speech consistent with Plaintiffs' viewpoints "may expose districts to liability under [the Human Rights Law]." *Id.* at 6. They also say that school districts face liability for so-called "harassing" speech "even if the harassment does not directly result in the creation of a disparately hostile environment." *Id.* at 6 n.24. Defendants also warn school boards that if they permit speech close to, but not over, the line drawn by the Letter, "even an unsuccessful application for removal may pose a financial burden to schools and an unwelcome distraction from school boards' important work." *Id.* at 7–8. Defendants enhance these warnings by stating that the Human Rights Law will "be construed liberally for the accomplishment of the remedial purposes thereof." *Id.* at 6 n.24 (quoting N.Y. Exec. Law § 300). Against this intimidating backdrop, Plaintiffs seek to speak at board meetings about gender identity and transgender issues.

## II.     Plaintiffs want to express their beliefs on gender identity and transgender issues but fear enforcement of the Letter.

Like many other parents and community members in the United States, Plaintiffs wish to publicly discuss gender identity and transgender policies at school board meetings. Plaintiffs have expressed at their local board meetings their views that students should use facilities and play in sports according to their biological sex. They likewise only use biological pronouns, including when discussing these issues. All Plaintiffs intend to speak similarly in the future, and School

7

Board Plaintiffs intend to permit parents and community members to do the same. But Plaintiffs fear Defendants' enforcement of the Letter.

### A.    Plaintiffs believe that students should use facilities and play sports consistent with their biological sex.

Each Plaintiff believes that "[s]ex is an immutable, objective characteristic" based on a person's chromosomal composition and that a person cannot change his or her gender or hold multiple genders. Wachter Decl. ¶ 6(b)-(c); Ciampino Decl. ¶ 6(b)-(c); Rouse Decl. ¶ 5(b)-(c); Kuo Decl. ¶ 6(b)-(c). Each Plaintiff further believes that students should use sex-separated facilities corresponding with their biological sex. Wachter Decl. ¶ 6(e); Ciampino Decl. ¶ 6(e); Rouse Decl. ¶ 5(e); Kuo Decl. ¶ 6(e).  Parent Plaintiff Issac Kuo specifically believes that biological males using the girls' locker room or bathroom presents a safety concern, including to his four daughters. Kuo Decl. ¶¶ 6(e), 10. Plaintiffs all believe that female athletes should be able to play sex-separated sports with and against athletes only of their sex. *See* Wachter Decl. ¶ 6(f); Ciampino Decl. ¶ 6(f); Rouse Decl. ¶ 5(f); Kuo Decl. ¶ 6(f). Plaintiffs all also believe in using only biological pronouns to discuss these matters because the use of "preferred" pronouns falsely acknowledges that a person can change gender. Wachter Decl. ¶ 6(g); Ciampino Decl. ¶ 6(g); Rouse Decl. ¶ 5(g); Kuo Decl. ¶ 6(g). Finally, School Board Plaintiff Ciampino ran for office and was elected in part because of her viewpoints on gender identity and transgender issues. Ciampino Decl. ¶ 7.

### B.    Plaintiffs have expressed their beliefs at past school board meetings, and School Board Plaintiffs have permitted speech on these issues at past meetings.

At prior meetings, Plaintiffs' school boards have permitted public comment on gender identity and transgender issues. Wachter Decl. ¶¶ 4, 13; Ciampino Decl. ¶¶ 4, 14; Rouse Decl. ¶¶ 8–9; Kuo Decl. ¶¶ 9–10. These school boards have permitted parents and community members to voice opinions from all sides of the issues. Wachter Decl. ¶ 13; Ciampino Decl. ¶ 14; *see also*

Rouse Decl. ¶ 20; Kuo Decl. ¶ 21. Plaintiffs have all spoken at school board meetings and advocated for their beliefs on these issues. Wachter Decl. ¶¶ 8, 14; Ciampino Decl. ¶¶ 9, 15; Rouse Decl. ¶ 9; Kuo Decl. ¶ 10. Parent Plaintiffs Rouse and Kuo last spoke against school policies allowing transgender-identifying individuals to use bathrooms and locker rooms based on gender identity, rather than biological sex, at a January 9, 2025, Rockville Centre School District Board of Education meeting. Rouse Decl. ¶ 15; Kuo Decl. ¶ 15. At no point before Defendants issued the Letter did any school board prohibit Plaintiffs from expressing their views. *See* Wachter Decl. ¶ 13; Ciampino Decl. ¶ 14; Rouse Decl. ¶ 15; Kuo Decl. ¶ 15.

