**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

KERRY WACHTER, et al.,

    *Plaintiffs*,

    v.

LETITIA JAMES, in her official capacity as
Attorney General for the State of New York, et al.,

    *Defendants*.

)
)
)
)
)
)
)
)
)
)
)

Case No. 1:25-cv-01718-GTS-TWD

---

**PLAINTIFFS' COMBINED MEMORANDUM OF LAW IN REPLY SUPPORTING
THEIR MOTION FOR A PRELIMINARY INJUNCTION AND IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

---

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

REPLY STATEMENT OF FACTS ................................................................................ 2

    I.     Defendants understate and mischaracterize the Letter. ................................... 2

    II.    Activists continue to target Plaintiffs Ciampino and Wachter for their speech on gender identity and transgender matters. ....................................... 4

STANDARD OF REVIEW ............................................................................................. 4

    I.     Standard of review for a motion to dismiss for lack of Article III standing. ............... 4

    II.    The heightened standard does not apply to Plaintiffs' preliminary injunction motion .. 5

ARGUMENT ................................................................................................................... 6

    I.     The Letter imposes obligations on school board members beyond those imposed by New York statutory law. .......................................................... 6

    II.    Plaintiffs have standing to bring their preenforcement challenge and seek a preliminary injunction ................................................................................... 9

        A.    Plaintiffs are the object of Defendants' coercive Letter that causes an Article III injury. ............................................................................. 9

        B.    Plaintiffs have standing to obtain a preliminary injunction because they face a credible threat of enforcement. ................................................ 15

    III.    Plaintiffs are likely to succeed on the merits of their claims. ................................... 19

        A.    Plaintiffs are likely to succeed on their viewpoint discrimination claim. ........ 19

        B.    Plaintiffs are likely to succeed on their vagueness and overbreadth claim ..... 20

        C.    School Board Plaintiffs are likely to succeed on their compelled speech claim .................................................................... 22

    IV.    Plaintiffs have and will continue to suffer irreparable harm ..................................... 22

    V.    The balance of equities and public interest favor preliminarily enjoining the Letter. 25

CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011) ................................................. 18

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023)................................................................ 22

*A.H. v. French*, 985 F.3d 165 (2d Cir. 2021)....................................................................... 25

*Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481 (6th Cir. 2020) ............. 19

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140 (2d Cir. 2011) ......................................... 5

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) ................................................................ 16

*Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979).............................................................. 16

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)..........................................................1, 11

*Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342 (2d Cir. 2003) ................................... 23

*Bulman v. 2BKCo, Inc.*, 882 F. Supp. 2d 551 (S.D.N.Y. 2012)................................................ 24

*Carter v. HealthPort Techs., LLC*, 822 F.3d 47 (2d Cir. 2016)................................................. 4

*Cayuga Nation v. Tanner*, 824 F.3d 321 (2d Cir. 2016) ........................................................ 17

*Cerame v. Slack*, 123 F.4th 72 (2d Cir. 2024) ....................................................... 15, 16, 17

*Cockrun v. Berrien Cnty.*, 101 F.4th 416 (6th Cir. 2024) ........................................................ 5

*Connally v. Gen. Constr. Co.*, 269 U.S. 385 (1925)............................................................. 21

*Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*,
158 F.4th 732 (6th Cir. 2025) (en banc)....................................................................... 19, 22

*Doe v. Trump Corp.,* 6 F.4th 400 (2d Cir. 2021) ................................................................... 6

*Elrod v. Burns*, 427 U.S. 347 (1976).................................................................................. 23

*Fams. Achieving Indep. & Respect v. Neb. Dep't of Soc. Servs.,* 91 F.3d 1076 (8th Cir. 1996) ... 21

*FCC v. Fox TV Stations, Inc.*, 567 U.S. 239 (2012)............................................................. 21

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)............................................................... 21

*Hammerhead Enters. v. Brezenoff,* 707 F.2d 33 (2d Cir. 1983) ............................................. 12

*Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70 (2d Cir. 1988) .............................................. 23

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ......................................................... 16

*Lewis v. Bd. of Educ.*, 258 N.Y. 117 (N.Y. Ct. App. 1932) ..................................................... 8

*Mastrovincenzo v. City of New York,* 435 F.3d 78 (2d Cir. 2006)............................................. 6

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ..................................................... 19, 22

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) .................................... 24, 25

*Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682 (2d Cir. 2013) ...................................... 15

*New York v. Actavis PLC,* 787 F.3d 638 (2d Cir. 2015) ...................................................... 5, 6

*NRA of Am. v. Vullo*, 602 U.S. 175 (2024) ............................................................ passim

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) (per curiam)............................................ 1, 9, 12

*Parents Defending Education v. Linn Mar Community School District*,
    83 F.4th 658 (8th Cir. 2023)...................................................... 19

*Parish v. Kosinski*, Case No. 5:17-cv-344 (BKS/DEP),
    2017 U.S. Dist. LX 232844 (N.D.N.Y. May 2, 2017) ........................................ 24, 25

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992)...................................................... 19

*Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991) ................................................1, 11, 12

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ...................................... 15, 16, 18

*Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022) ........................ 10, 13, 14

*Texas v. Cardona*, No. 4:23-cv-00604-O,
    2024 U.S. Dist. LX 103452 (N.D. Tex. June 11, 2024)........................................ 10, 14

*Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016) .................................. 10, 13

*Tom Doherty Assocs. v. Saban Entm't, Inc.,* 60 F.3d 27 (2d Cir. 1995) .............................. 5, 6, 24

*Vaughn v. Spartanburg Cnty. Sch. Dist. Five*, C.A. No. 7:25-cv-12623-DCC,
    2026 U.S. Dist. LX 8110 (D.S.C. Jan. 13, 2026).......................................... 24

*Veeco Instruments Inc. v. SGL Carbon, LLC*, No. 17-CV-2217 (PKC),
    2017 U.S. Dist. LX 181935 (E.D.N.Y. Nov. 2, 2017) .................................... 23

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988)............................................ 15, 16

*Vitagliano v. County of Westchester,* 71 F.4th 130 (2d Cir. 2023)................................ 17

*Weight Watchers Int'l v. Luigino's, Inc.*, 423 F.3d 137 (2d Cir. 2005)............................ 23

*Whipper v. Green*, No 3:23-CV-27 (SVN),
    2024 U.S. Dist. LX 144066 (D. Conn. Aug. 13, 2024) ...................................... 24

**Statutes**

N.Y. Educ. Law § 11(2) ................................................................ 9

N.Y. Educ. Law § 11(7) ................................................................ 7, 8

N.Y. Educ. Law § 12(1) ................................................................ 7, 8

N.Y. Educ. Law § 1706................................................................11, 14, 17

