**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

KERRY WACHTER, *et al.*,

                 Plaintiffs,

v.                                            1:25-cv-01718 (AMN/CBF)

LETITIA JAMES, *et al.*,

                 Defendants.

---

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **SOUTHEASTERN LEGAL FOUNDATION** | **JAMES V. F. DICKEY, ESQ.** |
| 560 W Crossville Road – Suite 104 | **JORDAN MILLER, ESQ.** |
| Roswell, Georgia 30075 | |
| *Attorneys for Plaintiffs* | |
| | |
| **NEW YORK STATE ATTORNEY GENERAL** | **AIMEE COWAN, ESQ.** |
| 300 South State Street – Suite 300 | |
| Syracuse, New York 13202 | |
| | |
| The Capitol | **RACHEL FINN, ESQ.** |
| Albany, New York 12224 | |
| | |
| 28 Liberty Street | **RICK SAWYER, ESQ.** |
| New York, New York 10005 | |
| *Attorneys for Defendants* | |

**Hon. Anne M. Nardacci, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

On December 9, 2025, Kerry Wachter and Danielle Ciampino (together, "School Board Plaintiffs") and Sarah Rouse and Issac Kuo (together, "Parent Plaintiffs") (collectively, "Plaintiffs") commenced this action against Letitia James, in her official capacity as Attorney General for the State of New York; Betty Rosa, in her official capacity as Commissioner of

Education for the State of New York ("Commissioner"); Lester W. Young, Jr., in his official capacity as Chancellor of the New York State Board of Regents; Judith Chin, in her official capacity as Vice Chancellor of the New York State Board of Regents; and Roger Tilles, Christine Cea, Wade Norwood, Susan Mittler, Frances Wills, Aramina Vega Ferrer, Shino Tanikawa, Roger Catania, Adrian Hale, Hasoni Pratts, Patrick Mannion, Seema Rivera, Brian Krist, Keith Wiley, and Felicia Thomas-Williams, in their official capacities as members of the New York State Board of Regents. Dkt. No. 1 ("Complaint"). On January 9, 2026, Plaintiffs filed a motion for a preliminary injunction seeking an order that preliminarily enjoins Defendants from enforcing the letter entitled, "Joint Guidance on Harassment and Bullying at School Board Meetings," dated May 8, 2025 ("Guidance Letter"). Dkt. No. 12 ("Motion"). On February 20, 2026, Defendants opposed the Motion and cross-moved to dismiss the Complaint for failure to state a claim. Dkt. No. 20 ("Cross-Motion").

For the reasons set forth below, the Court denies Plaintiffs' Motion and grants Defendants' Cross-Motion.

## II.    BACKGROUND

### A.  The Parties

Kerry Wachter resides in Nassau County, New York and currently serves as the president of the Massapequa Union Free School District Board of Education. Dkt. No. 1 at ¶ 14. Danielle Ciampino resides in Schenectady County, New York and is an elected member of the Rotterdam-Mohonasen Central School District Board of Education. *Id.* at ¶ 15. Both Wachter and Ciampino are also parents to students in their respective school districts. *Id.* at ¶¶ 14-15.

Sarah Rouse and Issac Kuo are residents of Nassau County, New York, within the Rockville Centre Union Free School District. *Id.* at ¶¶ 16-17. Both are parents of students who

attend Rockville Centre schools. *Id.*

Defendants are Attorney General Letitia James and Commissioner of Education Betty Rosa, who together co-authored the Guidance Letter, as well as members of the New York State Board of Regents, including Chancellor Lester W. Young, Jr. and Vice Chancellor Judith Chin. *Id.* at ¶¶ 18-20; *see also supra* Section I. All Defendants are sued in their official capacities. Dkt. No. 1 at ¶¶ 18-20.

### B. Plaintiffs' Allegations

On May 8, 2025, Defendants James and Rosa issued the Guidance Letter, which is a "Dear Colleague" letter that provides guidance to members of local boards of education, including the School Board Plaintiffs, concerning conduct at public school board meetings and particularly the public comment portions of those meetings. *Id.* at ¶¶ 37, 39; *see also* Dkt. No. 1-1. All school districts in which Plaintiffs reside permit public comment during school board meetings. Dkt. No. 1 at ¶ 35.

The Guidance Letter begins by noting that "some board members have made, and encouraged, comments during board meetings that demean and stigmatize LGBTQ+ students," which "included attacks on school support for LGBTQ+ student groups and on transgender and gender-expansive students' rights to use facilities . . . or participate on school athletic teams consistent with their gender identity—rights that remain firmly embedded in state law." Dkt. No. 1-1 at 2[1] (citing, *inter alia*, N.Y. Exec. Law § 296(4) (prohibiting public schools from denying the use of facilities, including restrooms and locker rooms, to any person on the basis of sex, gender identity or gender expression); N.Y. Educ. Law § 12(1) (prohibiting discrimination based on a

---

[1] Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system.

3

student's actual or perceived sex or gender on public-school property and at school functions); N.Y. Educ. Law § 3201-a (prohibiting discrimination based on sex, including gender identity and expression, with respect to inclusion on public schools' athletic teams)).  At the outset, the Guidance Letter "remind[s] boards of education of their obligation to adhere to state laws and regulations that safeguard students from harassment, bullying, and the disclosure of protected student information." *Id.* at 3.