Plaintiffs Wachter and Rouse have also used biological pronouns and descriptors when speaking at school board meetings and referring to transgender individuals. Wachter Decl. ¶ 8; Rouse Decl. ¶ 10. While Ms. Wachter was accused of "misgendering" a speaker, neither Ms. Wachter nor Ms. Rouse was prohibited from completing their speech or otherwise reprimanded for using biological pronouns. Wachter Decl. ¶ 8; Rouse Decl. ¶ 15. Ms. Wachter is also aware of parents and community members who have used biological pronouns when referring to transgender individuals when speaking at school board meetings. *See* Wachter Decl. ¶ 19.

### C. Plaintiffs expect that gender identity and transgender issues will arise at future school board meetings, and they intend to continue expressing their beliefs and permitting the expression of such beliefs.

Discussions of gender identity and transgender issues occur regularly in the Plaintiffs' school districts. All four Plaintiffs are aware of transgender students in their respective districts. Wachter Decl. ¶ 7; Ciampino Decl. ¶ 8; Rouse Decl. ¶ 6; Kuo Decl. ¶ 7. Transgender students in these districts have used sex-separated restrooms corresponding with their purported gender identity rather than their biological sex. Wachter Decl. ¶ 7; Ciampino Decl. ¶ 8; Rouse Decl. ¶ 7; Kuo Decl. ¶ 8.

Transgender students in Ms. Wachter's district have asked to go by a purported gender identity that differs from their biological sex. Wachter Decl. ¶ 7. Ms. Wachter's district also recently passed a resolution requiring all students to use sex-separated facilities corresponding to their biological sex, or to use single-stall, gender-neutral facilities. *Id.* ¶ 8. Meanwhile, Ms. Ciampino's district has discussed and aspires to revise its related policies. Ciampino Decl. ¶ 11. Both School Board Plaintiffs therefore expect that discussions about gender identity and transgender issues will arise at future school board meetings. Wachter Decl. ¶ 13; Ciampino Decl. ¶ 11. And they know of parents and community members who would speak against transgender-identifying students using sex-separated bathrooms and locker rooms that do not correspond with their biological sex. Wachter Decl. ¶ 13; Ciampino Decl. ¶ 14. They also perceive that some of these parents and community members are likely to use biological pronouns, rather than "preferred" pronouns, when discussing these issues. Wachter Decl. ¶ 13; Ciampino Decl. ¶ 14.

Plaintiffs intend to express beliefs contrary to the Letter. *Compare supra* Statement of Facts I.A, *with* Wachter Decl. ¶ 15; Ciampino Decl. ¶ 16; Rouse Decl. ¶ 16; Kuo Decl. ¶ 16. Plaintiffs further intend to use biological pronouns when expressing their views. Wachter Decl. ¶ 16; Ciampino Decl. ¶ 17; Rouse Decl. ¶ 17; Kuo Decl. ¶ 17. Moreover, School Board Plaintiffs intend to allow parents and community members to express views prohibited by the Letter and to use biological pronouns when doing so. Wachter Decl. ¶ 19; Ciampino Decl. ¶ 19.

### D.    Plaintiffs fear that Defendants will enforce the Letter against them.

School Board Plaintiffs fear removal if they express their views and use biological pronouns, or if they permit parents and community members to do the same. Ms. Wachter's fear of punishment is heightened because she has supported Massapequa resolutions requiring students to use sex-separated facilities corresponding to their biological sex, or to use single-stall, gender-

neutral facilities. Wachter Decl. ¶ 8. Similarly, Ms. Ciampino's fears are heightened because, before issuance of the Letter, a local activist attempted to remove her fellow board member based on an alleged statement related to LGBTQ+ student organizations. Ciampino Decl. ¶¶ 9–10. And while this proceeding did not result in the removal of Ms. Ciampino's fellow board member, Commissioner Rosa "admonish[ed]" the fellow board member and suggested he had violated his oath of office. *See Application of T.L. for the removal of Chad McFarland as member of the Bd. of Educ. of the Rotterdam-Mohonasen Ctr. Sch. Dist.*, 2024 N.Y. Educ. Dept. LEXIS 103, at *5, Decision No. 18,474 (Aug. 19, 2024). Both School Board Plaintiffs are also aware of active LGBTQ+ activist communities within their school districts who may disagree with or even report their speech. Wachter Decl. ¶ 21; Ciampino Decl. ¶ 21.