N.Y. Educ. Law § 306................................................................11, 14, 17

N.Y. Educ. Law § 308................................................................11, 14, 17

iii

**Other Authorities**

A.B. A7687A, 2025–2026 Reg. Sess. (N.Y. Apr. 4, 2025) (unenacted) ........................................ 9

Decision No. 18,474, *Application of T.L.* (Aug. 19, 2024) ............................................................ 17

Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination
   on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County.*,
   86 Fed. Reg. 32637 (June 22, 2021) ...................................................................................... 14

Letter to Educators on Title IX's 49th Anniversary (June 22, 2021) ............................................ 14

Merriam-Webster Dictionary, "extracurricular," .......................................................................... 9

**Court Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................................................................ 4

Fed. R. Civ. P. 12(b)(6) ................................................................................................................ 4

**INTRODUCTION**

Defendants, through the Guidance Letter (Letter), threaten to remove school board members from office if they allow or advance speech on one side of a contentious and important public debate. They "rely[] on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech." *NRA of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). The Court should enjoin Defendants' textbook viewpoint discrimination and deny Defendants' motion to dismiss.

Plaintiffs want to advocate at New York public school board meetings for boys and girls to each have their own private bathroom and locker room spaces based on their sex and to have the opportunity to fairly compete in sex-separated sports. Defendants, through the Letter, tell school board members that such speech—because of the viewpoint expressed—is "harassment" and "bullying." Defendants tie this restriction of Plaintiffs' viewpoint to school board members' *duties* when conducting meetings—in fact, they do so *twenty times*. *See* Wachter Decl. Ex. A (Letter) at 1–7, Dkt. 12-2. These speech prohibitions at school board meetings cannot be found anywhere in New York statutory law. They are not in the Dignity for All Students Act (DASA) or anywhere else. In fact, the New York State Assembly tried to amend DASA to extend DASA to school board meetings last year. But the bill failed. The Letter followed on the heels of that failure.

The email to school board members containing the Letter makes the threat clear: there are "*consequences* for not meeting those *obligations*" described in the Letter. Wachter Decl. Ex. B at 3 (emphasis added), Dkt. 12-2. And Commissioner Rosa, who cosigned the Letter, oversees removal proceedings. A reasonable person serving on a school board would not feel free to ignore the Letter. Under *Vullo* and the Second Circuit's decisions in *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) (per curiam), and *Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991), Defendants'

1

threats to remove elected officials through a guidance document cross the line from government speech to First Amendment violation. Plaintiffs have alleged concrete injuries and First Amendment claims.

As for Plaintiffs' motion for a preliminary injunction, Defendants barely resist the merits of Plaintiffs' claims. And Plaintiffs' ability to demonstrate a likelihood of success on the merits is all but dispositive. For this and other reasons laid out below, any delay by Plaintiffs in seeking a preliminary injunction was not undue and should be excused.

## REPLY STATEMENT OF FACTS

Plaintiffs incorporate the facts in their opening memorandum of law in support of their motion for a preliminary injunction and respond to two of Defendants' fact characterizations.

## I.    Defendants understate and mischaracterize the Letter.

Defendants argue their Letter "directs no course of action and threatens no consequences." Mem. of Law in Opp. to Pls.' Mot. for a Preliminary Injunction and in Supp. of Defs.' Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (Defs.' Resp.) 10, Dkt. No. 20-1. But it does both.

First, Defendants inform school boards what speech they may not "entertain," "allow," or "permit." Letter at 4, 6. For instance, Defendants, after discussing students hypothetically feeling "harassed, stigmatized, or unwelcome," command that "school boards should not entertain baseless allegations that transgender students' identities and experiences are illegitimate." *Id.* at 4. By telling school boards to "not entertain" certain speech, Defendants direct school board members to take a course of action. Defendants also describe speech opposing "transgender and gender-expansive students' rights to use facilities, including restrooms and locker rooms, or participate on school athletic teams consistent with their gender identity" as comments that "stigmatize LGBTQ+ students." *Id.* at 1. Defendants further label statements questioning what they call the "legitimacy

2

of students' gender identity and students' equal access to educational facilities and opportunities" as "harassment" and "bullying." *Id.* at 2.

Second, Defendants repeatedly connect their admonitions about speech they find unacceptable at school board meetings to a school board member's oath of office and duties. Defendants' Letter uses the word "duty" or "duties" *twenty times*. *See id.* at 1–7. Those words appear on each of the first seven pages of the Letter. *Id*. After stressing that the Letter pertains to school board member duties, Defendants "remind[] board members that they may be removed from office when they willfully neglect their duty." *Id.* at 3; *see also id.* at 6 ("Board members may be removed if they willfully neglect their duty or engage in official misconduct." (emphasis removed)). Simultaneously, after providing examples of harassing statements, Defendants state that "willfully permitting the harassment of students on the basis of . . . gender identity . . . meets the[] standard" for removing a school board member. *Id*. at 7. And the email distributing the Letter to school boards advised there would be "*consequences* for not meeting th[e] *obligations*" in the Letter. Wachter Decl. Ex. B at 3 (emphasis added). Any reasonable school board member would understand Defendants to be directing board members to stop stating the views identified in the Letter and to stop parents and community members from speaking the same views.

Defendants also contend the Letter does not compel the use of "preferred" pronouns in place of biological pronouns. Defs.' Resp. at 21. Defendants ignore the plain language of their own Letter. It states: "Nor should boards allow individuals to intentionally misgender district students." Letter at 4. School board members are compelled to artificially construct sentences to avoid all pronoun usage or to use a transgender-identifying individual's "preferred" pronouns where they do not align with the individual's biological sex. Otherwise, board members violate the prohibition on so-called misgendering.

**II.    Activists continue to target Plaintiffs Ciampino and Wachter for their speech on gender identity and transgender matters.**

As detailed in their supplemental declarations, activists continue to target Plaintiffs Ciampino and Wachter. One activist emailed the Mohonasen Central School District Board of Education calling for Ms. Ciampino's removal for not observing state law. Ciampino Supp. Decl. ¶ 6. Another, seemingly referencing language from the Letter, suggested Ms. Ciampino violated her oath of office. *Id.* ¶ 8. A third called Ms. Ciampino at her home and left a message chanting pro-LGBTQ+ slogans. *Id.* ¶ 9. And numerous activists have called for Ms. Wachter to resign. Wachter Supp. Decl. ¶ 7. One activist, who has attended Massapequa Union Free School District Board of Education meetings, posted a video stating "I personally am going to be writing a letter to the Attorney General's Office and to the New York State Board of Education to look into Kerry Wachter's situation and that whole' board's situation because they should be removed." *Id.* ¶ 6.