The Guidance Letter is then divided into three sections.  The first section "discusses board members' duty to ensure that board meetings are conducted in a manner that respects the dignity and rights of all students" and "provides resources to assist board members in sustaining a safe and supportive learning environment for LGBTQ+ students in their districts." *Id.* at 3-4.  For example, the Guidance Letter notes that board members who "knowingly undermine the purpose of the [Dignity for All Students Act ("DASA")] by making or promoting discriminatory and harassing comments willfully neglect their duties to 'engage in constructive discussion' and ensure effective functioning of board operations" and "sends a message to LGBTQ+ students that their dignity, safety, and wellbeing are not valued in their school community, contrary to [DASA's] requirements and purpose." *Id.* at 5-6 (citing, *inter alia*, N.Y. Educ. Law §§ 10, 12).  The second section "surveys legal protections that may be violated by board member conduct that permits or creates a hostile learning environment for transgender and other LGBTQ+ students." *Id.* at 4.  For example, the Guidance Letter states that "[c]onduct that denies LGBTQ+ students equal protection of the law or otherwise subjects them to 'any discrimination in their civil rights' on the basis of these or other protected characteristics violates the New York State Constitution and Civil Rights Law." *Id.* at 6-7 (citing N.Y. Const. art. I, § 11(a); N.Y. Civ. Rts. Law § 40-c).  The Guidance Letter further states that "[b]oards of education that permit harassing and stigmatizing comments

4

about LGBTQ+ students in public meetings may expose districts to liability under [the New York State Human Rights Law]." *Id.* at 7 (noting that the New York State Legislature amended the New York State Human Rights Law in 2019 to ensure that it would "be construed liberally" (citing N.Y. Exec. Law § 300; *Cooper v. Franklin Templeton Invs.*, No. 22-cv-2763, 2023 WL 3882977, at *3 (2d Cir. June 8, 2023)). The final section "reminds board members that they may be removed from office when they willfully neglect their duty or violate legal protections for students in their districts." *Id.* at 4. Specifically, the Guidance Letter states that "[b]oard members may be removed by the Commissioner of Education if they: (1) violate the Education Law or another law 'pertaining to public schools,' including the state Human Rights Law; (2) willfully neglect their duties as public officers; or (3) willfully disobey a 'decision, order, rule or regulation' of the Regents or the Commissioner of Education." *Id.* at 7-8 (citing, *inter alia*, N.Y. Educ. Law § 306(1); N.Y. Exec. Law § 296(4)). Additionally, the Guidance Letter notes that "[w]illfully permitting the harassment of students on the basis of sex, sexual orientation, gender identity, gender expression, or other protected characteristics" may also warrant removal. *Id.* at 8 (citing N.Y. Exec. Law § 296(4); N.Y. Educ. Law § 3201-a; N.Y. Civil Rts. Law § 40-c).[2]

One week later, on May 15, 2025, the Guidance Letter was circulated via email to local boards of education, advising them that the Guidance Letter "provides information around obligations to adhere to state laws and regulations that safeguard students from harassment, bullying, and the disclosure of protected student information, and the consequences for not meeting those obligations." Dkt. No. 1 at ¶ 38; *see also* Dkt. No. 1-2. The email further advises board of

---

[2] The Guidance Letter also notes that school board meetings are considered limited public fora under the First Amendment, which means that school boards that allow public comment "may make reasonable, viewpoint-neutral rules governing the content of speech allowed[.]" Dkt. No. 1-1 at 4 (quoting *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 626 (2d Cir. 2005) and collecting cases).

education members that they "must conduct meetings in a manner that respects the dignity of all students." Dkt. No. 1 at ¶ 38.

Plaintiffs believe that sex is an immutable, objective characteristic, and thus, an individual cannot change his or her gender or hold multiple genders. *See* Dkt. No. 12-2 at ¶ 6(b)-(d); Dkt. No. 12-3 at ¶ 6(b)-(d); Dkt. No. 12-4 at ¶ 5(b)-(d); Dkt. No. 12-5 at ¶ 6(b)-(d). Plaintiffs also express opposition to the use of preferred pronouns that conflict with an individual's biological sex. *See* Dkt. No. 12-2 at ¶ 6(g); Dkt. No. 12-3 at ¶ 6(g); Dkt. No. 12-4 at ¶ 5(g); Dkt. No. 12-5 at ¶ 6(g). Plaintiffs additionally believe that students should be required to use sex-separated restroom and locker room facilities that correspond with their biological sex and that student athletes should only be permitted to play sex-separated sports that correspond with their biological sex. *See* Dkt. No. 12-2 at ¶ 6(e)-(f); Dkt. No. 12-3 at ¶ 6(e)-(f); Dkt. No. 12-4 at ¶ 5(e)-(f); Dkt. No. 12-5 at ¶ 6(e)-(f) (expressing the opinion that the presence of biological males in a girls' locker room or bathroom presents a safety concern).

Plaintiffs have spoken and expressed their opinions regarding gender identity and transgender student policies during school board meetings. *See* Dkt. No. 12-2 at 8; Dkt. No. 12-4 at ¶¶ 9-10; Dkt. No. 12-5 at ¶¶ 10-11. According to Plaintiffs, before the publication of the Guidance Letter, Plaintiffs did not face explicit threats of removal or censorship for speaking about gender identity and transgender student policies at public school board meetings. Dkt. No. 1 at ¶ 32. Specifically, School Board Plaintiffs never observed someone being "shut down" during the public comment portion of their respective board meetings for speaking about gender identity or transgender student policies, and neither of the Parent Plaintiffs were prevented from speaking about gender identity issues during public comment. *Id.* at ¶¶ 33-34.

No Plaintiff alleges to have changed their behavior or to have had their speech chilled

following the issuance of the Guidance Letter. Indeed, the School Board Plaintiffs "intend to continue to express [their] views and advocate for policies consistent with [their] views," "use pronouns that correspond to a person's biological sex," "permit parents and community members to speak freely . . . about gender identity and transgender issues[,] . . . [and] to continue allowing parents and community members to use pronouns that correspond to a third person's biological sex, rather than 'preferred' pronouns." Dkt. No. 12-2 at ¶¶ 15, 16, 19; Dkt. No. 12-3 at ¶¶ 16, 17, 19. Likewise, Parent Plaintiffs "intend to continue attending [b]oard meetings and expressing [their] views on gender identity and transgender issues," and intend to continue to use biological pronouns during the public comment portion of board meetings. Dkt. No. 12-4 at ¶¶ 16-17; Dkt. No. 12-5 at ¶¶ 16-17.