Meanwhile, Parent Plaintiffs fear that if they express their views or use biological pronouns, the Rockville Centre Board of Education will verbally reprimand them, deem them out-of-order, and stop them from speaking. Rouse Decl. ¶ 18; Kuo Decl. ¶ 19. They also fear that their school board will publicly brand them as harassers and bullies for their expression. Rouse Decl. ¶ 18; Kuo Decl. ¶ 19. Their fears are made worse because their school board has expressed fear that Commissioner Rosa will take action against the school board, including stripping funding from their district, if the school board does not carefully follow Rosa's guidance documents about transgender-related issues. Rouse Decl. ¶¶ 21–24; Kuo Decl. ¶¶ 22–25. Finally, members of an active LGBTQ+ community in their district regularly attend school board meetings where Ms. Rouse and Mr. Kuo intend to speak, increasing the likelihood of a complaint to the Commissioner if the district does not enforce the Letter. *See* Rouse Decl. ¶ 20; Kuo Decl. ¶ 21.

## ANALYSIS

Plaintiffs satisfy the factors for a preliminary injunction. First, Plaintiffs are likely to succeed on the merits of their First Amendment claims. Second, they suffer irreparable injury in

the loss of their First Amendment right to present their viewpoints on important issues of social and political debate. That injury establishes standing to bring their claims. Third, the equities favor granting an injunction. The Court should therefore enjoin enforcement of the Letter.

## I.    The standard governing a motion for a preliminary injunction.

Federal Rule of Civil Procedure 65 authorizes trial courts to grant injunctive relief. The purpose of a preliminary injunction is to preserve the status quo until a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A preliminary injunction is usually based on procedures that are "less formal and evidence that is less complete than in a trial on the merits." *Id*. To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Because the deprivation of First Amendment rights is an irreparable harm, in First Amendment cases 'the likelihood of success on the merits is the dominant, if not the dispositive, factor.'" *Agudath Isr. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) (quoting *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)); *see also A.H. v. French*, 985 F.3d 165, 184 (2d Cir. 2021) (stating that where a plaintiff establishes likelihood of success on merits of First Amendment challenge, courts "have little difficulty concluding that the remaining factors favor a preliminary injunction").

## II.    Plaintiffs are likely to succeed on the merits of their claims.

Plaintiffs are likely to succeed on the merits. First, Defendants engage in viewpoint discrimination by restricting speech at school board meetings on only one side of the debate surrounding gender identity and transgender issues in schools. Second, Defendants do so using

vague and overbroad language in the Letter. Finally, Defendants compel school board members to label protected speech on important matters of public concern as harassing and bullying.

**A.    Plaintiffs are likely to succeed on their viewpoint discrimination claims.**

**1.    The Letter is *per se* unconstitutional because it discriminates based on viewpoint.**

Viewpoint discrimination is discrimination against speech "because of its message." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). "The Supreme Court has held that government restrictions on speech constitute unlawful viewpoint discrimination when the speech's 'opinion or perspective' is 'the rationale for the restriction.'" *Collins v. Putt*, 979 F.3d 128, 139 (2d Cir. 2020) (quoting *Rosenberger*, 515 U.S. at 829). Viewpoint discrimination occurs where the government "chooses winners and losers in the marketplace of ideas—which it may not do." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 (11th Cir. 2022). "Viewpoint discrimination obviously exists when the government allows speech conveying one point of view . . . but prohibits speech conveying the opposite point of view . . . ." *Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 499 (6th Cir. 2020) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)).

Moreover, "censoring the views of some to prevent offense to others is viewpoint discrimination." *Collins*, 979 F.3d at 140; *see also Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) ("[A] law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." (quoting *Matal v. Tam*, 582 U.S. 218, 233 (2017) (opinion of Alito., J.))). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see also People v. Dietze*, 75 N.Y.2d 47, 51 (N.Y. Ct. App. 1989) ("Speech is often 'abusive' – even vulgar, derisive, and provocative – and yet it is still

protected under the State and Federal constitutional guarantees of free expression unless it is much more than that."). In fact, often, "[g]iving offense is a viewpoint." *Matal*, 582 U.S. at 243 (opinion of Alito, J.); *see id.* at 244 (collecting a dozen cases concluding that regulating speech because it offends the listener is viewpoint discrimination).