**STANDARD OF REVIEW**

Defendants misstate the standard of review for both the motion to dismiss and the preliminary injunction portions of their combined brief.

**I.    Standard of review for a motion to dismiss for lack of Article III standing.**

Defendants argue "Plaintiffs cannot establish standing, and their complaint must be dismissed." Defs.' Resp. at 9. Defendants seek dismissal with prejudice and cite only Federal Rule of Civil Procedure 12(b)(6). *Id.* at 4–5; Defs.' Notice of Mot. at 1, Dkt. No. 20. But Defendants' Article III standing argument relates to this Court's subject matter jurisdiction, so it falls under Federal Rule of Civil Procedure 12(b)(1), not 12(b)(6). *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 54 (2d Cir. 2016). This matters because if a case is dismissed under Rule 12(b)(1) "for lack of Article III standing, the dismissal must be without prejudice, rather than with prejudice." *Id.* Finally, Defendants fail to acknowledge that in reviewing a facial attack to standing, a court must

4

"draw all facts—which we assume to be true unless contradicted by more specific allegations or documentary evidence—from the complaint and from the exhibits attached thereto." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). The Court must also "construe all reasonable inferences to be drawn from those factual allegations in [the plaintiffs'] favor," including its construction of the Letter itself.[1] *Id.*

## II.     The heightened standard does not apply to Plaintiffs' preliminary injunction motion.

Defendants half-heartedly contend a heightened standard applies to Plaintiffs' motion for a preliminary injunction. Defendants have forfeited this argument. The heightened standard applies only "where: (i) an injunction is 'mandatory,' *or* (ii) the injunction 'will provide the movant with substantially all the relief sought *and* that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *New York v. Actavis PLC,* 787 F.3d 638, 650 (2d Cir. 2015) (emphasis added) (quoting *Tom Doherty Assocs. v. Saban Entm't, Inc.,* 60 F.3d 27, 33–34 (2d Cir. 1995)). Because of the "or" between (i) and (ii), a heightened standard applies "[w]hen either condition is met." *Id.* But the "and" in (ii) means (ii) has two necessary conditions for that heightened standard.

Defendants do not contend the injunction Plaintiffs seek is mandatory. *See* Defs.' Resp. at 5–6. Thus, they needed to argue under (ii) from *Actavis PLC* that the injunction will *both* provide Plaintiffs "substantially all the relief sought" *and* that the relief granted "cannot be undone." *See, e.g.*, *Cockrun v. Berrien Cnty.*, 101 F.4th 416, 419 (6th Cir. 2024) (denying qualified immunity based on forfeiture because the government defendants invoked "only the first prong of the test" (internal quotation marks omitted)). But Defendants never argue that the preliminary relief

---

[1] To the extent Defendants' arguments about Plaintiffs' likelihood of success on the merits can be construed as a Rule 12(b)(6) defense, the Court must "view[] the language of [the] [L]etter in the light most favorable to plaintiffs" and draw all inferences in their favor, including whether the Letter is coercive and contains a threat of punishment. *Okwedy*, 333 F.3d at 344; *see also Rattner*, 930 F.2d at 209.

5

Plaintiffs seek could not be undone by a later order on the merits. *See* Defs. Resp. at 5–6. Defendants' argument is therefore incomplete and forfeited. *See Doe v. Trump Corp.,* 6 F.4th 400, 410 (2d Cir. 2021) (finding forfeiture where legal argument not fully raised in district court).

Even if the Court overlooks the forfeiture, the heightened standard still does not apply. Granting Plaintiffs' preliminary injunction motion will not provide all relief Plaintiffs seek. It is not true here that "issuance of an injunction will render a trial on the merits largely or partly meaningless, either because of temporal concerns . . . or because of the nature of the subject of the litigation, say a case involving the disclosure of confidential information." *Tom Doherty Assocs.,* 60 F.3d at 35. Granting Plaintiffs' motion does not effectively create permanent relief like in *Actavis PLC*, where the court applied the heightened standard because a preliminary injunction would allow generic drugs to go to market, which could not later be undone. 787 F.3d at 650–51.

Rather, any preliminary injunction will be temporary in nature, extending only until the Court reaches the full merits of this case. *See Mastrovincenzo v. City of New York,* 435 F.3d 78, 90 (2d Cir. 2006) (holding that a preliminary injunction on a licensing requirement was not subject to a heightened standard because "the ultimate question of whether New York City may impose its licensing requirements on vendors of clothing painted with graffiti remains ripe for resolution on the merits"). Plaintiffs wish to express their views at school board meetings indefinitely. Only a permanent injunction will grant Plaintiffs the ultimate relief they seek. Second, for this same reason, any preliminary injunction would be undone by an adverse ruling on the merits.

## ARGUMENT

I.   **The Letter imposes obligations on school board members beyond those imposed by New York statutory law.**

Defendants argue they merely interpreted state law, imposing no obligations on school board members beyond what the Dignity for All Students Act (DASA) already imposes. This is

6

not true. Both the statutory text of DASA and failed legislative efforts in the New York State Assembly demonstrate otherwise. New York's statutes do not prohibit Plaintiffs' speech based on its content at school board meetings. The Letter does. If the Court disagrees, however, Plaintiffs request leave to amend their Complaint to challenge any such law.

First, DASA does not reach the content of Plaintiffs' speech. Although DASA prohibits the harassment or bullying of students, N.Y. Educ. Law § 12(1), it defines "harassment" and "bullying" more narrowly than do Defendants in the Letter. DASA defines these terms, in relevant part, to include "verbal . . . action" based on "gender" that creates:

> a hostile environment by conduct or by threats, intimidation or abuse . . . that (a) has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being; or . . . (c) reasonably causes or would reasonably be expected to cause . . . emotional harm to a student; or (d) occurs off school property and creates or would foreseeably create a risk of substantial disruption within the school environment, where it is foreseeable that the conduct, threats, intimidation or abuse might reach school property.

N.Y. Educ. Law § 11(7). DASA's definition does not apply to speech expressing views on gender identity and transgender issues at school board meetings largely attended by adults. And nothing in DASA prohibits New Yorkers from using biological pronouns instead of "preferred" pronouns, especially when they are not even speaking to a transgender-identifying individual.

Under DASA, parents merely contending that students should use restrooms and locker rooms and play in sex-separated sports according to their biological sex does not create a "hostile environment" or interfere with transgender-identifying students' educational opportunities.[2] Rather, speech of this nature is everywhere today. And it surprises no one, including transgender-identifying students, that some members of their community believe sex is immutable and should

---

[2] Such interference is nonexistent where Defendants do not establish that students frequently attend school board meetings and do not narrowly tailor their Letter to when students attend.

control usage of sex-separated facilities, playing in sex-separated sports, and pronoun usage. School board members violate no duty under New York statutory law for permitting such speech at public school board meetings.