Relatedly, the School Board Plaintiffs allege that they fear being removed from their respective boards by the Commissioner if they advocate for policies consistent with their views; offer, advocate for, or vote in favor of school board resolutions advancing policies consistent with their views; use biological pronouns during board meetings when discussing gender identity and transgender student policies; or permit parents and community members to speak in a manner prohibited by the Guidance Letter. *See* Dkt. No. 12-2 at ¶¶ 18, 20; Dkt. No. 12-3 at ¶¶ 18, 20; *see also* Dkt. No. 24-1 at ¶¶ 5-11 and Dkt. No. 24-2 at ¶¶ 5-10 (claiming fear of removal based on communications they have received from activists). Similarly, the Parent Plaintiffs allege that they fear that, if they misgender individuals identifying as transgender during public comment, the Rockville Centre board will prohibit them from expressing their views and brand their actions as harassing and bullying children. *See* Dkt. No. 12-4 at ¶¶ 18-19; Dkt. No. 12-5 at ¶¶ 19-20.

But Plaintiffs do not allege that, following the issuance of the Guidance Letter, any application for removal was filed against a school board member, or that Defendants removed any

7

school board member from office in response to the Guidance Letter. While Plaintiffs allege that a parent filed a complaint against the Massapequa Union Free School District in response to the board's passage of a resolution prohibiting transgender students from using restrooms that align with their gender identity approximately four months after the issuance of the Guidance Letter, *see* Dkt. No. 20-4 at ¶¶ 5-6, the Commissioner stayed the resolution, and in any event, the complaint was not against any individual school board member, nor did it seek the removal of any school board member. Dkt. No. 24-2 at ¶ 9.

### C. Procedural History

On December 9, 2025, Plaintiffs filed a complaint alleging that Defendants have violated their constitutional rights pursuant to the First and Fourteenth Amendments because (i) the Guidance Letter is a viewpoint-based restriction on speech, (ii) the Guidance Letter is vague and overbroad, and (iii) the Guidance Letter compels the School Board Plaintiffs' speech in a manner that violates the First Amendment. *See generally* Dkt. No. 1. One month later, on January 9, 2026, Plaintiffs filed a motion for a preliminary injunction seeking to preliminarily enjoin Defendants from enforcing the Guidance Letter. Dkt. No. 12.[3] On February 20, 2026, Defendants opposed the Motion and filed their Cross-Motion to dismiss the Complaint. Dkt. No. 20. On March 27, 2026, Plaintiffs replied in further support of their Motion and opposed Defendants' Cross-Motion. Dkt. No. 24. On April 10, 2026, Defendants replied in further support of their Cross-Motion. Dkt. No. 27. On May 27, 2026, the Court held a hearing on both the Motion and Cross-Motion. *See* Dkt. No. 29. Accordingly, Plaintiffs' Motion and Defendants' Cross-Motion are now ripe for adjudication.

---

[3] Plaintiffs also request the Court to waive any bond required by Rule 65(c) of the Federal Rules of Civil Procedure "because they seek to uphold First Amendment rights." Dkt. No. 12-1 at 29 (citing *Hartford Courant Co., LLC v. Carroll*, 474 F. Supp. 3d 483, 508 (D. Conn. 2020)).

### III.    STANDARD OF REVIEW

#### A.  Preliminary Injunction

"A preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies[.]'" *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 298 (S.D.N.Y. 2021) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).  "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139-40 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis in original).  Further, a preliminary injunction is "never awarded as of right," *Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 200 (N.D.N.Y. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), and the decision to grant such relief "rests in the sound discretion of the district court[.]" *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).

A party seeking preliminary injunctive relief must establish: "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018).

#### B.  Rule 12(b)(1)

Federal courts "have an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citation omitted).  Because it involves a court's power to hear a case, subject matter jurisdiction can never be forfeited or waived. *United States v. Cotton*, 535 U.S. 625, 630 (2002).  A district court may dismiss an action for lack of subject matter jurisdiction

under Rule 12(b)(1) of the Federal Rules of Civil Procedure when the court "lacks the statutory or constitutional power to adjudicate it." *Huntress v. United States*, 810 F. App'x 74, 75 (2d Cir. 2020) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "Where a plaintiff lacks standing, a court has no subject matter jurisdiction to hear its claims." *Sellers Rep., LLC v. Abbott Lab'ys*, No. 23-cv-1034, 2026 WL 879162, at *4 (S.D.N.Y. Mar. 31, 2026) (citing *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)).

"A plaintiff asserting subject matter jurisdiction must demonstrate its existence by a preponderance of the evidence." *Jeannot v. New York State*, 762 F. Supp. 3d 217, 223 (E.D.N.Y. 2025) (quoting *Makarova*, 201 F.3d at 113). The Court "must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor," *see Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009) (citations omitted), but "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Buday v. New York Yankees P'ship*, 486 F. App'x 894, 895 (2d Cir. 2012) (summary order) (citations omitted). "Where, as here, 'subject matter jurisdiction is contested, courts are permitted to look to materials outside the pleadings.'" *Four S Inv. Grp., Inc. v. Hilton Worldwide Manage Ltd.*, No. 26-cv-810, 2026 WL 396099, at *3 (S.D.N.Y. Feb. 12, 2026) (quoting *Romano v. Kazacos*, 609 F.3d 512, 520 (2d Cir. 2010)); *see also Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) ("[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." (citations omitted)).