Despite these precedents, Defendants openly engage in viewpoint discrimination against Plaintiffs by restricting their speech advocating for student safety and privacy from members of the opposite sex. Defendants prohibit comments opposing "transgender and gender-expansive students' rights to use facilities, including restrooms and locker rooms, or participate on school athletic teams consistent with their gender identity." Letter at 1. Defendants likewise prohibit speech "about the legitimacy of students' gender identity." *Id.* at 2. Defendants mischaracterize this speech as "inflammatory," *id.* at 2, "purely ideological," *id.* at 3, and "an unproductive diversion from boards' important work," *id.* at 4. They also prohibit what they call "misgendering," which they define as "[a]ttributing a gender to someone that is incorrect or does not align with the person's gender identity." *Id. at* 4 n.14 (quotation marks omitted). Defendants direct school boards not to permit, entertain, or allow such statements or pronoun usage at school board meetings. *Id.* at 1, 3–7. As Defendants reveal in characterizing this speech as "inflammatory" and "ideological," they prohibit Plaintiffs' speech in the name of shielding others from possible offense or hypothetical "emotional harm." *See id*. at 1–7.

Plaintiffs object to this mischaracterization of their speech. Plaintiffs' speech supports student safety, privacy, and opportunity. *E.g.*, Kuo Decl. ¶¶ 6, 10. But it is nonetheless contrary to the Letter's prohibitions. Plaintiffs have spoken at school board meetings against students using restrooms and locker rooms according to a gender identity different from their biological sex. Wachter Decl. ¶¶ 8, 14–15; Ciampino Decl. ¶¶ 15–16; Rouse Decl. ¶ 9; Kuo Decl. ¶ 10. Plaintiffs

have also opposed students playing in sex-separated sports with or against the opposite sex. Wachter Decl. ¶¶ 8, 14–15; Ciampino Decl. ¶¶ 15–16; Rouse Decl. ¶ 9; Kuo Decl. ¶ 10. Plaintiffs use biological pronouns when they speak at board meetings regardless of the person referenced. Wachter Decl. ¶ 16; Ciampino Decl. ¶ 17; Rouse Decl. ¶ 10. When Plaintiffs express their viewpoints on these issues or use biological pronouns, they express what they believe to be true about sex and gender: "[s]ex is an immutable, objective characteristic such that an individual cannot change his or her sex or gender." Wachter Decl. ¶ 6(b); Ciampino Decl. ¶ 6(b); Rouse Decl. ¶ 5(b); Kuo Decl. ¶ 6(b). They intend to keep expressing these viewpoints. Wachter Decl. ¶ 15; Ciampino Decl. ¶ 16; Rouse Decl. ¶ 16; Kuo Decl. ¶ 16.

Plaintiffs' viewpoints on student privacy, safety, and opportunity, prohibited by Defendants in the Letter, are simply part of the "broader debate over transgender rights." *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 753 (6th Cir. 2025) (en banc) ("*Olentangy*"); *see also Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) ("[T]hat one's sex cannot be changed, a topic which has been in the news on many occasions and 'has become an issue of contentious political . . . debate.'" (quotation marks omitted). Plaintiffs' use of biological pronouns also reflects a viewpoint on human identity different from Defendants' viewpoint. *See Meriwether*, 992 F.3d at 508 ("Pronouns can and do convey a powerful message implicating a sensitive topic of public concern."). Where a government "bars [speakers] from referring to transgender and nonbinary [persons] using the pronouns that match their biological sex if the [persons] prefer to go by different pronouns," it "raises the most serious red flags under the First Amendment." *Olentangy*, 158 F.4th at 738, 755. These red flags fly here. Regardless of whose viewpoint is correct, Plaintiffs and Defendants express opposing *viewpoints*.