Yet Defendants, through the Letter, threaten school board members who permit, allow, or entertain this speech and equate it to harassment and bullying. Tellingly, Defendants never cite DASA's definition of harassment and bullying, New York Education Law § 11(7), in the Letter. As discussed in the facts above and in Plaintiffs' opening brief, Defendants, through the plain language of their Letter and its examples, go beyond New York law to craft their own vague definition of "harassment" and "bullying."[3]

Second, DASA does not apply to school board meetings attended by adults who seek to engage in discussion about the governance of their local school districts—quintessential matters of public concern. So even if Defendants are right about what speech DASA prohibits, DASA does not apply to Plaintiffs' speech at issue here. DASA prohibits the "harassment or bullying *by employees or students* on school property or at a school function." N.Y. Educ. Law § 12(1) (emphasis added). Parents who speak during the public comment portion of school board meetings are not "employees or students." And members of New York boards of education are state officers, not school employees. *See Lewis v. Bd. of Educ.*, 258 N.Y. 117, 122–23 (N.Y. Ct. App. 1932) (a board of education "is a corporation created by the State Legislature" and "its members act as officers of the State"). So, at a minimum, Defendants' Letter extends DASA to new groups of

---

[3] Again, if the Court reads DASA as reaching speech advancing Plaintiffs' beliefs, *see* Wachter Decl. ¶ 6, Dkt. No. 12-2; Ciampino Decl. ¶ 6, Dkt. No. 12-3; Rouse Decl. ¶ 5, Dkt. No. 12-4; Kuo Decl. ¶ 6, Dkt. No. 12-5, Plaintiffs request leave to amend their Complaint to directly challenge DASA.

people, restricting speech by parents and placing obligations on school board members. Neither group, to which Plaintiffs belong, is subject to DASA.

Recognizing that DASA does not apply to school board meetings, the New York State Assembly just last session attempted to amend DASA to add "a school board or trustee meeting" to the definition of "school function."[4] A.B. A7687A, 2025–2026 Reg. Sess. (N.Y. Apr. 4, 2025) (unenacted). Only after the proposed legislation failed did Defendants circulate their Letter, which applies DASA to school board meetings. This puts an exclamation point on Plaintiffs' contention that Defendants, through the Letter, impose obligations beyond existing state law.

## II. Plaintiffs have standing to bring their preenforcement challenge and seek a preliminary injunction.

Plaintiffs demonstrate injury for purposes of Article III standing and meet the Second Circuit's standing requirements for obtaining a preenforcement preliminary injunction.

### A. Plaintiffs are the object of Defendants' coercive Letter that causes an Article III injury.

A second theme of Defendants' argument, seemingly as to Article III standing, is that Plaintiffs suffer no injury from the Letter. *See, e.g.,* Defs.' Resp. at 10. This argument hinges on Defendants miscasting the Letter as an informal policy that has not gone through rulemaking. *Id.* at 2, 7, 10, 13, 15. New York officials unsuccessfully raised this same argument in *Vullo*, 602 U.S. 175. Undeterred, they try the same failed argument again. But government threats to citizen speech on matters of public concern create concrete First Amendment harm. *Okwedy*, 333 F.3d at 342–44. And district courts have recognized that similar guidance documents on gender identity

---

[4] Presently, DASA defines "school function" as "a school-sponsored extra-curricular event or activity." N.Y. Educ. Law § 11(2). A school board meeting is not, definitionally, "extra-curricular." *See* Merriam-Webster Dictionary, "extracurricular," https://perma.cc/5P8N-ZPLU (defining term as "of or relating to . . . approved and usually organized *student activities* (such as athletics) connected with school and usually carrying no academic credit" (emphasis added)).

and transgender issues in education cause an Article III injury to the object of the guidance. *See Texas v. Cardona*, No. 4:23-cv-00604-O, 2024 U.S. Dist. LX 103452 (N.D. Tex. June 11, 2024) (*Cardona*); *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022); *Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. 2016) (*Texas*).

In *Vullo*, the New York Department of Financial Services (Department) issued a pair of guidance letters encouraging regulated insurers and financial services institutions to cut business ties with the NRA. 602 U.S. at 183–84. At the same time, the head of the Department launched investigations into regulated businesses providing services to the NRA. *Id.* at 183, 185. These investigations resulted in consent decrees requiring the cessation of selling all NRA-endorsed insurance programs, including selling programs that fully complied with New York law. *Id.* at 185.

The NRA sued, challenging the Department's actions as violating the First Amendment. *Id.* In defending the action, the *Vullo* defendants, like Defendants here, argued the guidance letters were protected government speech and not "coercive" because (1) they were "non-binding" and (2) "[n]either document ha[d] any statutory or regulatory power behind it" such that "no penalty legally could flow from its 'violation.'" Br. and Special App. for Def.-Appellant, *NRA of Am. v. Vullo*, No. 21-0636-cv (2d Cir. May 17, 2021), Dkt. No. 29 at 40–41; *see also* Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Compl. Pursuant to FRCP 12(B)(6), *NRA of Am. v. Cuomo*, No. 18-cv-0566 (N.D.N.Y. July 2, 2018), Dkt. No. 27-1 at 18–22.

The Supreme Court unanimously rejected New York's position. Government threats violate the First Amendment "through coercion of a third party" where a plaintiff "plausibly allege[s] conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Vullo*, 602 U.S. at 191. The Supreme Court instructs that when assessing the threat posed by a Letter, a court must consider

10

the "power that a government official wields." *Id.* "[T]he greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." *Id.* at 191–92. A person is not likely to feel free to disregard a Letter from an official with direct regulatory and enforcement control over the person. *Id.* at 192; *see also Bantam Books, Inc.*, 372 U.S. at 68 ("People do not lightly disregard public officers' thinly veiled threats.").

Here, Defendants threaten a coercive action: removal of a school board member for violating the Letter's terms. Letter at 6–8. Defendants' email distributing the Letter to school boards solidifies the threat: there will be "*consequences* for not meeting th[e] *obligations*" stated in the Letter. Wachter Decl. Ex. B at 3 (emphasis added). Commissioner Rosa cosigned the Letter and "wields" the power to remove a school board member.[5] *See* N.Y. Educ. Law §§ 306, 308, 1706. Drawing all inferences in favor of Plaintiffs, a reasonable person would view the Letter as a directive that school boards cannot disregard. In fact, school boards, such as Plaintiffs Kuo's and Rouse's board, view Commissioner Rosa's Letters as "binding."[6] Kuo Decl. ¶ 23; Rouse Decl. ¶ 22.