### C. Rule 12(b)(6)

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal

sufficiency of a party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007). In considering legal sufficiency, a court must accept as true all well-pled facts in the complaint and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). This presumption, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleadings, the court may consider documents that are "integral" to the pleadings even if they are neither physically attached to, nor incorporated by reference into, the pleadings. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers*, 282 F.3d at 152-53).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to sho[w] that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (alteration in original) (quotation omitted). Under this standard, a pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555, and present claims that are "plausible on [their] face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

11

## IV.    DISCUSSION

### A. Standing

Standing is a threshold question in every federal case, *see Griffin v. Doe*, 71 F. Supp. 3d 306, 316 (N.D.N.Y. 2014), that asks whether a plaintiff is the proper party to bring suit. *See Am. Italian Women for Greater New Haven v. City of New Haven*, No. 21-cv-1401, 2023 WL 122043, at *3 (D. Conn. Jan. 5, 2023) (citing *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003)). "Article III of the Constitution of the United States restricts the jurisdiction of federal courts to actual cases or controversies." *Esquibel v. Colgate-Palmolive Co.*, No. 23-cv-742, 2023 WL 7412169, at *2 (S.D.N.Y. Nov. 9, 2023) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *A.H. by E.H. v. New York State Dep't of Health*, 147 F.4th 270, 276 (2d Cir. 2025) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

"The task of the district court is to determine whether the [complaint] alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (internal quotation marks and alterations omitted). "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Cerame v. Slack*, 123 F.4th 72, 80 (2d Cir. 2024) (quoting *Picard v. Magliano*, 42 F.4th 89, 97 (2d Cir. 2022)) (internal quotation marks omitted). Regarding the first element, "[a]n injury sufficient to satisfy Article III must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id.* at 80-81 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (internal quotation marks omitted). "An alleged future injury will suffice if the threatened injury is 'certainly impending' or there is 'substantial

12

risk' of harm." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)). Defendants focus on this first element, contending that Plaintiffs lack standing because their purported injury is speculative and hypothetical, not "actual or imminent." Dkt. No. 20-1 at 15. Specifically, Defendants contend that Plaintiffs (i) have not alleged that the Guidance Letter has chilled or will chill their speech, and (ii) have not plausibly alleged a credible threat of enforcement that is fairly traceable to the Guidance Letter. *Id.* at 16-21.

To assess the existence of a cognizable injury in fact in the context of a pre-enforcement First Amendment challenge, courts apply the three-pronged test set forth by the Supreme Court in *Susan B. Anthony List*. *See Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)); *see also Cerame*, 123 F.4th at 81. Under this test, to establish a cognizable injury in fact, Plaintiffs must demonstrate "(1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest'; (2) that the intended conduct is 'arguably proscribed by' the challenged regulation; and (3) that 'there exists a credible threat of prosecution thereunder' that is 'sufficiently imminent.'" *Cerame*, 123 F.4th at 81 (quoting *Susan B. Anthony List*, 573 U.S. at 159).

### 1. School Board Plaintiffs

As an initial matter, speech related to gender identity and transgender student policies involves a course of conduct affected with a First Amendment interest. *See, e.g.*, *Cerame*, 123 F.4th at 82 (finding that "[a]ppellants' desire to engage in speech on controversial issues" such as free exercise of religion and critical race theory "clearly involves a course of conduct affected with a First Amendment interest").

As to the second prong, the School Board Plaintiffs' contemplated speech is arguably proscribed by the Guidance Letter, or at least the New York State statutes and regulations

13

interpreted therein. "Intended conduct" need only be "arguably proscribed" by the challenged statute, regulation or policy, not necessarily "in fact proscribed." *See Picard*, 42 F.4th at 98. Here, the School Board Plaintiffs' advocacy for gender identity and transgender student policies consistent with their views and their use of biological pronouns during school board meetings constitutes conduct that the statutes and regulations cited in the Guidance Letter arguably proscribe. "'[A] plaintiff's interpretation' of a prohibition and its application to him need not be 'the best interpretation,' only 'reasonable enough' for it to convey standing." *See Cerame*, 123 F.4th at 83 (internal quotation marks omitted) (quoting *Picard*, 42 F.4th at 98); *see also Picard*, 42 F.4th at 99 (noting that both the "arguably proscribed" standard and the "reasonable enough" standard, which predates the Supreme Court's decision in *Susan B. Anthony List*, "consider whether the plaintiff's proffered interpretation of the statute—which leads them to fear its enforcement against their intended conduct—is arguable or reasonable"). Here, while it is possible that none of the School Board Plaintiffs' intended speech is actually proscribed by the Guidance Letter, the School Board Plaintiffs' contrary conclusion that such speech could be proscribed is arguable and reasonable enough to satisfy the second prong. *See, e.g.*, *Khalil v. Trs. of Columbia Univ. in City of New York*, No. 25-cv-2079, 2026 WL 775813, at *6 (S.D.N.Y. Mar. 19, 2026) (finding that student plaintiffs' contemplated anti-Israel speech was arguably proscribed by Columbia University's revised antidiscrimination policy); *Cerame*, 123 F.4th at 83 (finding that appellants' contemplated comments were "arguably proscribed" by a recently enacted Connecticut Rule of Professional Conduct).

However, as to the third prong, the School Board Plaintiffs have not demonstrated that they face a credible threat of enforcement. Whether a threat of enforcement is credible "necessarily depends on the particular circumstances at issue, and will not be found where plaintiffs do not

14

claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Cerame*, 123 F.4th at 85 (quoting *Picard*, F.4th at 98). In evaluating whether there is a credible threat of enforcement, courts "consider, among other factors, the presumption that the government intends to enforce its laws, the recency of the applicable regulation, the general extent of enforcement against similar conduct, and whether there has been any specific disavowal of enforcement against a plaintiff or his conduct." *Id.* (citing *Vitagliano*, 71 F.4th at 138-39). For plaintiffs seeking pre-enforcement review, "courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Vitagliano*, 71 F.4th at 138 (quoting *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016)).