Through the Letter, Defendants seek to end their disagreement with Plaintiffs by government edict. They threaten to remove School Board Plaintiffs from office if they speak their viewpoints at school board meetings or allow others to do so. And because Defendants pressure all New York school board members to silence speakers with Plaintiffs' viewpoints, Parent Plaintiffs are in constant jeopardy of losing their full speaking time at a board meeting and being branded harassers and bullies. In contrast, Defendants do not restrict speech that supports transgender students using sex-separated bathrooms and locker rooms and playing in sex-separated sports based on their gender identity rather than their biological sex. Nor do they restrict speech claiming the legitimacy of a transgender-identifying person's identity or claiming the possibility of changing sex or gender.

Plaintiffs' viewpoints are punished, while Defendants' viewpoints have free rein. This is "obviously" viewpoint discrimination: "the government allows speech conveying one point of view . . . but prohibits speech conveying the opposite point of view." *See Am. Freedom Def. Initiative*, 978 F.3d at 499. A finding of viewpoint discrimination should end the analysis because the Supreme Court has held viewpoint discrimination *per se* unconstitutional. *See Olentangy*, 158 F.4th at 756 (explaining that "a viewpoint-discrimination finding suffices—without more—to hold a government action unconstitutional" in contexts outside the in-school setting (citing *Iancu*, 588 U.S. at 393; *Rosenberger*, 515 U.S. at 829–30)); *see also Gen. Media Commc'ns v. Cohen*, Dkt. No. 97-6029, 1997 U.S. App. LEXIS 40571, at *61 n.7 (2d Cir. Nov. 21, 1997) (Parker, J., dissenting) ("However, the view that viewpoint discrimination is per se unconstitutional has also been expressed." (citing *R.A.V.*, 505 U.S. at 392)).

## 2.    The Letter fails strict scrutiny.

The Letter is *per se* unconstitutional, and the Supreme Court's precedents so holding should apply here. But Plaintiffs acknowledge that the United States Court of Appeals for the Second Circuit has applied strict scrutiny to viewpoint-discriminatory government policies like the Letter. Strict scrutiny requires the government to show that the Letter is narrowly tailored to a compelling government interest. *E.g.*, *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 39 (2d Cir. 2018).

The Letter fails strict scrutiny. In theory, a government defendant could have a compelling interest in remedying discrimination, bullying, or harassment. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209–10 (3d Cir. 2001) (Alito, J.); *United States v. Yung*, 37 F.4th 70, 78 (3d Cir. 2022) ("Harassment and intimidation, narrowly construed, are punishable."). But even within the *classroom* setting, where the government has more authority to regulate speech than at public school board meetings among adults,[4] "[a] school district cannot avoid the strictures of the First Amendment simply by defining certain speech as 'bullying' or 'harassment.'" *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 667 (8th Cir. 2023). Yet Defendants proscribe Plaintiffs' "nonviolent, nonthreatening speech" made among a group of adults discussing the direction of New York's public schools, which "collide[s] with the First Amendment." *Yung*, 37 F.4th at 78; *see also Dietze*, 75 N.Y.2d at 52 ("[U]nless speech presents a clear and present danger of some serious substantive evil, it may neither be forbidden nor penalized."). Defendants cannot claim any government interest in regulating Plaintiffs' speech.

---

[4] School board meetings are distinct from in-school settings for evaluating the government interest in regulating speech in each location. *E.g.*, *Monroe v. Hous. Indep. Sch. Dist.*, 794 F. App'x 381, 386 (5th Cir. 2019) (unpublished) ("[T]he fora of a *school* and a *school board meeting* must be distinguished.").

Similarly, the Supreme Court has recognized that a regulation may prohibit harassment where it is directed at *conduct* that is "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999).[5] The Letter does not satisfy the *Davis* standard. It reaches single episodes of speech that: (1) have no conduct element; (2) may be made by parents who have no authority over school policy; (3) occur outside of school hours; and (4) are not directed at a particular student. Thus, not only do Defendants target speech that is far from "severe, pervasive, and objectively offensive," they target speech that has no effect of denying any student access to education.