A pair of pre-*Vullo* Second Circuit cases stand for the same principle as *Vullo*. First, in *Rattner*, a village trustee criticized a publication by the local chamber of commerce and later commented that he had "made a list" of forty businesses associated with the chamber. 930 F.2d at 206. Members of the chamber sued, alleging the village trustee violated the First Amendment

---

[5] Plaintiffs alleged in the Complaint and argued in their opening brief that Commissioner Rosa has the power to remove a school board member if a community member files a petition for removal and that New York law grants her the independent power to initiate removal proceedings. Defendants did not dispute this in their brief.

[6] Defendants, in a footnote, attempt to bat away the importance of this fact. Defs.' Resp. at 14 n.1. They cannot ask the Court to make such a contrary inference without any record evidence.

11

because he threatened a boycott of businesses in retaliation for the chamber's publication. *Id.* at 207. The village trustee sought dismissal, arguing he engaged in protected speech that contained no threat. *Id.* The Second Circuit held that "where comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim for violation of First Amendment rights can be stated." *Id.* at 208 (brackets omitted) (quoting *Hammerhead Enters. v. Brezenoff,* 707 F.2d 33, 39 (2d Cir. 1983)). Viewing the facts in the light most favorable to plaintiffs, the trustee's speech suggested a possible boycott and retaliation, which satisfied the injury and Rule 12(b)(6) thresholds. *Id.* at 209–10.

Second, in *Okwedy*, a borough president sent a letter to the owner of billboards opposing advertisements paid for by the plaintiff that used Bible verses to criticize homosexuality. 333 F.3d at 341. The letter noted that the billboard owner "derive[d] substantial economic benefits from" the billboards and requested that the billboard owner contact the borough president's legal counsel and the borough's anti-bias task force. *Id.* at 342. The district court dismissed the plaintiff's First Amendment claims and concluded the letter was protected government speech that did not reasonably convey a threat. *Id.* at 342–43. The Second Circuit reversed. After discussing *Rattner*, the court concluded that a government official "who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form." *Id.* at 344. The Second Circuit held a jury could reasonably find the letter's suggestion that the billboard owner received substantial money from the billboards as a threat to retaliate if the billboard owner did not remove the messages disfavored by the borough president. *Id.*

12

Like *Vullo*, *Rattner* and *Okwedy* demonstrate the low threshold for when speech by a government official transforms into a threat giving rise to a First Amendment claim. Defendants' discussion in the Letter of removing school board members is more direct than the possible boycott in *Rattner* or the indirect suggestion of retaliation in *Okwedy*. Both direct threats and threats against a third party with power to control a plaintiff's speech injure citizens' First Amendment rights. *Rattner* and *Okwedy* are controlling authority for these premises and demonstrate that Plaintiffs have standing both under Rule 12 and to seek a preliminary injunction.

Courts have also applied the principles from *Vullo* to the educational setting in a trio of Title IX cases involving guidance documents issued by the United States Department of Education (DoED) on gender identity matters. These cases further confirm the viability of Plaintiffs' claims.

In 2016, the DoED, without using any formal rulemaking, issued a Dear Colleague Letter informing schools that they must permit transgender-identifying students to use bathrooms and locker rooms according to their asserted gender identity. *Texas*, 201 F. Supp. 3d at 815–16. Texas sued. *Id.* In response to a preliminary injunction motion, the DoED raised the same argument Defendants assert: its guidance documents were "merely expressions of the agencies' views as to what the law requires," "not legally binding," and did not "expose Plaintiffs to . . . new liability or legal requirements." *Id.* at 817 (quoting DoED's brief); *see also id.* at 820 (noting DoED's argument that plaintiffs lacked standing and injury for these reasons). The district court rejected this argument. It concluded a plaintiff suffers an Article III injury where it is the object of a guidance document that attempts to coerce the plaintiff to change its conduct. *Id.* at 822–23.

Again in 2021, the DoED, without engaging in any formal rulemaking, "issued guidance documents providing their interpretation" of Title IX. *Tennessee*, 615 F. Supp. 3d at 817. The DoED labeled the guidance documents an "interpretation," placing one document in the federal

13

register and then distributing a "Dear Educator" letter. *Id.* at 817–18. Both "guidance" documents advised schools that the DoED intended to enforce Title IX's prohibition on discrimination "on the basis of sex" as protecting against harassment based on gender identity. *See* Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*., 86 Fed. Reg. 32637 (June 22, 2021); Letter to Educators on Title IX's 49th Anniversary (June 22, 2021), https://perma.cc/J3AW-S8PG. Almost identical to the Letter, the DoED documents included an example of discrimination of "referring to a transgender student by a name or pronouns other than the ones the student prefers." *Cardona*, 2024 U.S. Dist. LX 103452, at *12.

A guidance document that forces a plaintiff into the Hobson's choice between modifying behavior and facing legal consequences is "sufficient to constitute an injury." *Tennessee*, 615 F. Supp. 3d at 823; *see also Cardona*, 2024 U.S. Dist. LX 103452, at *34–35. In other words, guidance documents injure the target of the guidance if the guidance seeks to alter the target's behavior through explicit or implicit coercion. These elements are present here. Defendants target school board members with their Letter. The Letter expands state law. The Letter compels school board members to refrain from certain speech and prohibits parents from engaging in that speech. The Letter coerces by threatening to remove board members from their elected positions. And Commissioner Rosa herself has the power to remove a school board member. *See* N.Y. Educ. Law §§ 306, 308, 1706. Thus, Defendants labeling the document "guidance" is irrelevant. Plaintiffs may bring their challenge and seek a preliminary injunction. *See Cardona*, 2024 U.S. Dist. LX 103452, at *27–28 (collecting cases for proposition that "[w]hat matters is the actual effect of the challenged actions—not the label assigned to the action").

14

**B.**     **Plaintiffs have standing to obtain a preliminary injunction because they face a credible threat of enforcement.**

For preenforcement First Amendment claims, the Court reviews standing and ripeness "under somewhat relaxed . . . rules." *Cerame v. Slack*, 123 F.4th 72, 81 (2d Cir. 2024) (quoting *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013)). A plaintiff has standing to obtain a preliminary injunction upon demonstrating: "(1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest'; (2) that the intended conduct is 'arguably proscribed by' the challenged regulation; and (3) that 'there exists a credible threat of prosecution thereunder' that is 'sufficiently imminent.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 162 (2014) (*SBA List*)).