Here, Defendants argue that Plaintiffs fail to allege a credible threat of enforcement because the Guidance Letter is informal guidance, as it merely expresses Defendants' interpretation of state law, and thus, any legal consequences that Plaintiffs allege that they could conceivably face are not actual or well-founded. *See* Dkt. No. 20-1 at 19. Plaintiffs contend that they have a well-founded fear that Defendants will enforce the Guidance Letter against them because Defendants published and circulated the Guidance Letter approximately one year ago, the Guidance Letter threatens coercive action against school board members if they do not censor their speech during school board meetings, the Commissioner has the authority to remove school board members, activists who disagree with Plaintiffs' viewpoints regularly attend school board meetings in Plaintiffs' districts, and the Guidance Letter "lays out the process for any member of the public to file applications for the removal of a school board member." *See* Dkt. No. 24 at 22-24.

The Court agrees with Defendants. The Guidance Letter lacks the force of law, as it merely

15

serves as a restatement of existing anti-discrimination law and reminds board members of the various consequences that may follow for failure to comply with applicable New York State law. *See, e.g.*, *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 462 n.7 (S.D.N.Y. 2015) (finding that a "Dear Colleague" letter published by the United States Department of Education Office for Civil Rights "does not add requirements to applicable law, but provides information and examples to inform recipients about how the Office for Civil Rights evaluates whether covered entities are complying with their legal obligations"); *C.C. v. Paradise High Sch.*, No. 16-cv-2210, 2019 WL 6130439, at *5 (E.D. Cal. Nov. 19, 2019) (noting that a "Dear Colleague" letter "is a guidance document issued by a government agency providing insight into that agency's interpretation or application of a particular statute, regulation or rule"), *aff'd sub nom. Csutoras v. Paradise High Sch.*, 12 F.4th 960 (9th Cir. 2021); *United States ex rel. Hitrost, LLC v. Study Across the Pond, LLC*, No. 21-cv-10274, 2025 WL 871024, at *8 (D. Mass. Mar. 19, 2025) (explaining that a "Dear Colleague" letter was "merely meant to provide guidance on a previously issued final regulation" and "does not by itself create or purport to create law").  Here, the Guidance Letter states that boards of education that "permit the harassment of LGBTQ+ students may expose their school districts to liability under New York law," including, under the New York State Constitution, New York Civil Rights Law, and the New York State Human Rights Law.  *See* Dkt. No. 1-1 at 6-7 (noting that "[c]onduct that denies LGBTQ+ students equal protection of the law or otherwise subjects them to 'any discrimination in their civil rights' on the basis of these or other protected characteristics violates the New York State Constitution and Civil Rights Law" and "New York State Human Rights Law makes it unlawful for school districts to 'permit the harassment of any student' because of the student's sex, sexual orientation, gender identity, or gender expression" (citing, *inter alia*, N.Y. Const. art. I, § 11(a); N.Y. Civ. Rts. Law § 40-c; N.Y. Exec. Law § 296(4)).  Additionally,

16

the Guidance Letter does not mandate or direct the removal of school board members. Instead, the Guidance Letter advises board members that they "*may*" be removed by the Commissioner if they, *inter alia*, "violate the Education Law or another law 'pertaining to public schools,' including the state Human Rights Law"; "engage[] in a pattern of inappropriate, antagonistic and offensive conduct that interferes with the board's ability to function"; or "willfully make unlawful disclosures of confidential student information learned in the course of their official duties." Dkt. No. 1-1 at 7-8 (citing, *inter alia*, N.Y. Educ. Law § 306(1); N.Y. Exec Law § 296(4)). Such conduct is independently prohibited by pre-existing state law, which the Guidance Letter extensively references.

Moreover, none of Plaintiffs' arguments to the contrary are persuasive. Plaintiffs argue that the Guidance Letter establishes a credible threat of enforcement by "detail[ing] . . . the potential consequences for anyone who violates its prohibitions," thereby giving it the force and effect of law. Dkt. No. 12-1 at 28. However, "[t]he identification of a credible threat . . . necessarily depends on the particular circumstances at issue" and "cannot rest on fears that are 'imaginary or speculative.'" *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see also Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 169, 178 (D.N.H. 2025) (holding that plaintiffs had standing to challenge "Dear Colleague" letter where the letter indicated that compliance "with the Department of Justice's interpretation of federal law" was a condition of receiving federal funding and opened investigations into forty-five universities following its issuance). "In determining whether a credible threat of enforcement exists, courts have considered (i) whether or not a law has been enforced against a plaintiff in the past; (ii) whether authorities have directly or expressly threatened the plaintiff with enforcement; and (iii) the history of prosecution or

17

enforcement under the statute." *Bellocchio v. Garland*, 614 F. Supp. 3d 11, 16 (S.D.N.Y. 2022) (citations omitted).

Here, regarding the first and third factors, the School Board Plaintiffs do not allege that the Guidance Letter has ever been enforced against them in the past. *Compare Knife Rts.*, 802 F.3d at 385 (holding that plaintiffs demonstrated a credible threat of enforcement that was "hardly conjectural or hypothetical given that defendant . . . recently identified [one of the plaintiffs] as a violator and pursued enforcement action against it") *with Adam v. Barr*, No. 18-cv-2106, 2019 WL 1426991, at *4 (S.D.N.Y. Mar. 29, 2019) (finding that plaintiff failed to allege a credible threat of enforcement, in part, because plaintiff "fail[ed] to allege that the [statute] had ever been enforced against him in the past"), *aff'd*, 792 F. App'x 20 (2d Cir. 2019).  Nor do Plaintiffs allege a history of enforcement of the Guidance Letter against any school board member, which is significant in light of the Commissioner's statutory authority to remove board members.  In fact, Plaintiffs do not allege that any school board member has been removed following the issuance of the Guidance Letter, much less that any application for removal has been filed in response to the Guidance Letter. *Compare Khalil*, 2026 WL 775813, at *6 (finding credible threat of enforcement where defendant "recently suspended or expelled more than 80 students for participation in pro-Palestine protests and subjected plaintiffs to investigations based purely on anti-Israel speech" (internal quotation marks and alterations omitted)) *with Bellocchio*, 614 F. Supp. 3d at 18 (finding that plaintiff had not alleged a credible threat of enforcement, in part, because he "d[id] not plead any facts . . . relating to the history of enforcement of the [statute]" prohibiting the sale and purchase of human organs that carried civil and criminal penalties).