The Letter also fails to target any recognized "secondary effects" of Plaintiffs' speech. A "secondary effect" is a "non-expressive qualit[y]" of speech that governments can sometimes address through regulations that incidentally burden speech. *Saxe*, 240 F.3d at 208. "The Supreme Court has made it clear, however, that the government may not prohibit speech under a 'secondary effects' rationale based solely on the emotive impact that its offensive content may have on a listener." *Id.* at 209 (rejecting application of "secondary effects" rationale to anti-harassment law). But in the Letter, Defendants claim that Plaintiffs' speech at public board meetings causes third persons to "feel harassed, stigmatized, or unwelcome at their schools," and that "[c]hildren should not have to endure the indignity" of such remarks. Letter at 4. The Letter only identifies the emotive impact of Plaintiffs' viewpoints as a harm it seeks to address. As a result, it is not narrowly tailored to address a compelling government interest.

---

[5] The Supreme Court has often distinguished between regulations that target conduct instead of pure speech. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 725–29 (2000) (upholding law restricting manner of speech near abortion providers); *R.A.V.*, 505 U.S. at 393 ("fighting words" can be proscribed because they "embod[y] a particularly intolerable (and socially unnecessary) mode of expressing whatever idea the speaker wishes to convey"); *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) ("true threats" can be proscribed as "serious expressions conveying that a speaker means to commit an act of unlawful violence" (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003))).

Defendants fail to advance a legitimate government interest through the Letter because they prohibit speech based *only* on the emotive impact of the speech's viewpoint on listeners. Defendants also broadly and impermissibly label as discrimination, harassment, and bullying: (1) pure speech; (2) by adults to other adults; (3) at a public school board meeting; (4) expressing important viewpoints. *Id.* at 1–4. Defendants cannot justify the Letter under strict scrutiny.

**B.    Plaintiffs are likely to succeed on their vagueness and overbreadth claim.**

The Court should enjoin Defendants' enforcement of the Letter because it is vague and overbroad. A government policy is vague where it "either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application. . . ." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925). Where vague laws interfere with free speech rights, "a more stringent vagueness test" applies. *Hoffman Ests. v. Flipside, Hoffman Ests.*, 455 U.S. 489, 499 (1982). Vague and overbroad policies are also unconstitutional if they give officials unfettered discretion to approve or censor speech based on its viewpoint or content. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130–33 (1992).

A government policy is overbroad where, by its reach, it "prohibit[s] constitutionally protected conduct"—here, protected speech. *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972); *accord Forsyth Cnty.*, 505 U.S. at 129–30. It is facially overbroad if it "lacks a plainly legitimate sweep" or if "a substantial number of [the policy's] applications are unconstitutional, judged in relation to the [policy's] plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (internal quotation marks and citations omitted). Vague policies are more likely to be overbroad. *Hoffman Ests.*, 455 U.S. at 494 n.6.

Although Defendants claim to prohibit speech that is "harassing" and "bullying" in the Letter, they never define either term. They do not even cite DASA's definition of "harassment and

19

bullying," *see* N.Y. Educ. Law § 11(7), even though they claim to be upholding DASA's purpose, *see* Letter at 4 n.15 (citing N.Y. Educ. Law § 10); *id.* at 5 n.17 (citing N.Y. Educ. Law §§ 10, 12).[6] Defendants instead leave the reader to divine what speech on gender identity and transgender issues might offend the Letter. Parents and school board members are left wondering if a single sentence opposing the usage of bathroom and locker room facilities based on gender identity runs afoul of the Letter and may result in the removal of a school board member. The Letter certainly implies this. The Letter lacks necessary definitions and therefore has no "legitimate sweep," which makes it both vague and overbroad. *Moody*, 603 U.S. at 723.

Worse yet, Defendants blur the periphery of what speech triggers penalties. Defendants state that school districts face liability for undefined, so-called "harassing" speech "even if the harassment does not directly result in the creation of a disparately hostile environment." Letter at 6 n.24. Defendants also prohibit speech that is, by definition, not bullying or harassment: they threaten school board members "whose acts or omissions *lead to* the bullying or harassment of LGBTQ+ students." *Id.* at 6 (emphasis added). They also warn school boards that if they permit speech close to but not over the line drawn by the Letter, "even an unsuccessful application for removal may pose a financial burden to schools and an unwelcome distraction from school boards' important work." *Id.* at 7–8. Thus, Defendants reach far beyond actual so-called "harassment" or "bullying." The Letter's expansive description of the speech it prohibits makes a substantial number of its applications unconstitutional, judged in relation to any legitimate sweep. *Moody*, 603 U.S. at 723. As a result, Plaintiffs and others are forced to "limit their behavior to that which is unquestionably safe." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 609 (1967); *see also Moody*,

---

[6] Even had Defendants used DASA's "harassment and bullying" definition for those terms, that definition, at least when applied within the school-board-meeting setting, would still be viewpoint-discriminatory, vague, and overbroad.