Defendants do not contest that Plaintiffs satisfy the first two requirements. Rather, Defendants argue Plaintiffs have not satisfied the "credible threat" prong because Plaintiffs pled an intent to speak. Defs.' Resp. at 7–9. This argument severely misses the mark. Plaintiffs, as masters of their complaint, advance a credible threat case, not a self-censorship case.[7] A plaintiff need not allege *actual* present or future self-censorship in a First Amendment preenforcement challenge.[8] Rather, the question is whether Defendants' threat against Plaintiffs' intended conduct is credible enough to create a "well-founded fear that the law will be enforced against them." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). A fear of enforcement is "well-founded" where plaintiffs have made speech prohibited by the government policy in the past and

---

[7] Defendants also contend Plaintiffs have not argued "prior restraint." Defs.' Resp. at 16. This is irrelevant. The relevant question is whether Plaintiffs pled a credible threat.

[8] Defendants also fail to acknowledge that Plaintiffs repeatedly alleged their fear that the Letter will be used against them. *See* Compl. ¶¶ 84, 103–04, 122–23, 134–37, 145–48, Dkt. No. 1 (describing Plaintiffs' fear of being removed from office, stopped from speaking, and falsely and publicly branded a bully and harasser). As the cases cited here show, standing is established if that fear is well-founded because of an objectively credible threat of prosecution.

intend to make the same speech again. *SBA List*, 573 U.S. at 160 (discussing *Am. Booksellers Ass'n*, 484 U.S. at 386, 393, and *Holder v. Humanitarian L. Project*, 561 U.S. 1, 8, 15 (2010)).

The Supreme Court's decision in *SBA List*, applying *Holder* and *Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979), and the Second Circuit's decision in *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024), are controlling and foreclose Defendants' argument that actual self-censorship is required for a plaintiff to have standing to challenge a government restriction. *SBA List*, 573 U.S. at 162; *Antonyuk*, 120 F.4th at 1006. In *SBA List*, the Court noted that "[b]oth SBA and COAST have alleged an intent to '[m]ake' statements" "arguably proscribed" by the challenged law. 573 U.S. at 162. This is unsurprising because, contrary to Defendants' argument here, the first element for standing *requires* Plaintiffs to plead an intention to engage in the speech Defendants prohibit. *See Cerame*, 123 F.4th at 81. The same was true in *Babbitt*: The United Farm Workers intended to keep boycotting agricultural producers despite the challenged law. 442 U.S. at 301. They had standing to challenge it because, even though they intended to keep speaking, they were "not without some reason in fearing prosecution." *Id.* at 302. The Second Circuit in *Antonyuk* held the same: A plaintiff in a credible threat case need "aver[] an intention only to *risk* lawbreaking." 120 F.4th at 1006 (citing *Babbitt*, 442 U.S. at 302).

Contrary to Defendants' misstatement of the credible-threat test, courts consider (1) "the presumption that the government intends to enforce its laws," (2) "the recency of the applicable regulation," (3) "the general extent of enforcement against similar conduct," and (4) "whether there has been any specific disavowal of enforcement against a plaintiff or his conduct." *Cerame*, 123 F.4th at 85. "The credible-threat standard 'sets a low threshold and is quite forgiving to plaintiffs seeking such preenforcement review, as courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund."

16

*Vitagliano v. County of Westchester,* 71 F.4th 130, 138 (2d Cir. 2023) (quoting *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016)).

Plaintiffs have a well-founded fear that Defendants will enforce the Letter against them. The first two considerations from *Cerame* support this conclusion. Defendants published and distributed their Letter within the last year. The recency of the Letter strengthens the presumption that Defendants will enforce the Letter. *Cerame*, 123 F.4th at 85.

The general extent of enforcement against *similar* conduct also supports Plaintiffs' well-founded fear. Commissioner Rosa has demonstrated a receptiveness to applications for removal based on speech by school board members on gender identity and transgender issues. In Plaintiff Ciampino's very district, a parent filed an application for removal against one of Ms. Ciampino's fellow board members based purely on that member's protected speech. Decision No. 18,474, *Application of T.L.* (Aug. 19, 2024), https://perma.cc/XL6X-4C79. Commissioner Rosa was compelled to dismiss that application on procedural grounds. *Id.* But she went out of her way to "admonish" the board member solely because his speech was, to the Commissioner, "unnecessarily inflammatory." *Id.*

Several additional facts further support the credible threat. First, as discussed earlier, the Letter follows the example of the guidance in *Vullo* and is more coercive than the letters in *Rattner* and *Okwedy*. It threatens a coercive action against school board members if they do not engage in conduct preferred by Defendants—the censoring of certain speech at school board meetings at the threat of removal. Second, again, Commissioner Rosa is a co-author of the Letter. She has direct authority over the removal of school board members. *See* N.Y. Educ. Law §§ 306, 308, 1706. No school board member of ordinary firmness would ignore a directive from the state official with power to remove them from their elected office. *See* Kuo Decl. ¶ 23; Rouse Decl. ¶ 22 (Rockville

17

Centre views Rosa's guidance as "binding"). It is quite credible for Plaintiffs Rouse and Kuo—and all parents across New York—to believe that their school board will enforce the Letter, prevent them from expressing the views disallowed by the Letter, and curtail their ability to speak.

Third, Plaintiffs' initial declarations establish that activists who disagree with Plaintiffs' viewpoints regularly attend school board meetings in Plaintiffs' districts. Wachter Decl. ¶ 21; Ciampino Decl. ¶ 21; Kuo Decl. ¶ 21; Rouse Decl. ¶ 20. The recent targeting of Plaintiffs Ciampino and Wachter because of their views demonstrates this. Wachter Supp. Decl. ¶ 5–8, 10; Ciampino Supp. Decl. ¶ 5–11. Most notably, one activist posted a video stating, "I personally am going to be writing a letter to the Attorney General's Office and to the New York State Board of Education to look into Kerry Wachter's situation and that whole' board's situation because they should be removed." Wachter Supp. Decl. ¶ 6.  If Plaintiffs Wachter and Ciampino utter or permit speech Defendants prohibit in the Letter, it is only a matter of time before an activist or parent of an LGBTQ+ student files an application with Commissioner Rosa seeking their removal. This already happened to another board member before Defendants published their Letter.

Fourth, the Letter lays out the process for any member of the public to file applications for the removal of a school board member. Letter at 7. Thus, anyone aware of the Letter now knows exactly how to commence a removal proceeding over the speech identified in the Letter. Courts recognize that the threat of an investigation and having to "lawyer up" in response supports the existence of a credible threat and Article III injury. *See SBA List*, 573 U.S. at 165 (recognizing diversion of time and resources and hiring legal counsel as part of Article III injury calculus); *281 Care Comm. v. Arneson*, 638 F.3d 621, 630 (8th Cir. 2011) (considering time and money spent defending action as part of Article III injury calculus). Even the Letter, in coercing school boards

18

to regulate speech, recognizes the costs of defending a removal petition. *See* Letter at 7–8 ("[E]ven an unsuccessful application for removal may pose a financial burden to schools . . . .").