And as to the second factor—whether Defendants have directly or expressly threatened the School Board Plaintiffs with enforcement—no Defendant is alleged to have threatened to enforce

18

the Guidance Letter against the School Board Plaintiffs. *Compare Evergreen Ass'n, Inc. v. Hochul*, No. 20-cv-112 (AMN/DJS), 2025 WL 359074, at *6 (N.D.N.Y. Jan. 31, 2025) (finding no credible enforcement where plaintiff "failed to identify any threatened enforcement, and thus, [p]laintiff's assertion of standing rest[ed] on the mere existence of [the statute]" (internal quotation marks and citation omitted)) *with Antonyuk v. James*, 120 F.4th 941, 1006-07 (2d Cir. 2024) (finding credible threat of enforcement where statements by law enforcement officials that were "[f]ar from disavowing the prosecution of [p]laintiffs" and "warn[ed] that [law enforcement] will have 'zero tolerance' for violations" provided sufficient "evidence that [p]laintiffs face[d] a realistic threat of arrest and prosecution"), *cert. denied*, 145 S. Ct. 1900 (2025).

Plaintiffs claim that the Guidance Letter conveys a credible threat of enforcement by "lay[ing] out the process for any member of the public to file applications for the removal of a school board member" such that anyone who is aware of the Guidance Letter "knows exactly how to commence a removal proceeding[.]" Dkt. No. 24 at 23. This is overstated. The Guidance Letter notes that applications for removal may be initiated "by a person aggrieved by the board member's actions," *see* Dkt. No. 1-1 at 8 (citing N.Y. Educ. Law § 310; 8 N.Y.C.R.R. § 275), but does not provide any additional guidance regarding the procedures for filing such an application, including what information it must contain, where or how it should be submitted, or the standards governing its review. Rather, the Guidance Letter notes that "[s]tudents and other community members who have experienced or witnessed harassment or discrimination . . . *may* lodge a complaint" with the New York State Attorney General's Office, or seek assistance from other state agencies, such as the New York State Division of Human Rights, and provides links to their respective resources. *Id.* at 9 (emphasis added). Thus, the Guidance Letter, by merely describing the types of conduct that *may* result in potential removal from office and referencing the types of individuals who can

19

initiate such removal, cannot be reasonably understood to convey a credible threat of enforcement.

Moreover, fear that an activist parent or community member will file an application for the School Board Plaintiffs' removal, without more, is insufficient, especially where the School Board Plaintiffs have conducted numerous school board meetings following the issuance of the Guidance Letter and no application for removal is alleged to have been filed. *See* Dkt. No. 20-4 at ¶¶ 7-8 (noting that the Massapequa Union Free School District held at least six school board meetings following the issuance of the Guidance Letter during which members of the public expressed opinions on transgender student policies, including four meetings where Plaintiff Wachter spoke about topics including transgender student policies).

The Supreme Court cases that Plaintiffs cite also bear little resemblance to the case at bar. In *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), the Rhode Island legislature established a "Rhode Island Commission to Encourage Morality in Youth" and empowered it "to educate the public concerning any book . . . manifestly tending to the corruption of the youth," and "to investigate and recommend the prosecution" of all violations of the relevant laws. *Id.* at 59-60. The Commission sent multiple notices to a book distributor to notify him that "certain designated books or magazines distributed by him had been reviewed by the Commission and had been declared . . . to be objectionable for sale, distribution or display" to minors. *Id.* at 61. The notice informed the distributor that the Commission had circulated lists of "objectionable publications" to local police departments, and "thanked [the distributor], in advance, for his 'cooperation' with the Commission," as it would "eliminate the necessity of [the Commission] recommending prosecution to the Attorney General's department." *Id.* at 62-63, 62 n.5. Additionally, "[a] local police officer usually visited [the distributor] shortly after [his] receipt of a notice to learn what action he had taken." *Id.* at 63. The Supreme Court concluded that the distributor's compliance

20

with the Commission's directives was not voluntary because the "notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications *ex proprio vigore*." *Id.* at 68.

Similarly, in *Susan B. Anthony List*, an anti-abortion organization challenged an Ohio statute that criminalized knowingly or recklessly making certain false statements during the course of a political campaign. 573 U.S. at 152. Petitioner Susan B. Anthony List issued a press release stating that a political candidate supported "taxpayer-funded abortion" by voting for the Affordable Care Act. *Id.* at 153-54. The candidate then filed a complaint with the Ohio Elections Commission alleging that Susan B. Anthony List violated the statute. *Id.* at 154. A Commission panel found probable cause to believe that a violation had been committed and scheduled a hearing before the full Commission. *Id.* After the panel's probable cause determination, but before the Commission hearing, Susan B. Anthony List filed suit alleging that the statute violated the First and Fourteenth Amendments and seeking declaratory and injunctive relief, which was stayed pending the completion of the Commission proceedings. *Id.* at 154-55. However, the candidate withdrew his complaint against Susan B. Anthony List after he lost the election, which lifted the stay. *Id.* at 155. Susan B. Anthony's suit was then consolidated with a separate suit brought by petitioner Coalition Opposed to Additional Spending and Taxes, which also alleged that it intended to criticize the candidate's vote for the Affordable Care Act as a vote "to fund abortions with tax dollars," but refrained from doing so because of the Commission proceedings against Susan B. Anthony List. *Id.* at 155-56. Although the Ohio Elections Commission never enforced the statute against the petitioners, the Supreme Court concluded that the petitioners faced a credible threat of enforcement because (i) both petitioners pled "specific statements they intend[ed] to make in future election cycles" about other federal candidates who voted for the Affordable Care Act; (ii) the

intended speech was "arguably" proscribed by the statute; (iii) the statute had a history of past enforcement, as the Ohio Elections Commission had "already found probable cause to believe that [one plaintiff] violated the statute"; and (iv) the respondents had "not disavowed enforcement if petitioners ma[de] similar statements in the future." *Id.* at 161-65.