603 U.S. at 727 (a government policy is unconstitutional where a substantial number of its applications outweigh its legitimate sweep).

Finally, the Letter is constitutionally infirm because Defendants leave it to school board members to decide on the fly what public comments at a school board meeting might qualify as harassment. This exacerbates the Letter's vagueness and overbreadth. *Grayned*, 408 U.S. at 108–09 ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant danger of arbitrary and discriminatory enforcement."); *see also Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006) (holding statute is vague where it "authorizes or even encourages arbitrary and discriminatory enforcement." (quoting *Hill*, 530 U.S. at 732)).

The Letter lacks any legitimate sweep. Defendants target pure speech based only on its emotive impact on the listener. And Defendants' definitional blurring makes the Letter's vagueness and overbreadth that much worse.

**C.    School Board Plaintiffs are likely to succeed on their compelled speech claim.**

"The First Amendment protects the right to decide what to say and what not to say." *Boehringer Ingelheim Pharms., Inc. v. HHS*, 150 F.4th 76, 95 (2d Cir. 2025) (quoting *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018)). "Any 'Government action that . . . requires the utterance of a particular message favored by the Government contravenes this essential right." *Id.* (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). Defendants force school board members to "curate" speech at board meetings such that only Defendants' viewpoints are expressed. This forced curation unconstitutionally compels speech because it creates the false impression that all speakers agree with the government's message. *E.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 581 (1995) ("Disapproval of a private speaker's

statement does not legitimize use of the Commonwealth's power to compel the speaker to alter the message by including one more acceptable to others.").

Defendants force School Board Plaintiffs to prohibit and stop: (1) speech against student use of sex-separated restrooms and locker rooms based on gender identity; (2) speech that questions the legitimacy of a person's claimed gender identity; and (3) the purported "misgendering" of individuals identifying as transgender. Letter at 1–7. Defendants also force School Board Plaintiffs to use non-biological pronouns to refer to a person identifying as transgender when speech calls for the use of pronouns. *Id.* at 4. School Board Plaintiffs know of parents and community members likely to speak on gender identity and transgender issues at future board meetings in a way that would violate these prohibitions. Wachter Decl. ¶ 13; Ciampino Decl. ¶ 14. They also expect that gender identity and transgender issues will arise for discussion at future meetings. Wachter Decl. ¶¶ 7, 13; Ciampino Decl. ¶¶ 8, 11, 14. Through the Letter, then, Defendants impose on School Board Plaintiffs an unconstitutional choice: speak the State's message and silence speakers they agree with or allow contrary viewpoints (including their own) and risk removal from office.[7]

The Letter thus compels School Board Plaintiffs' speech. Its enforcement is *per se* unconstitutional. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 586, 589 (2023) (striking down compulsory law without conducting strict scrutiny); *Wooley v. Maynard* 430 U.S. 705, 717 (1976) ("[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right[.]" (emphasis added)). At

---

[7] If School Board Plaintiffs heed the Letter and stop any "offending" speech, they are likely to face questions from constituents who will want them to explain their prohibition. Any explanation would require School Board Plaintiffs to say that the speech they stopped was harassment or bullying. Such a compelled explanation would contradict School Board Plaintiffs' beliefs.

minimum, however, Defendants' compulsion is subject to strict scrutiny. *Eugene Volokh, Locs. Tech. Inc. v. James*, 148 F.4th 71, 84–85 (2d Cir. 2025). It fails strict scrutiny for the same reasons set forth above related to viewpoint discrimination.