Based on the presumption of enforcement, the considerations from *Cerame*, and the four other factors, Plaintiffs demonstrate a credible threat of enforcement. Therefore, Plaintiffs have standing under Article III and to seek a preliminary injunction.

## III.     Plaintiffs are likely to succeed on the merits of their claims.

This Court should grant a preliminary injunction because Plaintiffs are likely to succeed on each of their First Amendment claims. A likelihood of success on the merits of any claim, though, is sufficient for the Court to grant a preliminary injunction.

### A.     Plaintiffs are likely to succeed on their viewpoint discrimination claim.

This Court should enjoin enforcement of the Letter because it is the epitome of viewpoint discrimination. "Viewpoint discrimination obviously exists when the government allows speech conveying one point of view . . . but prohibits speech conveying the opposite point of view . . . ." *Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 499 (6th Cir. 2020) (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 388 (1992)). Where a government "bars [speakers] from referring to transgender and nonbinary [persons] using the pronouns that match their biological sex," it "raises the most serious red flags under the First Amendment." *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 738, 755 (6th Cir. 2025) (en banc). The Letter forbids speech on one side of the debate regarding gender identity and transgender issues in schools. It is the definition of viewpoint discrimination.[9] *See* Pls' Mem. of Law in Supp. of Their Mot. for a Preliminary Injunction at 14–16, Dkt. 12-1 (Pls.' Mem.).

---

[9] Defendants contend that because Plaintiffs have not argued suppression by "preemptively silenc[ing] or censur[ing] speech," they cannot rely on cases such as *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), *Defending Education*, 158 F.4th 732, and *Parents Defending Education v. Linn Mar Community School District*, 83 F.4th 658 (8th Cir. 2023). None of these cases dealt

Defendants somehow fail to grapple with Plaintiffs' argument that the Letter is viewpoint discriminatory. *Compare* Defs.' Resp. at 13–18, 20–21 *with* Pls' Mem. at 14–16. Defendants avoid Plaintiffs' arguments by instead contending the Letter is government speech not subject to a viewpoint-discrimination claim. *See* Defs. Resp. at 13–18. *Vullo*, however, demonstrates that government speech ends and a First Amendment violation begins where government officials explicitly or implicitly threaten people in hopes of coercing their conduct. *See* 602 U.S. at 188 ("A government official can share her views freely and criticize particular beliefs . . . . What she cannot do, however, is use the power of the State to punish or suppress disfavored expression."). Applying *Vullo* is simple. Had Defendants merely stated their opinion about what speech at school board meetings does and does not foster a "welcoming environment," or something of that nature, and stopped there, the analysis of whether the Letter qualifies as government speech would be different. But the Letter goes an essential step further: Defendants link their disdain for Plaintiffs' speech to school board members' duties and removal for violating those duties. Thus, Defendants engage in the same threatening conduct as in *Vullo*, *Rattner*, and *Okwedy*. Defendants' implied government speech defense fails, and they have otherwise forfeited any argument that the Letter is not viewpoint discriminatory.

**B.    Plaintiffs are likely to succeed on their vagueness and overbreadth claim.**

This Court should enjoin enforcement of the Letter because it uses vague and overbroad language when restricting speech at school board meetings. A government policy is vague where it "either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Connally v.*

---

with prior restraint. Instead, they explain how policies like the Letter regulating speech on gender identity and transgender issues discriminate on viewpoint. They are persuasive and support Plaintiffs' likelihood of success on the merits of their viewpoint discrimination claim.

*Gen. Constr. Co.*, 269 U.S. 385, 391 (1925). A government policy is overbroad where, by its reach, it "prohibit[s] constitutionally protected conduct"—here, protected speech. *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972).

Defendants repeatedly call certain speech harassing, discriminatory, or bullying in the Letter. Despite Defendants providing some examples of such speech, they struggle to define these terms. Nowhere does the Letter say, "harassment means" or "bullying is." Nor does the Letter cite DASA's definition of harassment and bullying. Defendants further blur the lines by implicating speech that merely "leads to" or is "promoting" harassment, stigmatization, or bullying. Letter at 4. It thus requires school board members to regulate speech, with no clear standards, and threatens their removal if they fail to prohibit speech in the form and to the extent Defendants desire.

Defendants spend just two sentences, which are conclusory in nature, disputing that their Letter is vague and overbroad on its face. *Compare* Defs.' Resp. at 20 *with* Pls.' Mem. at 19–21. Rather than defend the Letter against the merits of Plaintiffs' vagueness challenge, Defendants argue parties cannot challenge guidance documents on vagueness grounds. Defs.' Resp. at 18–19. This is just another Rule 12(b)(1) justiciability argument couched in merits language. And it fails. Courts routinely apply the vagueness and overbreadth doctrines to less formal policies than the Letter. For instance, the Supreme Court has applied the vagueness doctrine to the application of guidelines issued by the Federal Communications Commission regarding broadcasting indecency. *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253–55 (2012). And the Eighth Circuit applied these doctrines to strike down an "unwritten policy" regarding lobby access and speech in a government building. *Fams. Achieving Indep. & Respect v. Neb. Dep't of Soc. Servs.,* 91 F.3d 1076, 1077, 1080–81 (8th Cir. 1996). Accordingly, where a guidance document, such as the Letter, coerces, limits, or threatens punishment for conduct, it is subject to a vagueness attack. Any other

21

conclusion would permit an end-run around *Vullo*, for government officials could phrase their coercive efforts and threats in ever vaguer terms.

### C. School Board Plaintiffs are likely to succeed on their compelled speech claim.

The Letter states, "[n]or should boards allow individuals to intentionally misgender district students." Letter at 4. This directs school boards to police pronoun usage and require speakers to use "preferred" pronouns, not biological pronouns, when speaking about transgender individuals. Requiring the use of "preferred" pronouns violates the First Amendment protection against compelled speech. It "offers an illusory choice that is no choice at all—self-censor or acquiesce in the compelled speech." *Defending Educ.*, 158 F.4th at 791 (Bush, J. concurring); *see also Meriwether*, 992 F.3d at 510. School board members who address public comment on gender identity issues cannot be expected to avoid all pronoun usage. Thus, the Letter compels them to use "preferred" pronouns. And one need not have actually uttered the compelled speech before bringing a compelled speech claim. *303 Creative LLC v. Elenis*, 600 U.S. 570, 596 (2023).

Defendants dispute this by arguing the Letter speaks in terms of "should not" rather than "must not." Defs.' Resp. at 21. This is a distinction without a difference. It is also not a merits argument, but a standing argument that hinges on whether the Letter is a threat.[10] Where the Letter says boards should not allow certain speech and suggests a violation will result in the removal of a board member, the Letter compels a course of action and speech.