Likewise, in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Supreme Court found that the plaintiffs faced a credible threat of enforcement where a statute criminalized knowingly providing material support or resources to certain foreign terrorist organizations, and the Government had already charged about 150 people with violating the statute, and did not argue that the plaintiffs would not be prosecuted "if they do what they say they wish to do." *Id.* at 7-8, 16.[4]

Lastly, in *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175 (2024), the Supreme Court held that the superintendent of the New York Department of Financial Services ("DFS") coerced DFS-regulated entities into terminating their business relationships with the National Rifle Association ("NRA"). The superintendent issued "guidance letters" that "*encouraged*" DFS-regulated entities

---

[4] Plaintiffs contend that the Commissioner "has demonstrated a receptiveness to applications for removal" of school board members for speech related to gender identity and transgender student policies because the Commissioner, in the course of dismissing a parent's application for a board member's removal as untimely, "'admonish[ed]' the board member solely because his speech was . . . 'unnecessarily inflammatory.'" Dkt. No. 24 at 22 (citing Decision No. 18,474, Application of T.L. (Aug. 19, 2024), https://perma.cc/XL6X-4C79 (hereinafter "Application of T.L.")). As an initial matter, the Court may take judicial notice of matters of public record. *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). However, the Court finds that Plaintiffs' argument is without merit. Because the Guidance Letter was published nearly a year *after* the Commissioner's decision was issued, the decision cannot establish a credible threat of enforcing the Guidance Letter. Additionally, despite the Commissioner finding the board member's remarks to be "unnecessarily inflammatory," the Commissioner did not remove the board member. *See* Application of T.L. (citing, *inter alia*, N.Y. Const., art. XIII, § 1; Pub. Officers L. § 10 (noting that board members "take an oath of office to uphold the law and faithfully discharge their duties," which "includes the 'duty to proceed with constructive discussions aimed at achieving the best possible governance of the school district'")).

to "1) continue evaluating and managing their risks, including reputational risks, that may arise from their dealings with the NRA or similar gun promotion organizations; (2) review any relationships they have with the NRA or similar gun promotion organizations; and (3) *take prompt actions* to manage these risks and promote public health and safety." *Id.* at 184 (internal quotation marks and brackets omitted) (emphasis added). The guidance letters were accompanied by a joint press release issued by the superintendent and then-New York Governor Andrew Cuomo that "urg[ed] all insurance companies and banks doing business in New York to join those that have already discontinued their arrangements with the NRA." *Id.* (internal quotation marks omitted). Additionally, prior to the issuance of the guidance letters, the superintendent allegedly told Lloyd's of London ("Lloyd's"), a DFS-regulated entity, during a private meeting that she would be "less interested in pursuing [technical insurance law] infractions so long as Lloyd's ceased providing insurance to gun groups, especially the NRA." *Id.* at 192. DFS then subsequently entered into separate consent decrees with Lloyd's and other DFS-regulated entities wherein the entities stipulated to violations of New York insurance law, "agreed not to provide any NRA-endorsed insurance programs (even if lawful)," and agreed to pay multi-million dollar fines. *Id.* at 185. In this case, the Supreme Court held that the superintendent's communications with DFS-regulated entities, together with the adverse actions taken against them, plausibly alleged that the superintendent coerced those entities into terminating their business relationships with the NRA. *Id.* at 198.

In each of these cases, the Supreme Court identified concrete and specific adverse government action meant to punish or suppress First Amendment protected speech. In *Bantam Books*, the Commission's notices, "phrased virtually as orders," included "thinly veiled threats to institute criminal proceedings" that warned distributors that the Commission would recommend

23

prosecution if they failed to pull the targeted publications, which were "invariably followed up by police visitations" to determine what actions had been taken. 372 U.S. at 68. In *Vullo*, the superintendent's communications with Lloyd's were "reasonably understood as a threat," as the superintendent stated that she would ignore unrelated infractions if Lloyd's ceased underwriting NRA insurance policies. 602 U.S. at 192-93. DFS then subsequently entered into consent decrees that imposed significant monetary penalties on Lloyd's and several DFS-regulated entities. *Id.* at 185. In both *Susan B. Anthony List* and *Holder*, the statutes at issue already had a history of past enforcement. In *Susan B. Anthony List*, the Ohio Elections Commission had already found probable cause to believe that one of the plaintiffs violated the statute, *see* 573 U.S. at 164 (noting that "past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'"), and in *Holder*, the Government had already charged approximately 150 people with violating the statute at issue. 561 U.S. at 16. By contrast, this case involves no criminal statute, no police or law enforcement involvement, no monetary penalties, and no evidence of prior complaints or prosecutions. References to applicable legal standards for removal and those who can initiate it, do not, standing alone, transform the Guidance Letter into a credible threat of adverse government action.

Accordingly, the School Board Plaintiffs have failed to establish a credible threat of enforcement.

### 2. Parent Plaintiffs

Lastly, the Parent Plaintiffs face a separate, additional problem with respect to standing. Even if a plaintiff plausibly alleges an injury in fact, in order to establish standing under Article III, the plaintiff must also demonstrate causation and redressability, i.e., that their injury "likely was caused or likely will be caused by the defendant's conduct," and when that is true, "enjoining

the action . . . will typically redress that injury." *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367, 381-82 (2024).