### III.    Plaintiffs are irreparably harmed by and have standing to challenge the Letter.

Plaintiffs satisfy the irreparable harm requirement because where a plaintiff demonstrates a First Amendment injury, irreparable harm necessarily follows. "The Supreme Court has declared that 'the loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury.'" *Robar v. Vill. of Potsdam Bd. of Trs.*, 490 F. Supp. 3d 546, 558 (N.D.N.Y. 2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction." *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (quoting 11 C. Wright & A. Miller, *Fed. Prac. & Proc.*, § 2948, at 440 (1973)). Furthermore, to satisfy the irreparable harm requirement, a plaintiff need only show "a *threat* of irreparable harm, not that irreparable harm already ha[s] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010). Thus, a "risk" that Plaintiffs are deterred from speaking and suffer a First Amendment injury because of the Letter is sufficient. *Id.* That risk is present here because, as detailed above, Defendants have violated and are violating Plaintiffs' First Amendment rights through the Letter's speech prohibitions.

Defendants' credible threat of enforcement of the Letter also establishes Plaintiffs' constitutional injury. Plaintiffs may seek a preliminary injunction where they demonstrate: "(1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest'; (2) that the intended conduct is 'arguably proscribed by' the challenged regulation; and (3) that 'there

exists a credible threat of prosecution thereunder' that is 'sufficiently imminent.'" *Upsolve, Inc. v. James*, 155 F.4th 133, 139 (2d Cir. 2025) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014)). All Plaintiffs have spoken at public school board meetings, whether at the open mic or from the board member's side of the table, and they intend to do so again. Their speech is protected by the First Amendment. Plaintiffs' speech need only be "arguably" proscribed to establish constitutional injury, *Susan B. Anthony List*, 573 U.S. at 162, but Defendants go further in the Letter. They instruct school board members not to say or allow what Plaintiffs wish to say, and they forbid the use of biological pronouns to refer to transgender-identifying persons. Finally, Defendants credibly threaten Plaintiffs' speech at any upcoming regular school board meeting. They threaten removal of School Board Plaintiffs if they flout the Letter's prohibitions. And by threatening their school board members, Defendants put Parent Plaintiffs in constant jeopardy of losing their full speaking time at a board meeting and being branded harassers and bullies.

## IV.    The balance of equities and public interest factors favor Plaintiffs.

The balance of equities and public interest factors likewise favor Plaintiffs. "Where, as here, the government is a party to the suit, the final two factors merge." *New York v. DHS*, 969 F.3d 42, 58–59 (2d Cir. 2020). And where plaintiffs establish "a likelihood" of success on the merits in First Amendment challenges, courts "have little difficulty concluding that the remaining factors favor a preliminary injunction." *A.H.*, 985 F.3d at 184.

Plaintiffs have shown that Defendants violate the First Amendment through the Letter by restricting protected speech and compelling speech. Defendants drape a cloak of silence over school board meetings across New York. They silence School Board Plaintiffs' right to advocate for student privacy and opportunity—viewpoints they believe in and on which they ran for and were elected to public office. And where, as here, elected officials' positions are threatened if they

fail to do the government's bidding, such an undemocratic process can never be in the public interest. Likewise, Defendants tell Parent Plaintiffs' school board members to shut down their speech if they similarly advocate. The government's interests here, on the other hand, are "diminished when the laws at issue likely impinge a federal constitutional right." *Id.* at 184.

## V.    The Court should not require an injunction bond.

Where plaintiffs seek to vindicate First Amendment rights, courts often waive any bond required by Federal Rule of Civil Procedure 65(c) because the action promotes the public interest. *See Hartford Courant Co., LLC v. Carroll*, 474 F. Supp. 3d 483, 508 (D. Conn. 2020). Plaintiffs ask the Court to waive any bond requirement because they seek to uphold First Amendment rights.

### CONCLUSION

Plaintiffs are likely to succeed on the merits of this First Amendment challenge because Defendants discriminate against Plaintiffs' viewpoints and sweep their protected speech into the Letter's overbroad net. And because Defendants are violating Plaintiffs' First Amendment rights, Plaintiffs are suffering irreparable harm. Finally, the equities strongly favor an injunction because an injunction will stop ongoing constitutional violations. The Court should therefore enjoin Defendants from enforcing the Letter pending the full resolution of this case.

Respectfully submitted this 9th day of January, 2026.

  s/ James V. F. Dickey
James V. F. Dickey
  N.D.N.Y Bar No. 706872
Jordan R. Miller (admitted pro hac vice)
  Michigan Bar No. P81467
Attorneys for Plaintiffs
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Road, Suite 104
Roswell, GA 30075
Tel.: (770) 977-2131
jdickey@southeasternlegal.org
jmiller@southeasternlegal.org