### IV. Plaintiffs have and will continue to suffer irreparable harm

Plaintiffs demonstrate irreparable harm. "Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." *Bronx*

---

[10] Again, whether the Letter is a threat must be viewed in the light most favorable to Plaintiffs. *See Okwedy*, 333 F.3d at 344; *Rattner*, 930 F.2d at 209. Because a reasonable person could view the Letter as a threat, and Defendants failed to address Plaintiffs' merits arguments, forfeiting any additional argument, the Court should hold that Plaintiffs are likely to succeed on the merits.

*Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003). This is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Where Plaintiffs have established a likelihood of success on the merits of their First Amendment claims, the Court should also find they suffer an ongoing irreparable injury absent a preliminary injunction.

Defendants, nonetheless, argue Plaintiffs unduly delayed seeking a preliminary injunction. Assessing undue delay in seeking a preliminary injunction is a case-specific inquiry. *See Weight Watchers Int'l v. Luigino's, Inc.*, 423 F.3d 137, 144–45 (2d Cir. 2005) (collecting cases). Under this approach, the Second Circuit, even outside the First Amendment context, has found delays of up to seven months reasonable and not fatal to an irreparable injury showing. *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 72, 79 (2d Cir. 1988).

Courts in this circuit also consider the relevant time during which Plaintiffs suffered injury. *See Veeco Instruments Inc. v. SGL Carbon, LLC*, No. 17-CV-2217 (PKC), 2017 U.S. Dist. LX 181935, at *90 (E.D.N.Y. Nov. 2, 2017) (holding it reasonable for party to wait to file action until defendants conduct "began to cause [plaintiff] harm" rather than when plaintiff learned of conduct). Defendants issued the Letter in May, right as the school year concluded. Some school board meetings were held while school was out for summer, but few people attended or commented at these meetings. Ciampino Suppl. Decl. ¶ 12; Wachter Suppl. Decl. ¶ 11. The issues of bathroom usage by transgender-identifying individuals and "preferred" pronouns in the classroom did not arise then. Ciampino Suppl. Decl. ¶ 12; Wachter Suppl. Decl. ¶ 11. Once school restarted in September, the public reengaged with these issues. Thus, the Court should view Plaintiffs' delay as, at most, a four-month delay from September through December, not a seven-month delay. This places Plaintiffs' delay within the duration the Second Circuit has deemed not an undue delay for

irreparable harm. *See Tom Doherty Assocs.*, 60 F.3d at 39–40 (four-month delay not undue to preclude temporary restraining order); *see also Bulman v. 2BKCo, Inc.*, 882 F. Supp. 2d 551, 564–65 (S.D.N.Y. 2012) (delay of "several months" did not foreclose preliminary injunction).

The four months aside, any delay is but "one factor to be considered in determining whether a plaintiff will, in fact, suffer irreparable harm in the absence of a preliminary injunction." *Bulman*, 882 F. Supp. 2d at 565 (quotation marks omitted). Two other factors strongly favor finding irreparable harm. First, there is an ongoing threat to Plaintiffs' ability to speak freely at school board meetings while the Letter remains in force. The Letter is the prototypical ongoing injury. *See Whipper v. Green*, No 3:23-CV-27 (SVN), 2024 U.S. Dist. LX 144066, at *53 (D. Conn. Aug. 13, 2024) ("Plaintiff's injuries from th[e] First Amendment injury remain ongoing, and Plaintiff has demonstrated a strong likelihood of success on this claim. For these reasons, the ongoing nature of Plaintiff's constitutional injury weighs strongly in favor of finding that Plaintiff suffers an irreparable harm."); *Vaughn v. Spartanburg Cnty. Sch. Dist. Five*, C.A. No. 7:25-cv-12623-DCC, 2026 U.S. Dist. LX 8110, at *11 (D.S.C. Jan. 13, 2026) (citing *Elrod* and stating, "the Court finds that the alleged infringement on the individual's constitutional rights must be presently occurring or set to occur in the imminent future to constitute an irreparable harm").

Second, "[t]he Second Circuit . . . has been critical of delay arguments . . . in political speech cases." *Parish v. Kosinski*, Case No. 5:17-cv-344 (BKS/DEP), 2017 U.S. Dist. LX 232844, at *26 (N.D.N.Y. May 2, 2017). Courts "ought not to be determining what speech is pressing and what can suffer the law's delay. That, like deciding what speech is important and what is important, is not for the courts." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 489 (2d Cir. 2013) (internal quotation marks omitted). Courts have accordingly rejected Defendants' arguments that "delay . . . undermines the irreparable harm [p]laintiffs suffer as a result of the chilling of their

24

First Amendment rights to freedom of speech . . . ." *Parish*, 2017 U.S. Dist. LX 232844, at \*27; *see also N.Y. Progress & Prot. PAC*, 733 F.3d at 489.

The Court should rely on Plaintiffs' likelihood of success on the merits and the weighty First Amendment issues presented in this case and apply the presumption of irreparable harm in accord with Second Circuit precedent. Plaintiffs have been and continue to be irreparably harmed.

**V.     The balance of equities and public interest favor preliminarily enjoining the Letter.**

Plaintiffs agree with Defendants that these two considerations hinge on Plaintiffs likelihood of success on the merits and whether they suffer hardship from the continued enforcement of the Letter. *See* Defs.' Resp. at 24–25. Thus, where Plaintiffs demonstrate a likelihood of success on the merits and a continuing First Amendment injury, the balance of equities and public interest favor a preliminary injunction. *See A.H. v. French*, 985 F.3d 165, 184 (2d Cir. 2021).[11]

**CONCLUSION**

For the reasons stated, Plaintiffs ask the Court to deny Defendants' motion to dismiss and grant Plaintiffs' motion for a preliminary injunction.

**s/ Jordan R. Miller**
James V. F. Dickey
  N.D.N.Y Bar No. 706872
Jordan R. Miller\*
  Michigan Bar No. P81467
Attorneys for Plaintiffs
SOUTHEASTERN LEGAL FOUNDATION
560 W. Crossville Road, Suite 104
Roswell, GA 30075
Tel.: (770) 977-2131
jdickey@southeasternlegal.org
jmiller@southeasternlegal.org

\*Admitted pro hac vice

---

[11] Defendants also did not contest Plaintiffs' argument that the Court should not require an injunction bond.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 27, 2026, this Combined Memorandum of Law in Reply Supporting Their Motion for a Preliminary Injunction and in Opposition to Defendants' Motion to Dismiss was electronically filed with the Clerk of the Court by using the CM/ECF system with electronic service to all counsel.

/s/ *Jordan R. Miller*
Jordan R. Miller

26