The Parent Plaintiffs allege that the Guidance Letter "expressly targets for punishment" the Parent Plaintiffs' viewpoints and speech during school board meetings. Dkt. No. 1 at ¶¶ 163-164. The Parent Plaintiffs further allege that "New York law empowers the public, the Commissioner, and the Attorney General to take action against Parent Plaintiffs who allegedly violate the laws Defendants have highlighted in the Guidance Letter." *Id.* at ¶ 167. But as Defendants correctly observe, the Guidance Letter, and the laws and regulations to which it cites, do not apply to the Parent Plaintiffs. *See* Dkt. No. 20-1 at 19. For instance, the Guidance Letter "provides resources to assist board members in sustaining a safe and supportive learning environment for LGBTQ+ students in their districts" and "remind[s] boards of education of their obligation" to comply with New York State law by identifying various legal protections that may be violated by board member conduct and the circumstances under which board members may be removed from office. *See* Dkt. No. 1-1 at 3. Indeed, Plaintiffs concede that the Guidance Letter is addressed to "colleagues" of the New York State Attorney General and the Commissioner for the New York State Education Department, i.e., board of education members. Dkt. No. 1 at ¶ 37. It was neither circulated to nor directed at non-members.

Accordingly, "standing is 'substantially more difficult to establish' where, like here, 'the plaintiff is not himself the object of the government action or inaction [that] he challenges.'" *Neurological Surgery Prac. of Long Island, PLLC v. United States Dep't of Health & Hum. Servs.*, 145 F.4th 212, 225 (2d Cir. 2025) (quoting *Lujan*, 504 U.S. at 562). "When a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed than in cases where the plaintiff is the object of government

action." *Id. (quoting Lujan*, 504 U.S. at 562) (emphasis in original) (alterations omitted).  "When the plaintiff is an unregulated party, causation 'ordinarily hinges on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'"  *Food & Drug Admin.*, 602 U.S. at 383 (quoting *Lujan*, 504 U.S. at 562).  To prove causation, the Parent Plaintiffs cannot "rely on speculation about the unfettered choices made by independent actors not before the courts," but instead "must show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff."  *Id.* at 383, 385. "[T]his requirement is in large part designed to ensure that the injury complained of is not the result of the independent action of some third party not before the court."  *Oneida Indian Nation v. United States Dep't of the Interior*, 336 F. Supp. 3d 37, 47 (N.D.N.Y. 2018) (internal quotation marks and citations omitted), *aff'd*, 789 F. App'x 271 (2d Cir. 2019).

Here, Parent Plaintiffs speculate that they will face threats of "being deemed out-of-order, having their speech silenced, [and] losing the balance of their speaking time" during school board meetings, and will be "publicly branded bullies and harassers of children by Defendants for speaking their viewpoint."  Dkt. No. 1 at 168.  First, it is unclear how the publication of the Guidance Letter, without more, could directly cause the Parent Plaintiffs to be publicly branded as bullies and harassers of children.  Second, to the extent that the Parent Plaintiffs could face threats of being deemed out-of-order, being silenced, or losing speaking time, such injuries are too speculative and attenuated to confer standing.  The Parent Plaintiffs improperly infer that Defendants' publication of the Guidance Letter will directly result in any loss of speaking time to the Parent Plaintiffs, as opposed to the independent actions of other school board members, who exercise broad discretion in moderating the public comment portion of school board meetings.

26

*See Alexander v. Sutton*, 747 F. Supp. 3d 520, 546 (E.D.N.Y. 2024) (noting that in limited public fora, such as open school board meetings, "government entities are permitted to restrict the form or manner of speech offered by members of the public, even if such speech addresses the topic or agenda of that forum"); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.").

Consequently, the Parent Plaintiffs fail to demonstrate causation for purposes of Article III standing.

\*   \*   \*

For the reasons set forth above, Plaintiffs lack standing to challenge the constitutionality of the Guidance Letter.[5]   Accordingly, the Complaint is dismissed without prejudice for lack of subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(h)(3); *see also Cortlandt St. Recovery Corp. v. Hellas Telecomms, S.a.r.l*, 790 F.3d 411, 416-17 (2d Cir. 2015) ("A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when (as in the case at bar) the plaintiff lacks constitutional standing to bring the action." (internal quotation marks and citation omitted)).

### B. Preliminary Injunction

Since the Court dismisses Plaintiffs' claims without prejudice for lack of standing, Plaintiffs' motion for a preliminary injunction is denied as moot.  Where "[t]he plaintiff's legal theory itself, rather than the insufficiency of the plaintiff's evidence . . . doom[s] the

---

[5] Because all Plaintiffs have failed to adequately allege an injury in fact, and the Parent Plaintiffs have failed to adequately allege causation, the Court declines to address the remaining elements of Article III standing.

plaintiff's standing, . . . the court *cannot* consider the merits of the preliminary injunction motion and should dismiss the claim altogether." *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 121 (2d Cir. Jan. 10, 2025) (emphasis in original). Such is the case here. *See, e.g.*, *Medicaid Consumers for Continuity of Care v. McDonald*, No. 25-cv-565, 2025 WL 1224189, at *12 (S.D.N.Y. Apr. 24, 2025) (denying preliminary injunction motion as moot after dismissing plaintiffs' claims for lack of standing and ripeness); *Jeannot*, 762 F. Supp. 3d at 240 (denying preliminary injunction motion as moot after dismissing plaintiffs' claims for lack of standing, among other reasons); *Kearns v. Cuomo*, 415 F. Supp. 3d 319, 337 (W.D.N.Y. 2019) (denying preliminary injunction motion as moot because "[t]he Court's determination that it lacks subject matter jurisdiction over [p]laintiff's claims eliminates any possibility that the Court could grant [p]laintiff's request for preliminary injunctive relief"), *aff'd*, 981 F.3d 200 (2d Cir. 2020).

## V.   CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Plaintiffs' motion for a preliminary injunction, Dkt. No. 12, is **DENIED**; and the Court further

**ORDERS** that Defendants' cross-motion to dismiss, Dkt. No. 20, is **GRANTED**; and the Court further

**ORDERS** that the Complaint, Dkt. No. 1, is **DISMISSED without prejudice**; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the Parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: June 8, 2026
Albany, New York

Anne M. Nardacci
U.S. District Judge

28